IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

SOURCEONE DENTAL, INC.,

                    Plaintiff,

        v.

PATTERSON COMPANIES, INC, HENRY                    **JURY TRIAL DEMANDED**
SCHEIN, INC., and BENCO DENTAL
SUPPLY COMPANY,

                    Defendants.

## COMPLAINT

Plaintiff SourceOne Dental, Inc. ("SourceOne"), by and through its undersigned attorneys, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief under state law, against the above-named Defendants, demanding a trial by jury.  For its Complaint against Defendants, SourceOne alleges the following:

### NATURE OF THE CASE

1.        This case involves a conspiracy among Defendants Patterson Companies, Inc. ("Patterson"), Henry Schein, Inc. ("Schein"), and Benco Dental Supply Company ("Benco"), to eliminate the threat of disruptive new entry and competition in the market for the marketing, distribution and sale of dental supplies and dental equipment.  That market is an oligopoly, protected by high barriers to entry, and dominated by the Defendants.  Secure from the threat of new entry, the Defendants have for years charged prices above competitive levels for dental supplies and equipment, in part by resisting and frustrating the efforts of dentists to form Group Purchasing Organizations ("GPOs") for dental supplies and equipment.  GPO formation in adjacent markets such as medical devices has led to substantially lower prices for those products,

1

and the entry of a new competitor that could offer a dental supplies and equipment GPO would have simultaneously led to dramatically lower prices for dental supplies and equipment, and the rapid expansion of that competitor's revenues, profits and market share, all at the expense of the Defendants' revenues and profits.

2.      Formation of a GPO for dental supplies and equipment involves the coordination of dentists and manufacturers of dental supplies and equipment on a single platform.  One half of the key to this coordination problem is held by the state dental associations, voluntary associations of dentists that provide resources and services to support practicing dentists.  One function of state dental associations is to certify and endorse products and services marketed to dentists.  The endorsement of a state dental association is an important promotional input into selling a range of products and services to dentists, including insurance, practice financing, and customer financing.  State dental associations have eagerly sought for many years to provide a GPO for dental supplies and equipment to their members, but have been rebuffed by the Defendants, who control the vast majority of dental supplies and equipment sales and whose revenues and profits would be sharply reduced by the formation of a dental supplies and equipment GPO.

3.      The other half of the key to the coordination problem in forming a dental supplies and equipment GPO is held by Plaintiff SourceOne Dental, Inc. ("SourceOne").  Through an existing and successful e-commerce platform already making sales of dental supplies directly to dentists, SourceOne had already aggregated a significant number of dental supplies manufacturers onto a single platform, SourceOne's website.  By securing the endorsement of state dental associations, who would promote SourceOne's platform to their members as an alternative to purchasing dental supplies and equipment from the Defendants, SourceOne could

2

bring tens of thousands of dentists and hundreds of manufacturers of supplies and equipment together on this platform.  Having secured the agreement of its vendors to offer progressively lower prices to the state associations' members as a function of increasing transaction volume, SourceOne created in 2013 the dental supplies and equipment GPO that had long been desired by dentists and feared by the Defendants.  The endorsement of state dental associations made SourceOne's platform progressively more attractive to manufacturers of dental supplies and equipment, who in turn agreed to participate in increasing numbers, which in turn made the platform more attractive to dentists and state dental associations.  This self-reinforcing positive feedback loop would, if unimpeded by the Defendants' anticompetitive and tortious conduct, have led rapidly to the formation of a nationwide GPO for dental supplies and equipment.  As the representative of one state dental association predicted, the successful launch of SourceOne's GPO would have meant that "it's all over for the big 3" dental supplies and equipment distributors, namely the Defendants.

4.      But the Defendants took swift and coordinated action to eliminate the competitive threat posed by SourceOne, communicating privately and reaching agreement on a plan of action to extinguish the threat of SourceOne's successful launch of a dental supplies and equipment GPO.  In furtherance of this plan the Defendants, in concert with one another and with other, as-yet unknown distributors of dental supplies, boycotted dentists, state dental associations, dental supplies manufacturers, and dental supplies distributors that did business with SourceOne.  This boycott was effective, as thousands of dentists, and scores of state dental associations, dental supplies and equipment manufacturers, and dental supplies and equipment distributors stopped dealing with SourceOne, or were deterred from dealing with SourceOne.

5.      The Defendants' conspiracy is the subject of an ongoing investigation by the Texas and Arizona Attorneys General, and by the Federal Trade Commission.   The Texas Attorney General's investigation resulted in a complaint and consent judgment against Defendant Benco in April 2015 for its role in the conspiracy alleged herein.   That consent judgment obliges Benco to cooperate in the Texas Attorney General's ongoing investigation of the remaining Defendants.

## PLAINTIFF

6.      Plaintiff SourceOne is incorporated under the laws of the State of Arizona, with its principal place of business at 1490 South Price Road, Suite 214, Chandler, Arizona 85286. Through its website, www.SourceOneDental.com, SourceOne markets and sells dental supplies and equipment to dentists, including dentists in the Eastern District of New York.

## DEFENDANTS

7.      Defendant Patterson is incorporated under the laws of the State of Minnesota, with its principal place of business at 1031 Mendota Heights Road, St. Paul, Minnesota 55120. Patterson sells dental supplies and equipment to dentists, including sales to dentists in the Eastern District of New York.  Along with Defendant Henry Schein, Patterson is one of the two largest distributors of dental supplies and equipment in the United States.

8.      Defendant Henry Schein is incorporated under the laws of the State of Delaware, with its principal place of business at 135 Duryea Road, Melville, New York 11747.   Henry Schein sells dental supplies and equipment to dentists, including sales to dentists in the Eastern District of New York.  Along with Defendant Patterson, Henry Schein is one of the two largest distributors of dental supplies and equipment in the United States.

4

9.     Defendant Benco is incorporated under the laws of the State of Delaware, with its principal place of business at 295 Centerpoint Boulevard, Pittston, PA, 18640.  Benco sells dental supplies and equipment to dentists, including sales to dentists in the Eastern District of New York.  Benco is the third largest distributor of dental supplies and equipment in the United States.

## JURISDICTION, STANDING AND VENUE

10.     Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

11.     This Court has subject matter jurisdiction of the Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

12.     Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

13.     This Court has subject matter jurisdiction of the Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.  Each of the Plaintiff's state law claims arise out of the same factual nucleus as the Plaintiff's federal law claims.  In addition, this Court has subject matter jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1332, because total diversity exists between the Plaintiff and the Defendants and the amount in controversy exceeds $75,000.

14.     This Court has personal jurisdiction over each Defendant and venue is proper in the Eastern District of New York under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because each Defendant transacts business and is subject to personal

jurisdiction within the Eastern District of New York.  Each Defendant sells dental supplies and equipment in or for delivery into the Eastern District of New York, and operates showrooms or other places of business with that District.

15.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

THE DENTAL SUPPLIES INDUSTRY

16.     Dental supplies, including x-ray film, restoration materials, hand instruments, and sterilization products, are consumed by dental professionals in the practice of dentistry.  Dental equipment, including x-ray machines, lasers, lights, and vacuums, are also used in the practice of dentistry. The market for dental supplies and equipment in the United States is approximately $10 billion annually.  There are over 120,000 private dental practices in the United States, each purchasing on average more than $80,000 annually of supplies and equipment.  Dental professionals require a broad range of products in the course of treating their patients, and on average use 100 or more different types of supplies each month.  The cost of consumable dental supplies is a substantial component of the revenues of private dental practices.  Most dentists use between 5 and 7 percent of their annual revenue to purchase supplies used in the daily operations of their practice, or nearly 28 percent of their average net income.

17.     There are over 300 dental supplies and equipment manufacturers, none of which offer the full range of dental supplies and equipment necessary to run a dental practice.  Dental supplies and equipment manufacturers sell their products either directly to dental professionals, or to wholesale distributors, including the Defendants.  The vast majority of dental supplies and equipment are sold by manufacturers to wholesale distributors, who in turn resell those supplies and equipment to dental professionals at a substantial profit.  Distributors carry broad product

lines of dental supplies and equipment and employ sales representatives to service their customers.  Manufacturers tend to sell through distributors due to the convenience and "one-stop shopping" that distributors can offer dentists.  Because dentists need a wide range of supplies and equipment in the daily operation of their practices, direct purchases from manufacturers require a complicated and time-consuming series of individual transactions, with additional paperwork and recordkeeping.  In contrast, purchases from distributors allow dentists to consolidate their purchases with a single supplier, with significant savings in time and effort.  The convenience of purchasing dental supplies and equipment through distribution allows distributors to charge a substantial mark-up on the price of dental supplies, often as high as twice the price at which the supplies and equipment are purchased from the manufacturer.

18.     Dental supplies and equipment distribution is a highly concentrated market. Defendants Henry Schein, Patterson and Benco together make approximately 90 percent of all sales in this market.  The Herfindahl-Hirschman index, a commonly accepted measure of market concentration, for the dental supplies distribution market is over 2500, a level characterized as "highly concentrated" by the federal antitrust enforcement agencies.  The high market shares of the Defendants are protected by substantial barriers to entry and expansion of new competitors, including necessary economies of scale in purchasing dental supplies and equipment.

19.     High level employees of the Defendants frequently and privately communicate with their counterparts at competing distributors, at in person meetings, and through electronic mail, text messages and telephone calls.  These communications provide the opportunity for the exchange of competitively-sensitive information among the Defendants.

20.     The substantial market power of the Defendants, and their control over the vast majority of dental supplies and equipment sales, has allowed them to frustrate and delay the

advent of GPOs for dental supplies and equipment.  A GPO is an entity that helps health care providers, such as dentists, realize savings and efficiencies by aggregating purchase volume and using that leverage to negotiate lower purchase prices.  GPOs can also allow participants to share and standardize best practices relating to product selection and use, further benefiting health care providers and consumers alike.

21.     Unlike in the dental supplies and equipment industry, GPOs are common in other health-care related product markets.  Virtually all hospitals, for example, participate in at least one, and usually several, GPOs, and over 70 percent of all non-labor purchases that hospitals make are made through GPOs.  A growing portion of the long-term care, ambulatory care, home care, and physician practice markets are also using group purchasing to help lower costs and improve efficiency.  The benefits of GPOs to health care providers in the form of lower costs and increased efficiency have been substantial, and play a key role in containing the continued increase in the cost of health care.  Researchers have estimated that GPOs result in over $36 billion in annual savings to health care providers, in the form of lower prices and increased efficiency.

22.     GPOs are especially effective in driving price reductions in markets where an oligopoly of sellers confronts a large number of small, decentralized purchasers.  GPO formation allows for the creation of larger, more powerful and sophisticated buyers.  Such buying groups force oligopoly suppliers to bid aggressively against each other in order to obtain large volume sales, often at substantial discounts.  For example, group purchasing of coronary stents – a market then dominated by four firms – led to price reductions of approximately 30 percent within a single year.  For these reasons, oligopoly suppliers such as the Defendants often regard

GPOs as a threat to the stability of their oligopolies and the cause of substantial forced price reductions.

23.     Dentists have historically lacked the option to participate in a GPO for dental supplies and equipment.  One reason that a dental supplies and equipment GPO have not existed is the fragmented, decentralized nature of dental practices, although with the rise of larger dental practice groups this is beginning to change.  By definition, group purchasing requires a degree of coordination among the members of a GPO.  The only entities with both the ability and incentive to solve this coordination problem are the state dental associations, which have the membership roster, administrative infrastructure, and promotional resources necessary to drive and monitor group purchasing organization participation and compliance.  State dental associations have the incentive to promote the rise of group purchasing as a value-added business proposition for their membership, and to earn commission fees from the sale of dental supplies through the group purchasing organization.   However, state dental associations are not in the business of purchasing dental supplies or equipment or facilitating their purchase, and in order to offer a GPO to their members need to partner with an entity, such as SourceOne or the Defendants, that does purchase or facilitate the purchase of dental supplies and equipment.

24.     The primary reason group purchasing organizations have historically not existed for dental supplies and equipment is the opposition of the Defendants.  Despite the state dental associations' active interest in sponsoring the formation of GPOs, and formal requests to the Defendants to participate in such organizations, the Defendants have historically refused to participate in any GPO for dental supplies and equipment.  Defendants have resisted the rise of GPOs to further their own pecuniary interests.  For example, the Defendants refused the 2013 request of the Texas Dental Association ("TDA") to participate in a GPO for the benefit of Texas

dentists.   Formation of a GPO for dental supplies and equipment, and the resulting price discounts to dental practices that would result from GPO formation, would threaten substantially the Defendants' revenues and profits.  Indeed, Defendant Henry Schein identifies in its 10-K the formation of group purchasing organizations as a "risk factor" that would "threaten our ability to compete effectively, which would in turn negatively impact our results of operations."

### SOURCEONE WAS A UNIQUE COMPETITIVE THREAT TO THE DEFENDANTS

25.     SourceOne markets and facilitates the sale of dental supplies and equipment directly to dentists over the internet.   SourceOne is an online marketplace connecting manufacturers and dentists, founded with the objective of making dental supplies and equipment available to dentists directly from manufacturers, bypassing distributors (including the Defendants) at the wholesale level and thereby reducing dental supplies and equipment prices to dentists.   With a broad product line of over 50,000 distinct types of dental supplies and equipment, SourceOne offers dentists a one-stop shopping platform that replicates the convenience and efficiency of purchasing through traditional distributors, but at substantially lower prices than those charged by the Defendants.  From the standpoint of dental supplies and equipment manufacturers, selling through SourceOne is a lower-cost, higher-margin alternative to their own internal sales force, or to selling to the Defendants.   SourceOne's broad product line, low cost structure and low prices make it a unique competitive threat to the Defendants.

26.     SourceOne planned to further compete with the Defendants by partnering with state dental associations to offer dentists the GPO option that had been for so long denied by the Defendants.  SourceOne's GPO platform would have made it a more effective competitor to the Defendants, by allowing it to lower its costs, lower its prices, and gain substantial market share at the Defendants' expense.   Using its existing e-commerce platform, SourceOne builds,

manages and services online sales platforms for state dental associations.  Each platform is customized and branded for each state dental association, and available exclusively to the members of each association.  SourceOne is the owner and operator of each GPO platform, is responsible for contracting with vendors participating in the platform, and retains the net revenues and profits generated by the platform, after paying a small commission fee to the applicable state dental association in exchange for its endorsement and promotion of the platform.  Dentists purchasing supplies and equipment from SourceOne make payment for those supplies to SourceOne when an order is placed, and SourceOne periodically remits a portion of that payment to the vendor whose supplies were purchased, after deducting SourceOne's profit margin on the transaction.  All of the dental supplies and equipment sold on SourceOne's GPO platforms, and on SourceOneDental.com, are authentic, non-counterfeit products, intended for sale by their manufacturers in the United States, purchased through authorized distribution channels, and in conformity with applicable federal regulations.

27.     Adoption of a GPO model would allow SourceOne to leverage the buying power of large groups of dentists to offer even lower prices to dentists, and even lower selling costs to manufacturers, than were previously available through SourceOne.  Customers who switch from purchasing their dental supplies and equipment from the Defendants to purchasing their supplies from a GPO operated by SourceOne save on average over 30 percent on their supplies expenditures.

28.     In October 2013, SourceOne launched TDA Perks Supplies, an online sales platform and GPO for the dental professional members of the TDA.  The platform was an immediate success, with rapidly increasing membership and sales.  Many state dental associations from around the country observed the success of TDA Perks Supplies and also

planned to partner with SourceOne to offer GPOs to their members.  Because SourceOne's GPO contracts with its vendors require those vendors to offer progressively lower prices based on increasing sales volumes across all of SourceOne's GPOs, each state association interested in partnering with SourceOne had an interest in seeing that other state associations also partnered with SourceOne, and these state associations communicated their common interest in partnering with SourceOne to one another and to SourceOne.  Through SourceOne's innovative entry and expansion into the dental supplies and equipment industry, the dental supplies and equipment GPO that the Defendants had long resisted was about to come into existence nationwide.

## THE DEFENDANTS TARGETED SOURCEONE WITH AN ILLEGAL BOYCOTT

29.    The Defendants understood that SourceOne's GPO platform, including TDA Perks Supplies, with its disruptive new business model, directly competed with them, and perceived a competitive threat based on the lower prices offered by SourceOne's GPO platform for many of the same goods offered by the Defendants.  The lower prices offered by SourceOne's GPO platform, including TDA Perks Supplies, threatened to induce dentists to switch some or all of their supplies and equipment purchases from the Defendants to SourceOne's GPO platform, or to force the Defendants to lower the prices at which they sold dental supplies and equipment to dentists, or both.

30.    Building on their historic culture of cooperation and communication, the Defendants engaged in ongoing communications over several months, beginning in October 2013 and continuing through at least April 2015, about SourceOne's GPO platform, including TDA Perks Supplies.  On information and belief, the Defendants shared information about market participants' reactions to SourceOne's entry, they collectively developed a response, and they provided reassurances to market participants about that collective response.    The

12

Defendants negotiated, reached and implemented this collusive response to SourceOne's formation of a GPO because, as the Defendants' themselves explained to numerous marketplace participants, SourceOne posed an existential threat to the Defendants, their revenues, and profits.

31.    The Defendants' collective response to the competitive threat posed by SourceOne's GPO platform, including TDA Perks Supplies, was three-fold.   First, the Defendants agreed with one another, and with as-yet unknown distributors of dental supplies and equipment,  to pressure manufacturers and other distributors to discontinue supplying SourceOne and SourceOne's GPO platform, including TDA Perks Supplies.   The Defendants agreed to threaten manufacturers who allowed their products to be sold through SourceOne with having their products "shelved," or not actively promoted, by the Defendants.   Because the Defendants comprise an overwhelmingly dominant share of dental supplies and equipment sales, these threats were successful in causing manufacturers to stop allowing their products to be sold through SourceOne.   Second, the Defendants agreed with one another to boycott the trade shows and annual meetings of the TDA and other state dental associations which were or were considering doing business with SourceOne.   Because revenues from these trade shows and annual meetings make up a substantial portion of the operating income of state dental associations, these threats – which were actually carried out on several occasions, causing substantial damage to those state associations – were effective in deterring state associations from endorsing or adopting SourceOne's GPO platform.   Third, the Defendants agreed to boycott dentists who dealt with SourceOne, by withholding from those dentists necessary service for those dentists' equipment.

32.    The Defendants' anticompetitive and tortious conduct had no legitimate business justification.   The only rationale for the Defendants' boycott of manufacturers and dental

associations that deal with SourceOne is the elimination of lower-cost, high quality and innovative competition from SourceOne, with the purpose and actual effect of artificially maintaining or increasing the prices paid by dentists for dental supplies and equipment.

**The Defendants' Boycott of Manufacturers and Distributors that Dealt With SourceOne**

33.     As the first part of their collusive response to SourceOne's successful launch of its GPO platform, including TDA Perks Supplies, the Defendants agreed with one another to pressure other distributors and manufacturers to discontinue supplying SourceOne and SourceOne's GPO platform, including TDA Perks Supplies.  Pursuant to this agreement, the Defendants contacted other distributors and manufacturers to pressure those entities to stop supplying dental supplies and equipment to SourceOne and SourceOne's GPO platform, including TDA Perks Supplies.  The Defendants threatened to reduce or stop entirely their purchases from manufacturers that did business with SourceOne and SourceOne's GPO platform, including TDA Perks Supplies.

34.     Between October 2013 and April 2014, the dental supplies sold by SourceOne came either directly from manufacturers, or through two distributors, Arnold Dental Supply ("Arnold") and DDS Dental Supplies ("DDS").  The manufacturers that supplied SourceOne were largely immune from the Defendants' boycott threats, as those manufacturers generally sold no dental supplies to the Defendants, and thus had no sales to lose as a result of dealing with SourceOne.  The manufacturers that supplied SourceOne through Arnold and DDS were, however, vulnerable to the Defendants' pressure, as those manufacturers generally made substantial sales to the Defendants, in addition to Arnold and DDS.

35.     Between October 2013 and at least April 2014, the Defendants exerted substantial pressure on manufacturers of dental supplies supplying SourceOne and SourceOne's GPO

platform through Arnold and DDS to stop dealing with SourceOne, through Arnold and DDS or otherwise.  Dozens of product lines, including many of SourceOne's most important and highest-selling items, were removed by Arnold and DDS, at the request of these manufacturers, from SourceOne as a result of the Defendants' boycott of manufacturers dealing with SourceOne.  On several occasions, Arnold and DDS informed SourceOne that the manufacturers whose products they were removing from SourceOne and its GPO platform were reacting to pressure, applied by the Defendants, to stop doing business with SourceOne.  For example, DDS informed SourceOne that DMG America, a manufacturer of dental restoration products, had told DDS that DMG America was pulling its products from SourceOne and its GPO platform due to pressure applied by Patterson and Schein.  Other manufacturers who instructed Arnold and DDS to remove their products from SourceOne and its GPO platform include Sultan Healthcare, Danaher, Heraeus Kulzer, Ivoclar Vivadent, Quala, and Septodont.  By April 2014, SourceOne had lost access to thousands of key dental supplies, and at least 75 percent of the top selling products on the TDA Perks Supplies and SourceOneDental.com platforms.  The same month, both Arnold and DDS informed SourceOne that they would no longer deal with SourceOne.  DDS explained to SourceOne that this decision was the result of the pressure applied by Defendants on manufacturers supplying DDS.

36.    The decision, in many cases simultaneous, of these dental supplies manufacturers to discontinue dealing with SourceOne was unprecedented and inexplicable in the absence of a conspiracy among the Defendants to exert coordinated pressure on multiple manufacturers simultaneously to pull their products from SourceOne and its GPO platform.  These manufacturers had voiced no concerns with SourceOne or its GPO platform until October 2013, when they began requiring Arnold and DDS to discontinue the availability of their products to

SourceOne, and had enjoyed increasing sales and revenues through SourceOne's platform. Similarly, before October 2013, both Arnold and DDS had realized increasing sales and revenues through dealing with SourceOne, and were highly motivated to continue to grow their business with SourceOne and its GPO platform.  At the same time as their products were being removed from SourceOne and its GPO platform, these manufacturers continued to sell the products they pulled from SourceOne on other electronic marketplaces, which were less of a competitive threat to the Defendants.

37.   Significantly, while many manufacturers that rely on the Defendants for the distribution of their products pulled their products from SourceOne between October 2013 and April 2014, manufacturers that had historically sold directly to dentists, thereby bypassing the Defendants and thus generally immune to their boycott threats, generally did not pull their products from SourceOne in that period.

38.   The manufacturers of dental supplies that the Defendants coerced into boycotting SourceOne are also manufacturers of equipment, and the Defendants' boycott had the purpose and effect of deterring manufacturers from selling equipment, as well as supplies, through SourceOne or SourceOne's GPO platforms.

39.   After the Defendants' boycott was successful in forcing Arnold and DDS to discontinue their sales to SourceOne, SourceOne sought alternative distributors to supply it with dental supplies, and with equipment.  Candidate distributors, including DHP Dental ("DHP"), were deterred from dealing with SourceOne by the Defendants' demonstrated success in forcing manufacturers to pull their products from SourceOne and its GPO platform.  DHP met with managers from several dental supplies and equipment manufacturers, in this way learned of the

16

effect of the Defendants' boycott in forcing manufacturers to stop dealing with SourceOne, and conveyed this information to SourceOne.

**The Defendants' Boycott of State Dental Associations that Dealt With SourceOne**

40.    Despite the Defendants' boycott of manufacturers and distributors that did business with SourceOne and TDA Perks Supplies, state dental associations outside of Texas communicated to SourceOne, and to one another, substantial interest in offering SourceOne's GPO platform to their members as well.

41.    To deter state dental associations from dealing with SourceOne, and thereby to forestall the significant competitive threat that SourceOne's GPO platform posed to their revenues and profits, the Defendants agreed with one another to break with their traditional practice of attending the trade shows of state dental associations and to boycott the trade show and annual meeting of state dental associations which were, or were considering, doing business with SourceOne.

42.    The Defendants' conspiracy was successful in deterring state dental associations from proceeding with their planned partnership with SourceOne.  The Defendants' boycott of the state association trade shows threatened to impose substantial financial losses on state associations adopting SourceOne's GPO platform, because revenues from those trade shows are substantial components of a state association's budget, and the participation of the Defendants is essential to a successful trade show.  Confronted with the choice of partnering with a SourceOne weakened by the Defendants' boycott of manufacturers dealing with SourceOne, and enduring the consequences of Defendants' boycotts of their own trade shows, or in the alternative, acceding to the Defendants' demands that they refrain from doing business with SourceOne, the state dental associations, against their will, almost uniformly chose to refrain from doing

17

business with SourceOne.   As a result, SourceOne's GPO platform has been adopted by only three state dental associations, rather than the scores of state dental associations that would likely have adopted the platform but-for the Defendants' illegal conduct.

43.   In March 2014, Patterson representatives met privately with TDA representatives and demanded that the TDA end its contractual relationship with SourceOne Dental and TDA Perks Supplies, or Patterson would no longer attend TDA's annual trade show, or advertise in TDA's publications.  A month later, in April 2014, Schein representatives met privately with TDA representatives and delivered the same threats and demands.

44.   When TDA did not accede to the Defendants' demands, the Defendants' boycotted the TDA's annual meeting and trade show, held between April 30 and May 3, 2014. The Defendants' decision not to attend the TDA's annual meeting and trade show was historically unprecedented, not announced publicly by the Defendants in advance, and risky, as each Defendant stood to lose substantial revenues from sales at the trade show and afterwards if its main rivals, the other Defendants, did not also boycott the show.  Dental association trade shows are a substantial source of revenue, promotion and goodwill for dental supplies distributors, including the Defendants.  The Defendants canceled their reserved spaces right before the 2014 TDA show, forfeiting significant deposits for prime location and associated promotions, all of which had been arranged well in advance and was non-refundable.  Smaller distributors – not part of the Defendants' conspiracy – attended and increased their revenues and market share at the Defendants' expense.

45.   Dozens of dental supplies and equipment manufacturers also stayed away from the TDA annual meeting and trade show, pulling out – like the Defendants – at the last minute, without warning, and at significant commercial expense and risk.  Many of these manufacturers

explained to the TDA that their decision to pull out of the annual meeting and trade show was a result of pressure applied by Patterson and Schein to boycott the TDA for its support of SourceOne Dental's GPO platform.

46.     As a result of the Defendants' boycott, and the concerted pressure they brought to bear on dental supplies and equipment manufacturers to similarly boycott the TDA's 2014 annual meeting and trade show, that meeting and trade show had significantly fewer exhibitors, and was significantly less profitable for the TDA, than previous shows.  The Defendants' boycott of the TDA was specifically intended to send a message to TDA and to other state dental associations, many of which were actively interested in doing business with SourceOne, to refrain from doing so or suffer damages similar to those inflicted upon the TDA.

47.     The Defendants' tactics were successful in coercing state dental associations across the county into abandoning their plans to endorse SourceOne and to endorse and promote SourceOne's GPO platform to their members.  After the boycott of the TDA annual meeting and trade show, other state associations that had expressed interest in promoting SourceOne's GPO platform to their members changed course and declined to do so, citing concerns about the coordinated pressure of Defendants and the risk of being targeted with a boycott similar to the one aimed at the TDA.

48.     One state dental association that did go forward with a business relationship with SourceOne, albeit after substantial delays caused by their concerns with being targeted with a boycott similar to the one aimed at the TDA, was the Arizona Dental Association ("AZDA").  After AZDA agreed to endorse SourceOne's GPO platform for the benefit of Arizona dentists, the Defendants retaliated against the AZDA by boycotting its annual meeting and trade show in March 2015.  The Defendants were aware at the time of their boycott of an existing, enforceable

contract between SourceOne and the AZDA calling for the promotion and endorsement of SourceOne's GPO platform, due to last-minute attempts by the AZDA to ward off the threatened boycott through negotiations with the Defendants.  In these negotiations, AZDA disclosed the existence of its contract with SourceOne, and offered to make certain changes to the GPO platform that SourceOne had developed for the benefit of its members, including to the name and trade dress of the platform, if the Defendants would stay their hand and abandon their planned boycott.  Specifically, AZDA agreed to distance its name and associated goodwill from the marketing of SourceOne's GPO platform, thereby diluting the benefit of AZDA's endorsement of SourceOne's GPO platform, making that platform less attractive to AZDA's members and a less effective competitor to the Defendants.  The Defendants were unappeased, and boycotted the AZDA trade show anyway.  As with the boycott of the TDA a year earlier, the Defendants were the only distributors that did not attend this meeting, and their smaller rivals that did attend gained revenue and market share at the Defendants' expense.  As with the earlier TDA boycott, the Defendants inflicted substantial damage against the AZDA and its trade show, causing AZDA lost revenue and profits as a result.  Chastened by the Defendants' boycott, the AZDA has not since actively promoted SourceOne's GPO platform to its members.

49.     Another state dental association, the Louisiana Dental Association ("LDA"), desired to simultaneously do business with SourceOne and to avoid the impact of the Defendants' boycott.  To achieve this, the LDA planned to announce its endorsement of SourceOne's GPO platform only *after* the annual LDA meeting and trade show, to be held in April of 2015, despite the fact that SourceOne was compelled to offer an expensive indemnity of the LDA against lost revenues caused by a boycott of the Defendants.  Nevertheless, Defendants Patterson and Schein learned of the LDA's planned business relationship with SourceOne –

which had been approved by the LDA Board of Directors in January 2015 – and in April 2015 threatened to boycott the LDA's annual meeting and trade show if the LDA did not abandon its planned business relationship with SourceOne.  With the example of the Defendants' boycott of the TDA and the AZDA fresh in their minds, and with members voicing a concern that such a boycott of the LDA was certain to follow if the LDA went through with its plans to deal with SourceOne, the LDA abandoned plans to endorse SourceOne's GPO platform.

50.     The LDA was not alone in changing its plans to endorse SourceOne's GPO platform as a result of the Defendants' threats to boycott state associations that dealt with SourceOne.   Other associations, including the California Dental Association, the Colorado Dental Association, and dozens more, were deterred from endorsing SourceOne's GPO platform by the Defendants' illegal and tortious conduct.  For example, after enthusiastically reacting to the possibility of an endorsement of SourceOne's GPO platform, the Colorado Dental Association specifically stated to SourceOne in January 2015 that it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA [Colorado Dental Association] and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it went ahead with its contemplated endorsement of SourceOne's platform.   Like dozens of other state dental associations, the Colorado Dental Association abandoned plans to deal with SourceOne due to the Defendants' illegal and anticompetitive conduct.

51.     The Defendants knew that SourceOne had a contract with TDA and AZDA, and specifically intended to induce TDA and AZDA to terminate those contracts.  Likewise, the Defendants knew that SourceOne was in discussions with many state dental associations, including the LDA, the California Dental Association, the Colorado Dental Association, and

dozens of others, and specifically intended to induce those state dental associations to not deal with SourceOne.

52.     The Nevada Dental Association ("NDA") did endorse SourceOne's GPO platform, but only because the NDA has no trade show for the Defendants to boycott, and is thus largely immune from their primary coercive strategy.

## The Defendants' Boycott of Dentists Dealing With SourceOne

53.     Defendants also agreed to boycott dentists who purchased supplies from SourceOne by withholding service and repair for installed equipment at those dental practices. Upon learning that a dentist was purchasing from SourceOne, the Defendants have routinely threatened not to provide necessary service and repair to "disloyal" dentists, or to do so only at higher prices or with significant delays.   These threats imperil the viability of the affected dentists' practices, and the quality and efficacy of the care provided by those dentists.   As a result of these threats, dentists have curtailed or eliminated their purchases of dental supplies and equipment from SourceOne, or refrained from purchasing from SourceOne.

54.     Defendants also actively misrepresent to dentists the nature and quality of the dental supplies and equipment sold by SourceOne.   Defendants misrepresent SourceOne's products as expired, counterfeit, altered, sold through unauthorized distribution channels, or otherwise unfit for their intended purpose.   These representations are false.   Defendants made these misrepresentations in an effort to convince dentists that purchasing dental supplies and equipment at discounted prices from new entrants, and particularly from SourceOne, was risky and undesirable.   Many dentists curtailed or discontinued entirely their purchases from SourceOne after the Defendants made these misrepresentations, which were delivered privately to dentists and are thus difficult for SourceOne to detect and rebut.

22

**THE TEXAS ATTORNEY GENERAL'S INVESTIGATION OF THE DEFENDANTS**

55.    In 2014, the Texas Attorney General opened an investigation of the Defendants'
conduct as alleged above.  Pursuant to Civil Investigative Demands ("CIDs") issued in August
2014, the Defendants were compelled to produce internal business documents and electronic
mail, among other documents, relating to the conduct alleged above to the Texas Attorney
General.  The Texas CIDs identify by name only three distributors of dental supplies products,
namely, the Defendants.  The Arizona Attorney General issued CIDs in its investigation of the
Defendants in October 2014.

56.    In April 2015, the Texas Attorney General filed a complaint against Defendant
Benco, alleging Benco's participation in the conspiracy alleged above.  A true and correct copy
of this complaint is attached as Exhibit A, and is hereby incorporated by reference.   On
information and belief, the documents and information gathered by the Texas Attorney General
in his investigation of the Defendants support and prove the allegations in his complaint.  The
Texas Attorney General the same day entered into a consent judgment with Benco, which
obligates Benco to cooperate with the Texas Attorney General's ongoing investigation into the
remaining Defendants.  Benco was also obligated to pay the Texas Attorney General $300,000.
A true and correct copy of this consent judgment is attached as Exhibit B.

57.    The Texas Attorney General's law enforcement action against Benco did not
remedy the effects of the Defendants' conspiracy, or signal to state dental associations that it was
safe to deal with SourceOne.  As the representative of one state dental association that has been
deterred from dealing with SourceOne explained to SourceOne in April 2015: "[H]ave suits also
been filed against Patterson and Schein?  If not, where do things stand as far as the actions of
those companies?  That's not to say that it isn't significant that the State successfully clipped

Benco's wings.  But, if there isn't a similar threat to Schein and Patterson, there's still quite a problem, I'd think."

58.     The Federal Trade Commission subsequently opened an investigation of the Defendants for their involvement in these matters.  That investigation is active and ongoing.

## RELEVANT MARKET

59.     One relevant antitrust market in which to evaluate the Defendants' conduct is the market for the marketing, distribution and sale of dental supplies in the United States.

60.     One relevant market in which to assess the Defendants' conduct is in the market for the marketing, distribution and sale of the full line of dental supplies in the United States. Due to substantial economies of scope, or savings from "one stop shopping," in the marketing, distribution and sale of dental supplies, dentists generally prefer to purchase dental supplies from a supplier that can offer a full line of dental supplies, including acrylics, alloys and amalgam, anesthetics, burs, cements and liners, disposable paper and cotton supplies, endodontic products, handpieces, impression products, instruments, orthodontics, preventive products, retraction materials, surgical products, waxes and x-ray products.  Buying these goods from a single seller significantly reduces dentists' transaction costs, because purchases of dental supplies are characterized by regular repeat purchases, each of which is of relatively small value.  Purchasing dental supplies from full-line sellers offers dentists convenience and service characteristics that set full-line sellers apart from other sellers, including an efficient way to obtain dental supplies through centralized warehousing, delivery, and billing services that enable dentists to avoid carrying large inventories, dealing with a large number of vendors, and negotiating numerous transactions.  Because dentists strongly prefer to purchase dental supplies from a single firm, firms selling only a partial line of dental supplies will not compete effectively with firms

24

supplying the full line of dental supplies.  For all of these reasons, a hypothetical monopolist supplier of a full-line of dental supplies would be able to profitably increase the price of the full line of dental supplies above the competitive level, as shown by the Defendants' ability to charge supra-competitive prices for the full-line of dental supplies that each carries.

61.    Alternatively, the Defendants' conduct may be assessed in the market for the marketing, distribution and sale of specific types of dental supplies in the United States.  Because the various types of dental supplies, including acrylics, alloys and amalgam, anesthetics, burs, cements and liners, disposable paper and cotton supplies, endodontic products, handpieces, impression products, instruments, orthodontics, preventive products, retraction materials, surgical products, waxes and x-ray products, are not functionally interchangeable from the standpoint of consumers, a hypothetical monopolist of each such product or product type could profitably increase the price of each such product or product-type above the competitive level.

62.    Another relevant market in which to evaluate the Defendants conduct is the market for the marketing, distribution and sale of durable dental equipment in the United States, including amalgamators, amalgam separators, curing lights, operatory lights, x-ray equipment, lasers, sterilization equipment, vacuum systems, and other types of equipment used in dental practices.  Equipment used in dental practices is generally customized for the needs of those practices, no other products or product types significantly constrain the prices of dental equipment, and a hypothetical monopolist of a full line of dental equipment, or of each such product or product type, could profitably increase the price of each such product or product-type above the competitive level.

63.    The Defendants collectively have substantial market power in the relevant market or markets, however defined.

25

## DEFENDANTS' UNLAWFUL CONDUCT

64.    The Defendants agreed with one another, and with other distributors presently unknown to SourceOne, to boycott dentists, manufacturers and state dental associations that dealt with, or considered dealing with, SourceOne.  The Defendants had a conscious commitment to a common scheme to prevent the emergence of a viable GPO competitor, to exclude SourceOne from the relevant market, and to eliminate SourceOne as an effective competitor, by virtue of this agreement and the overt acts taken pursuant to this agreement.  Defendants took overt acts in furtherance of this conspiracy, including the anticompetitive and tortious conduct alleged herein.

65.    Injury to SourceOne was the direct, foreseeable and intended result of the Defendants' boycott of dentists, manufacturers and state dental associations.  The Defendants' boycott simultaneously harmed SourceOne and consumers in the relevant market by excluding SourceOne and thereby artificially maintaining or increasing the prices paid by dentists for dental supplies.  Although the mechanism of injury to SourceOne and to dental professionals (and thereby to consumers) is the same, the damages caused by Defendants' boycott to dental professionals in the form of higher prices is distinct from, and not duplicative of, the damages caused to SourceOne, in the form of lost profits and damaged equity and goodwill.  SourceOne is the most direct victim of the Defendants' boycott, and apportionment of the harms suffered by SourceOne and those suffered by less-direct victims of the boycott, including state dental associations, will not be difficult.

## SOURCEONE'S CLAIMS FOR RELIEF

### COUNT ONE:

### The Defendants Have Unreasonably Restrained Trade

66.    Plaintiff hereby restates Paragraphs 1 through 65 of this Complaint.    The Defendants' conduct as alleged herein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Arizona Uniform State Antitrust Act, ARIZ. REV. STAT. ANN. §§ 44-1401 *et seq*, and the Donnelly Act, N.Y. GEN. BUS. LAW §§ 340-347.

67.    The Defendants' agreement with one another, and with as-yet unknown co-conspirators, that each would boycott state dental associations, dentists, dental supplies distributors, and dental supplies manufacturers doing business with SourceOne was a *per se* unlawful group boycott, or in the alternative, was an unlawful restraint under the rule of reason.

68.    This conduct has damaged SourceOne in the form of lost profits, and damaged equity and goodwill, diminishing the value of SourceOne as a going concern.

### COUNT TWO:

### Tortious Interference with Prospective Business Relations

69.    Plaintiff hereby restates Paragraphs 1 through 65 of this Complaint.    The Defendants' conduct as alleged herein constitutes tortious interference with SourceOne's prospective business relations with state dental associations, including (i) the Louisiana Dental Association, the California Dental Association, the Colorado Dental Association, and dozens of other state dental associations, as will be proven at trial, that were each deterred from endorsing and promoting SourceOne's GPO platform to their members by the Defendants' unlawful and anticompetitive conduct; and (ii) the Texas Dental Association and the Arizona Dental Association, each of which would have more actively promoted SourceOne's GPO platform to

27

their members but-for the Defendants' conduct.  But-for the Defendants' boycott of these and other state dental associations, dentists, dental supplies distributors, and dental supplies manufacturers doing business with SourceOne, SourceOne had a reasonable expectancy of prospective business relations in 2014 and beyond with these state dental associations that would have led to their endorsement and promotion of SourceOne's GPO platform to their members. Through their boycott of these and other state dental associations, dentists, dental supplies distributors, and dental supplies manufacturers doing business with SourceOne, the Defendants interfered with SourceOne's reasonable expectancy of prospective business relations with these state dental associations, causing SourceOne injury.

70.     The Defendants' conduct in (i) withholding service from dentists dealing with SourceOne and (ii) misrepresenting the nature and quality of SourceOne's products to all dentists, has deterred dentists from dealing with SourceOne and constitutes tortious interference with SourceOne's prospective business relations with those dentists.  SourceOne has lost substantial revenues and profits due to this conduct of the Defendants.

71.     This conduct has damaged SourceOne in the form of lost profits, and damaged equity and goodwill, diminishing the value of SourceOne as a going concern.

## COUNT THREE:

### Civil Conspiracy

72.     Plaintiff hereby restates Paragraphs 1 through 65 of this Complaint.  Each of the Defendants' conduct as alleged herein constitutes civil conspiracy.

73.     This conduct has damaged SourceOne in the form of lost profits, and damaged equity and goodwill, diminishing the value of SourceOne as a going concern.

## COUNT FOUR:

### Aiding and Abetting

74.     Plaintiff hereby restates Paragraphs 1 through 65 of this Complaint.  The conduct of each of the Defendants as alleged herein constitutes aiding and abetting of the other Defendants' ongoing tortious and anticompetitive conduct aimed at SourceOne.

75.     This conduct has damaged SourceOne in the form of lost profits, and damaged equity and goodwill, diminishing the value of SourceOne as a going concern.

### REQUEST FOR RELIEF

76.     To remedy these illegal acts, Plaintiff requests the Court:

a.      Enter an Order permanently enjoining the Defendants from entering into agreements to pressure third-parties, including dental supplies manufacturers and state dental associations, from doing business with SourceOne;

b.      Award compensatory and trebled damages in favor of the Plaintiff and against all Defendants, jointly and severally, and punitive damages, including all interest thereon;

c.      Award Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.      Any such further relief as the Court deems appropriate.

/S/ JACK G. STERN

JACK G. STERN (Bar Number JS-1394)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
7th Floor
New York, NY 10022
(212) 446-2300

WILLIAM A. ISAACSON
JAMES P. DENVIR
CHRISTOPHER G. RENNER
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
(202) 237-2727