**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

SOURCEONE DENTAL, INC.,

                Plaintiff,

        v.

PATTERSON COMPANIES, INC, HENRY
SCHEIN, INC., and BENCO DENTAL
SUPPLY COMPANY,

              Defendants.

Civil Action No.15-cv-05440-BMC-GRB

**JURY TRIAL DEMANDED**

**FILED UNDER SEAL
ATTORNEYS EYES ONLY**

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT ON SOURCEONE'S CLAIMS**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................................ 1

II.     Statement of Facts ...................................................................................................... 2

    A.  Industry Overview. ................................................................................................ 2

    B.  SourceOne's innovative business model threatened to disrupt the dental supplies
        distribution market. ............................................................................................. 6

    C.  Defendants conspired to eliminate SourceOne as a competitive threat. ..................... 9

        1.  In furtherance of their conspiracy, Defendants boycotted the TDA. ........................ 11

        2.  In furtherance of their conspiracy, Defendants boycotted the AzDA. ....................... 23

        3.  In furtherance of their conspiracy, Defendants boycotted manufacturers and
            dealers supplying SourceOne. ........................................................................... 27

        4.  In furtherance of their conspiracy, Defendants threatened dentists purchasing
            from SourceOne. ............................................................................................ 31

        5.  Defendants' conspiracy caused injury and damage to SourceOne. ........................... 33

III.    Statement of Law ..................................................................................................... 37

    A.  Summary Judgment Standard ................................................................................ 37

    B.  Proof of an Agreement Under Section One of the Sherman Act. ................................ 37

        1.  Conspiracy Evidence. ..................................................................................... 38

        2.  Matsushita Did Not Rewrite Rule 56. ................................................................ 40

    C.  Proof of Participating in and Withdrawal From a Section One Agreement. .................. 42

        1.  The Scope of a Conspiracy is an Issue of Fact. .................................................... 42

        2.  Knowledge of a Conspiracy Does Not Require Knowledge of the Whole. ................. 44

        3.  Liability for the Acts Performed by Co-Conspirators is Joint and Several. ................ 44

        4.  Withdrawal from a Conspiracy Requires Affirmative Steps. .................................. 45

        5.  The Test for Participating in a Conspiracy is Slight Participation. ........................... 45

IV.    Argument ....................................................................................................46

    A.  The Existence of an Antitrust Conspiracy is a Disputed Issue of Material Fact. .............46

        1.  Unambiguous Evidence of an Agreement among Defendants and Co-Conspirators. .............................................................................................46

        2.  Circumstantial Evidence of an Agreement among Defendants and Co-Conspirators. .............................................................................................52

            a)  Defendants Engaged in Consciously Parallel Conduct That Was Against Their Independent Interest Absent Collusion. ......................................................52

            b)  Defendants Frequently Communicated About the Conspiracy. ...........................59

            c)  Defendants Had a Consciousness of Obligation to One Another. ........................66

            d)  Defendants' Conduct Was Contrary to Unilateral Self-Interest. ..........................68

            e)  Defendants Had a Motive to Conspire to Jointly Boycott. ...................................70

            f)  Defendants All Chose the Same Coercive Methods with the Same Coercive End.................................................................................................73

        3.  Defendants' Information Exchange Violated the Rule of Reason.............................78

        4.  Defendants Are Not Entitled to Summary Judgment on Damages............................82

    B.  Defendants Are Not Entitled to Summary Judgment on SourceOne's State Law Claims. ......................................................................................................83

        1.  Arizona Law Applies to SourceOne's State Common Law Claims. ..........................83

        2.  There Are Material Factual Disputes as to SourceOne's Tortious Interference Claims. ........................................................................................................85

            a)  Defendants' Conduct Was Improper. ...................................................................86

            b)  SourceOne Had Valid Business Expectancies......................................................88

            c)  Defendants' Conduct Injured SourceOne. ...........................................................90

        3.  There Are Material Factual Disputes as to SourceOne's Civil Conspiracy Claim.............................................................................................................91

        4.  There Are Material Factual Disputes as to SourceOne's Aiding and Abetting Claim.............................................................................................................92

V.   Conclusion ......................................................................................................93

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ................................................................ 80

*Am. Column & Lumber Co. v. United States*,
257 U.S. 377 (1921) ............................................................ 78, 81

*Ambook Enters. v. Time Inc.*,
612 F.2d 604 (2d Cir. 1979) ........................................................ 38

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946) ................................................................ 38

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ........................................................ 39

*Anderson News, L.L.C. v. American Media, Inc.*,
123 F. Supp. 3d 478 (S.D.N.Y. 2015) ................................... 64, 65, 66, 67

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................ 37

*Antwerp Diamond Exchange of America v. Better Business Bureau of Maricopa County, Inc.*,
637 P.2d 733 (Ariz. 1981) .......................................................... 89

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) ................................................... *passim*

*Arista Records, Inc. v. Mp3Board, Inc.*,
2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ........................................ 84

*Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*,
826 F.2d 1335 (3rd Cir. 1987) ...................................................... 41

*Baker v. Stewart Title & Trust of Phoenix*,
5 P.3d 249 (Ariz. App. 2000) ....................................................... 91

*Bar J Bar Cattle Co. v. Pace*,
763 P.2d 545 (Ariz. App. 1988) ................................................. 85, 86

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................ 66, 67

*Brown v. Pro Football, Inc.*,
  518 U.S. 231 (1996) ............................................................................ 39

*Capital Imaging Assoc. v. Mohawk Valley Med. Assocs.*,
  996 F.2d 537 (2d Cir. 1993)........................................ 40, 52, 61,79, 81

*Cason-Merenda v. Detroit Med. Ctr.*,
  862 F. Supp. 2d 603 (E.D. Mich. 2012) .......................................... 79, 82

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  458 F.3d 1073 (10th Cir. 2006)...................................... 40, 50, 51, 73

*Clayton v. Richards*,
  47 S.W. 3d 159 (Tex. App. 2001) ...................................................... 93

*COC Servs., Ltd. v. CompUSA, Inc.*,
  130 S.W.3d 654 (Tex. App. 2004) ...................................................... 90

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
  417 S.W.3d 909 (Tex. 2013)............................................................. 85

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................ 49

*Cooney v. Osgood Mach., Inc.*,
  81 N.Y.2d 66 (1993). ........................................................................ 84

*Doe v. Boys Clubs of Greater Dallas, Inc.*
  907 S.W.2d 472 (Tex. 1995). ............................................................. 90

*Dube v. Likins*,
  167 P.3d 93 (Ariz. App. 2007) .............................................. 88, 89, 90

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992). ........................................................................ 40

*Emjayco v. Morgan Stanley & Co., Inc.*,
  1996 WL 452266 (S.D.N.Y. Aug. 8, 1996) ........................................ 84

*Fears v. Wilhelmina Model Agency, Inc.*,
  2004 U.S. Dist. LEXIS 4502 (S.D.N.Y. March 23, 2004)...................... 55

*First Nat'l Bank of Ariz. v. Cities Serve. Co.*,
  391 U.S. 253 (1968) ........................................................................ 70

*First United Pentecostal Church of Beaumont v. Parker*,
   514 S.W.3d 214 (Tex. 2017)....................................................................... 91

*Fishman v. Wirtz*,
   1981 WL 2153 (N.D. Ill. Oct. 28, 1981)...................................................... 63

*Gainesville Utilities Dep't v. Fla. Power & Light Co.*,
   573 F.2d 292 (5th Cir. 1978)....................................................................... 63

*Hill v. Heritage Resources, Inc.*,
   964 S.W.2d 89 (Tex. App. 1997) ................................................................ 87

*Hyde v. United States*,
   225 U.S. 347 (1912) .................................................................................... 45

*In re Adelphia Commc'ns Corp.*,
   365 B.R. 24 (Bankr. S.D.N.Y. 2007) .......................................................... 84

*In re Coordinated Pretrial Proceedings in Petroleum Prods Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990)....................................................................... 64

*In re Currency Conversion Fee Antitrust Litig.*,
   265 F. Supp. 2d 385 (S.D.N.Y. 2003) ........................................................ 68

*In re Currency Conversion Fee Antitrust Litig.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011) ........................................ 39, 54, 66, 69

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)................................................ 43, 44

*In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*,
   681 F. Supp. 2d 141, 167 (D. Conn. 2009). ........................................ 61, 63

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)........................................... 39, 40, 41, 81

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002)................................................ 38, 40, 52

*In re High Pressure Laminates Antitrust Litig.*,
   2006 U.S. Dist. LEXIS 29431 (S.D.N.Y. May 15, 2006)........................ 62, 69

*In re Linerboard Antitrust Litig.*,
   504 F. Supp. 2d 38, 59 (E.D. Pa. 2007). ................................................... 64

*In re Lipsky,*
    460 S.W.3d 579 (Tex. 2015) ................................................................. 86

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
    764 F. Supp. 2d 991 (N.D. Ill. 2011 .................................................... 54

*In re Polyurethane Foam Antitrust Litig.,*
    799 F. Supp. 2d 777 (N.D. Ohio 2011).  ............................................. 44

*In re Publ'n Paper Antitrust Litig.,*
     690 F.3d 51 (2d Cir. 2012) ........................................................... *passim*

*In re Sulfuric Acid Antitrust Litig.,*
    743 F. Supp. 2d 827 (N.D. Ill. 2007); ................................................. 64

*In re Tableware Antitrust Litig.,*
    484 F. Supp. 2d 1059 (N.D. Cal. 2007) ......................................... 51, 73

*Interstate Circuit, Inc. v. United States,*
    306 U.S. 208 (1939) ............................................................... 39, 43, 68

*Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,*
    416 F.2d 71 (9th Cir. 1969). ............................................................ 70, 71

*Juhl v. Arlington,*
    936 SW.2d 640 (Tex. 1996) ................................................................ 92

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997) ............................................................. 83

*Mark Andrew of Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp.,*
    265 F. Supp. 2d 366 (S.D.N.Y. 2003). ............................................... 84

*Marmis vs. Solot Co.,*
    573 P.2d 899 (Ariz. App. 1977) ......................................................... 88

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ..................................................................... 40, 41

*McWane, Inc. v. FTC,*
    783 F.3d 814 (11th Cir. 2015 ............................................................ 76

*Merck-Medco Managed Care, Inc. v. Rite Aid Corp.,*
    22 F. Supp. 447 (D. Md. 1998) .......................................................... 58

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ...................................................................................... 37, 39

*Okimoto v. Youngjun Cai*,
   2015 WL 3404334 (S.D.N.Y. May 21, 2015) .................................................. 84

*Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993) ............................................................ 41, 52, 73

*Reed Constr. Data, Inc. v. McGraw-Hill Cos*.,
   638 F. App'x 43 (2d Cir. 2016) ....................................................................... 84

*Richardson-Eagle, Inc. v. William M. Mercer, Inc*.,
   213 S.W.3d 469 (Tex. App. 2006) ................................................................... 88

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ............................................................................ 83

*Ross v. Am. Express Co.*,
   35 F. Supp. 3d 407 (S.D.N.Y. 2014) ................................................. 45, 54, 58, 66

*Rossi v. Standard Roofing*,
   156 F.3d 452 (3rd Cir. 1998) .......................................................................... 41

*Salinas v. United States*,
   522 U.S. 52 (1997) .......................................................................................... 74

*Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*,
   2017 WL 2729998 (N.D. Tex. June 26, 2017) ................................................ 89

*Schultz v. Boy Scouts*,
   65 N.Y.2d 189 (1985) ...................................................................................... 83

*SigmaPharm, Inc. v. Mut. Pharm. Co., Inc*.,
   772 F. Supp. 2d 660 (E.D. Pa. 2011) .............................................................. 67

*Southern Union Co. v. Sw. Gas Corp*.,
   180 F. Supp. 2d 1021 (D. Ariz. 2002) ....................................................... 88, 90

*Telesaurus VPC, LLC v. Power*,
   623 F.3d 998 (9th Cir. 2010) .......................................................................... 85

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
   346 U.S. 537 (1954) ........................................................................................ 38

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ..................................................................... 78, 80, 81

*United States v. Alessi*,
   638 F.3d 466 (2d Cir. 1980) ............................................................................. 43

*United States v. Am. Linseed Oil Co.*,
   262 U.S. 371 (1923) ................................................................................... 78, 81

*United States v. Apple, Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) ............................................................. 62

*United States v. Berger*,
   224 F. 3d 107 (2d Cir. 2000) ............................................................................ 45

*United States v. Certified Envt'l Servs., Inc.*,
   753 F.3d 72 (2d Cir. 2014) ............................................................................... 77

*United States v. Container Corp. of America*,
   393 U.S. 333 (1969) .................................................................................... 78, 79

*United States v. Cont'l Group, Inc.*,
   603 F.2d 444 (3d Cir. 1979) ............................................................................. 43

*United States v. Curley*,
   55 F.3d 254 (7th Cir. 1995) .............................................................................. 44

*United States v. Dupree*,
   706 F.3d 131 (2d Cir. 2013). ........................................................................... 77

*United States v. Foley*,
   598 F.2d 1323 (4th Cir. 1979) .......................................................................... 59

*United States v. Friesel*,
   224 F.3d 107 (2d Cir. 2000) ....................................................................... 42, 48

*United States v. Geibel*,
   369 F.3d 682 (2d Cir. 2004), ........................................................................... 43

*United States v. Gen. Motors Corp.*,
   384 U.S. 127 (1966). ........................................................................................ 39

*United States v. Hayter Oil Co.*,
   51 F.3d 1265 (6th Cir. 1995) ............................................................................ 44

*United States v. Hubbard,*
  474 F. Supp. 64 (D.D.C. 1979) ........................................................ 44

*United States v. Huezo,*
  546 F.3d 174 (2d Cir. 2008)......................................................... 44, 45

*United States v. Jones,*
  482 F.3d 60 (2d Cir. 2006). .......................................................... 43

*United States v. Inryco, Inc.,*
  1981 WL 2126 (D. Md. July 28, 1981). ............................................ 44

*United States v. Maldonado-Rivera,*
  922 F.2d 934 (2d Cir. 1990) ......................................................... 43

*United States v. Murray,*
  618 F.2d 892 (2d Cir. 1980) ......................................................... 42

*United States v. Panebianco,*
  543 F.2d 447 (2d Cir. 1976) ......................................................... 45

*United States v. Paramount Pictures,*
  334 U.S. 131 (1948) .............................................................. 38, 59

*United States v. Reed,*
  575 F.3d 900 (9th Cir. 2009) ........................................................ 45

*United States v. Salameh,*
  152 F.3d 88 (2d Cir. 1998)........................................................... 48

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) ......................................................... 79, 80, 81

*United States v. Vazquez,*
  113 F.3d 383 (2d Cir. 1997) ......................................................... 43

*United States v. W.F. Brinkley & Son Constr. Co.,*
  783 F.2d 1157 (4th Cir. 1986) ....................................................... 59

United *States. Vanwort,*
  887 F.2d 375 (2d Cir. 1989) ......................................................... 43

*Wal-Mart Stores, Inc. v. Sturges,*
  52 S.W.3d 711 (Tex. 2001). ......................................................... 87

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12 (Ariz. 2002) ............................................................ 86, 91, 92

*Woloshen v. State Farm Lloyds*, No. 3:08-CV-0634-D, 2008 WL 4133386 (N.D. Tex. Sept. 2, 2008) ..................................... 92

**Statutes**

15 U.S.C. § 1 ........................................................................................................... 36

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 35

Fed. R. Evid. 701 .................................................................................................... 79

**Treatises**

45 Am. Jur. 2d, Interference § 12 (1969) ................................................................ 88

VI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1406f (3d ed. 2010) ............................................. 78, 79

Phillip E. Areeda & Herbert Hovenkamp FUNDAMENTALS OF ANTITRUST LAW § 14.03b ......................................................... 88

Restatement (Second) of Torts § 768 ...................................................................... 88

## I.      Introduction

Discovery has revealed voluminous admissible evidence of a nationwide antitrust conspiracy among Defendants Patterson Companies, Inc. ("Patterson") and Benco Dental Supply Company ("Benco"), along with Henry Schein, Inc. ("Schein"), to exclude SourceOne Dental Inc. ("SourceOne") as a competitor in the distribution and sale of dental supplies.  Given that the Texas Attorney General sued both Benco and Schein for the same conspiracy, this is unsurprising.  What is surprising are the summary judgment motions of Patterson and Benco (Schein has settled with SourceOne), motions which are based on selective citations to the evidence, misreading of the substantive law of conspiracy, and willful blindness to the clear evidence of a conspiracy.  According to Patterson and Benco, to establish liability SourceOne must show that each conspirator agreed to each and every overt act committed in furtherance of the conspiracy, and actually participated in each and every overt act.  According to Patterson and Benco, e-mails and text messages that provide that the conspirators have communicated and "will be taking a stand" and "are of the same mind"  and "thought [they] could trust" one another with respect to a boycott of third-parties dealing with SourceOne are not evidence of agreement.  Both of these propositions are false.  And Defendants have no answer to the extensive evidence that their conspiracy encompassed a range of injury-causing acts to SourceOne, including pressuring manufacturers and distributors dealing with SourceOne and targeting dentists trying to save money on dental supplies for retaliation, instead choosing to simply ignore that evidence.  Defendants' motions for summary judgment should be denied.

## II.      Statement of Facts

### A.  Industry Overview.

Consumable dental supplies ("dental supplies") are the products used in a dental practice to provide dental services, including gauze, gloves, anesthetics, restorative materials, and sterilization products.  (Declaration of Abby L. Dennis ("Dennis Decl."), Ex. 193 (Leitzinger Rep.) at ¶ 10).  There are many manufacturers of dental supplies, but the majority of sales are made by less than ten manufacturers.  (*Id.* at ¶¶ 12-13).   Dental supplies are largely commodity products that have in many cases been commercially available for many years.  (*Id.* at ¶ 69.)

Dental supplies have historically reached dentists through wholesale distributors, such as the Defendants.  (*Id.* at ¶ 21).  These distributors typically use a high-cost, full-service sales model using sales representatives and extensive physical infrastructure.  (*Id.* at ¶¶ 22-23).  The dental supplies distribution market is highly concentrated.  The Defendants collectively control approximately 80 percent of the dental supplies distribution market, and have done so for many years.  (*Id.* at ¶¶ 56-57).  Schein, with a market share of 35 percent or more, and Patterson, with a similar but smaller share, are much larger than Benco, the next largest distributor with a market share of roughly 10 percent.  (*Id.* at ¶ 56).  The Defendants' market positions are protected by substantial barriers to entry and expansion by new or existing competitors, including the substantial economies of scale necessary for effective competition and high fixed costs.  (*Id.* at ¶¶ 62-68).  Another significant barrier to entry is adequate access to popular brands of dental supplies.  Most dental supplies are sold exclusively through Defendants and other wholesale distributors, and due to the commodity nature of many of these products the Defendants have the ability to steer dentists towards or away from specific brands, giving the Defendants substantial leverage over dental supplies manufacturers.  As summarized in a Patterson strategy document:



(Dennis Decl., Ex. 8 (Dep. Ex. 884) at PattersonDental 00001780).  The same Patterson strategy document offers the following summary of competitive conditions in the dental supplies distribution market:

(*Id*.).

　　There are roughly 200,000 dentists in the United States, and approximately 80 percent of them practice alone or with one other dentist.  (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶ 15). Expenditures on dental supplies are a significant expense for dental practices.  (Dennis Decl., Ex. 192 (Teece Rep.) at ¶ 20).

　　 The fragmented nature of the dental services industry gives the Defendants substantial pricing power.  (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶¶ 69-71).  Dentists can be profitably targeted by the Defendants for high prices because they lack the scale and buyer power to induce lower prices from Defendants.  For example, ███████████████████████████ █████████████████████████████████████ ████████████████████████████ (Dennis Decl., Ex. 192 (Teece Rep.) at ¶ 24).

　　Recent years have seen the rise of so-called "corporate" dentistry, or larger dental practices that do have sufficient purchase volumes to leverage lower prices from the Defendants. (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶ 17).  However, the rise of corporate dentistry has

increased the cost pressures on small practice dentists, ████████████████████

████████████████████████████████████████ (Dennis Decl., Ex.

192 (Teece Rep.) at ¶ 25).  As a result, small-practice dentists have been actively seeking out

ways to reduce their expenditures on supplies.  (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶ 19).

     One attractive option for small-practice dentists to avail themselves of lower prices would

be participation in buying groups or group purchasing organizations ("GPOs") of the sort that are

common in the adjacent medical device market.  (*Id.* at ¶ 20; Dennis Decl., Ex. 192 (Teece Rep.)

at ¶ 24)████████████████████████████████████████

████████████████████████████████████████

████████████████████ (Dennis Decl., Ex. 193 (Leitzinger

Rep.) at ¶ 20; Ex. 164 (Dep. Ex. 1524) (Schein memo identifying "Group Purchasing

Organizations (GPOs) in their various forms and formats" as "the emerging threats to our

business")).

     Not surprisingly, Defendants have long conspired to prevent the emergence of such

organizations.  For example, a February 2013 solicitation sent by a nascent GPO of dentists in

New Mexico was emailed by Schein to Benco, with the notation "call me."  (Dennis Decl., Ex. 9

(Dep. Ex. 868) at PattersonDental 00014108).  The email chain was forwarded to Benco's

Managing Director Chuck Cohen, who sent it to Paul Guggenheim, President of Patterson

Dental.  (*Id.*).  Mr. Cohen wrote:

> Just wanted to let you know about some noise I've picked up in New Mexico.
> FYI: Our policy at Benco is that we do not recognize, work with, or offer
> discounts to buying groups (though we do work with corporate accounts) and our
> team understands that policy.

Mr. Guggenheim responded: "Thanks for the heads up.  I'll investigate the situation.  We feel the

same way about these."  (*Id.*).

In June 2013, Patterson's Mr. Guggenheim confronted Benco's Mr. Cohen with evidence that Benco was supplying a buying group in Virginia.  (Dennis Decl., Ex. 16 (Dep. Ex. 869) at PattersonDental 00005213).  Mr. Cohen responded with a series of excuses for Benco's conduct, noting that the relevant practices were in the process of merging and were thus more like a single corporate practice (which Defendants did offer discounts to) and less like a buying group of small dentists (which Defendants did not offer discounts to).  (*Id.* at PattersonDental 00005212).

Benco's Mr. Cohen also communicated extensively with his opposite number at Schein, Tim Sullivan, about the problem of buying groups.  (*E.g.*, Dennis Decl., Ex. 11 (Dep. Ex. 1425); Ex. 12 (Dep. Ex. 1428); Ex. 13 (Dep. Ex. 802); Ex. 127 (Dep. Ex. 801)).  Mr. Cohen has testified that "You know, I believe that I want to share information [with Benco's competitors].  And oftentimes we do share information, especially on a local level."  (Dennis Decl., Ex. 208 (Cohen Dep.) at 50:20-51:9).

Before October 2013, one set of organizations that had been keenly interested in forming buying groups and group purchasing arrangements were state dental associations ("SDAs").  SDAs are voluntary trade associations of dentists.  SDAs typically have substantial memberships, as approximately two-thirds of practicing dentists are SDA members.  (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶ 162).  SDAs were interested in facilitating group purchasing arrangements for dental supplies on behalf of their member-dentists as a way of enhancing the value of SDA membership.  (*Id.* at ¶¶ 86-88).  As a Schein document provided, "many dental associations have wanted to put group buying as a member benefit for years."  (*Id.* at ¶ 89).  However, Defendants had rebuffed the requests of SDAs to participate in such an arrangement.  (Dennis Decl., Ex. 22 (Dep. Ex. 664) ("The TDA came to us about this 3 - 4 years ago .... all the dealers and major manufacturers chose not to participate"); Ex. 4 (Dep. Ex. 1244)).

5

This was the situation confronting Defendants in October 2013: They were charging high prices to small-practice dentists, and had largely frustrated the ability of those small-practice dentists to access lower prices by forming buying groups.  As Patterson's Vice President of Marketing wrote in August 2013, just months before SourceOne's endorsement by the TDA: "We don't need GPOs in the dental business.  Schein, Benco and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry."  (Dennis Decl., Ex. 17 (Dep. Ex. 1080)).  For their part, SDAs stood in the wings, interested in facilitating group purchasing arrangements on behalf of their members, but without access to a supplier willing to participate in such an arrangement.  SourceOne's endorsement by the TDA in October 2013 was set to change all of that.

**B. SourceOne's innovative business model threatened to disrupt the dental supplies distribution market.**

SourceOne is an e-commerce platform, connecting buyers and sellers of dental supplies and equipment.  SourceOne's business model and service offering developed and expanded over time, evolving by October 2013 into a serious competitive threat to the Defendants.

As described above, dental supplies are sold to dentists in two ways.  First, full-line distributors of dental supplies such as the Defendants purchase, warehouse, and resell dental supplies to dentists.  Full-line distributors offer the benefits of economies of scope, or "one-stop shopping," to dentists, who can place a single order for a wide range of supplies necessary to run a dental office.  Approximately eighty percent of dental supplies are distributed to dentists through this distributor channel.  (Dennis Decl., Ex. 192 (Teece Rep.) at ¶¶ 18, 20).  Second, some manufacturers of dental supplies sell their products directly to dentists.  However, because no single manufacturer of dental supplies sells the full array of products needed to run a dental

office, dentists purchasing from these direct-selling manufacturers do not realize the "one-stop shopping" efficiencies associated with purchases from distributors.  (*Id.* at ¶¶ 17-18, 106).

The initial iteration of SourceOne's business model was an innovative response to the business problem confronting direct-selling manufacturers, namely how to offer dentists the "one-stop shopping" efficiencies of purchases through distributors, while maintaining the price advantage often associated with avoiding the distributor channel.  (*Id.* at ¶¶ 106-112).  By aggregating the products of many direct-selling manufacturers onto a single, convenient internet platform, SourceOne could replicate the "one-stop shopping" efficiencies previously enjoyed only by dental supplies distributors, while maintaining the price advantage historically enjoyed by direct selling manufacturers.  (*Id.*).

The Defendants recognized even this early iteration of SourceOne's business model as an innovative entrant and a potential competitive threat.  Senior executives of settled-Defendant Schein learned of SourceOne in May 2012.  Reacting to an email describing SourceOne's business model, a Schein executive forwarded the email to the CEO of Henry Schein Inc., writing "this made its way to my desk this morning.  It is different and unusual and could be a 'threat' if executed well." (Dennis Decl., Ex. 6 (HS-00004876)).  However, Defendants did not react anticompetitively to SourceOne until October 2013, when SourceOne's business model had evolved further.  More generally, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████. (Dennis Decl., Ex. 192 (Teece Rep.) at ¶¶ 97-99 (citing Defendants' documents); Ex. 193 (Leitzinger Rep.) at ¶¶ 138-144 (citing Defendants' documents)).

Certain features of SourceOne's initial business model constrained its ability to mature into a serious competitor to Defendants. First, direct-selling manufacturers do not carry all of the products that dentists purchase. (Dennis Decl., Ex. 192 (Teece Rep.) at ¶ 113). Second, SourceOne needed substantial additional capital in order to effectively promote and market its platform to dentists. (*Id.* at ¶ 111). In 2013, SourceOne solved both of these problems, setting the stage for the anticompetitive conduct of the Defendants at issue in this case.

In early 2013, SourceOne filled out its product line by adding dental supplies distributors to its platform. This iteration of SourceOne's business model retained the innovative features of the initial model, while adding to SourceOne's platform a wide range of products available only through dental supplies dealers. (*Id.* at ¶¶ 113-115). Dental supplies distributors selling through SourceOne's platform lowered their cost of sales, and in recognition of this fact agreed to lower their prices as a condition of obtaining access to SourceOne's public website, SourceOneDental.com. (*Id.* at ¶ 114).

The major innovation in SourceOne's business model, and the catalyst for the Defendants' anticompetitive response, however, came later in 2013, with the endorsement of SourceOne by SDAs. For SourceOne, the endorsement of a SDA dramatically expanded SourceOne's promotional reach, virtually eliminating the need for additional promotional expenses and relaxing at a single stroke the capital constraints that had previously prevented SourceOne from emerging as a serious competitive threat to the Defendants. (*Id.* at ¶¶ 116-118; Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶ 79). For SDAs, an endorsement of SourceOne was a way to facilitate group purchasing arrangements on behalf of their members, and to enhance the benefit of SDA membership. Pursuant to these arrangements, SourceOne created customized internet platforms, bearing the trade dress and marks of the endorsing SDA. (Dennis Decl., Ex.

192 (Teece Rep.) at ¶ 117).  In recognition of the promotional power of SDA endorsements, SourceOne's vendors agreed as a condition of obtaining access to the SDA-branded platforms to lower their prices once again, this time below the already-low prices they charged on SourceOne's public website.  (Dennis Decl., Ex. 231 (Shams Dep.) at 325:1-19).  In this way, SourceOne and the SDAs collaborated to offer an exclusive member benefit to SDA members, namely access to deeply discounted prices for dental supplies available only to the members of endorsing SDAs.   For SDA member-dentists, access to SourceOne's SDA platforms allowed them to access prices that reflected the combined purchasing power of SDA members.

**C.  Defendants conspired to eliminate SourceOne as a competitive threat.**

After being endorsed by the Texas Dental Association ("TDA"), one of the largest and most influential dental associations in the United States, SourceOne launched in October 2013 an entity known as TDA Perks Supplies, which was an online marketplace for the sale of dental supplies and equipment exclusively for the benefit of TDA members.  (Dennis Decl., Ex. 223 (Osio Dep.) at 89:11-15; Ex. 193 (Leitzinger Rep.) at ¶¶ 36-37).  Defendants reacted with immediate alarm, recognizing the explosive potential of SourceOne business model and service offering.  For example, Schein Regional Managers in the Carolinas sent an email to Schein's Regional Manager in Texas, captioned "Interesting/scary article" and referencing an article about the endorsement of SourceOne by the TDA:

> I just read this article.  Do you compete with the TDA?  In North and South Carolina, we compete with gloves and other disposables.  It is definitely a sore spot with us locally.  It looks like you may have it much worse.  Just curious as this could spread nationally and be problematic.

(Dennis Decl., Ex. 31 (Dep. Ex. 477) at HS-00017441).  The Texas manager responded "We will do our best to take them out @ the knees so it doesn't metastasize into your neck of the woods!!" (*Id*. at HS-00017439).  In a similar email chain, Schein managers on the East Coast

9

communicated with a different Schein Texas manager their concerns about endorsements of SourceOne expanding out of Texas.  (Dennis Decl., Ex. 128 (Dep. Ex. 927)).  The Texas manager candidly responded: "I am hopeful we can convince them [TDA] to stop this madness.  If unsuccessful this could be devastating if it spreads to other states."  (*Id.*).

The other Defendants shared Schein's concerns.  Referring to TDA's endorsement of SourceOne, Patterson's Clint Edens informed a supervisor that "other states have began [sic] to implement this program;" "[t]hey are convinced that this is their way to compete with corporate dentistry", and "the concept of 'associations selling suppliers' is going nationwide."  (Dennis Decl., Ex. 88 (Dep. Ex. 692)).  When the Georgia Dental Association (which later endorsed SourceOne) approached Patterson about putting together a GPO, a Patterson manager observed "I believe we will see 40 or more of these in the next 24 months."  (Dennis Decl., Ex. 185 (Dep. Ex. 973)).  Benco's Director of Sales wrote ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████  (Dennis Decl., Ex. 166 (Dep. Ex. 1199)).

Defendants had good cause for alarm.  SDAs closely monitor the endorsements of other SDAs, in particular large associations like the TDA, and often follow suit. (E.g., Dennis Decl., Ex. 241 (Xelowski Dep.) at 24:15-23; Ex. 203 (Blackwell Dep.) at 21:19-23:9; Ex. 228 (Rupinski Dep.) at 19:22-20:8; Ex. 217 (Killpack Dep.) at 23:6-14; Ex. 239 (Trotter Dep.) at 29:23-30:5, Ex. 210 (Earle Dep.) at 50:16-51:23; Ex. 204 (Brockhaus Dep.) at 17:8-18:23).  And many SDAs were, in bilateral conversations and in large groups, in fact actively discussing endorsements of SourceOne.  (See Section II.C.5, *infra*).

Defendants worked together to prevent endorsements of SourceOne from spreading nationwide, boycotting the TDA and, later, the Arizona Dental Association ("AzDA"), and pressuring dentists, manufacturers and other distributors to refrain from dealing with SourceOne or with SDAs who did business with SourceOne.  This conspiracy was formed beginning in October 2013, and was negotiated, refined, and implemented in a lattice of communications between no fewer than 12 different pairs of communicating employees of the Defendants.

**1.      In furtherance of their conspiracy, Defendants boycotted the TDA**.

Benco first proposed a plan for conspiracy against SourceOne to Patterson and Schein. On October 14, 2013, Benco's Mr. Cohen instructed Benco Texas managers Mark Rowe and Ron Fernandez to contact Patterson, Schein and a third competitor, Midwest Dental, to communicate Benco's opposition to the TDA's endorsement of SourceOne.  (Dennis Decl., Ex. 26 (Dep. Ex. 1186)).[1]

Mr. Fernandez did so the very next day, leaving a voice mail for Glenn Showgren, a Schein manager in Texas.  (Dennis Decl., Ex. 27 (Dep. Ex. 409)).  Mr. Showgren relayed the fact of Mr. Fernandez's call to his superiors, and was instructed to learn what sanctions against the TDA Benco was willing to take.  (*Id.*; Dennis Decl., Ex. 232 (Showgren Dep.) at 142:10-16).

Mr. Showgren then had a conversation with Mr. Fernandez, who furnished the information that Mr. Showgren had been instructed to discover.  As later reported by Mr. Showgren to his supervisors, Mr. Fernandez informed Mr. Showgren that Benco was considering "suspending all activities with the TDA," and asked Mr. Showgren if he had "a relationship with local PDCO [i.e., Patterson] RM [i.e., Regional Manager] to see if they would consider pulling

---

[1] This happened just weeks after TDA's endorsement of SourceOne but weeks before the publication of the TDA Journal article that Defendants assert precipitated Mr. Cohen's actions (Defs. Joint Statement of Material Facts ¶ 134).

out as well." (Dennis Decl., Ex. 29 (Dep. Ex. 410); Ex. 214 (Fernandez Dep.) at 82:4-70).

Schein's Mr. Showgren regarded Mr. Fernandez's call as inappropriate.  (Dennis Decl., Ex. 232

(Showgren Dep.) at 154:7-15).  According to Mr. Showgren, he "would never share this type of

information with a competitor."  (*Id.* at 161:23-162:8.)  Mr. Fernandez also stated that Benco's

Mr. Cohen would contact Schein's Mr. Sullivan.  (Dennis Decl., Ex. 29 (Dep. Ex. 410)).  Mr.

Fernandez also tried to learn what steps Schein was willing to take against the TDA. (Dennis

Decl., Ex 232 (Showgren Dep.) at 153:17-24.)

     Mr. Sullivan, to whom Mr. Cavaretta forwarded Mr. Showgren's report, informed Mr.

Cavaretta that conversations with Benco concerning a collective response to TDA Perks Supplies

would be inappropriate: "Agree that we should NOT be having these discussions w Benco."

(Dennis Decl., Ex. 30 (Dep. Ex. 760)).  Nevertheless, Mr. Cavaretta did not instruct Mr.

Showgren not to speak to Mr. Fernandez or other competitors, and interfirm communications

continued.  (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 53:17-54:15).

     Just hours after his phone call with Mr. Fernandez of Benco, Schein's Mr. Showgren

wrote his supervisor, Mr. Kyle, that he had "kept playing the idea of pulling out of the TDA for

2014," and summarized the pros and cons of doing so.  (Dennis Decl., Ex. 28 (Dep. Ex. 411)).

Two days later, Mr. Showgren followed up with Mr. Kyle: "Wanted to get your take on my TDA

email about threatening to pull out of the 2014 show before their board meeting tomorrow to

make a statement."  (Dennis Decl., Ex. 33 (Dep. Ex. 412)).  That same day, Mr. Kyle wrote to

Randall McLemore, another Schein Texas manager, and a colleague in Virginia:

> The biggest fund raiser for TDA and all state associations is the [sic] their annual
> convention and I am considering not showing for a couple of years. If the other
> dealers and wholesale community would follow it would put a stop to this
> craziness.

(Dennis Decl., Ex. 32 (Dep. Ex. 478)).

One week later, on October 25, Patterson's Vice President recited the same plan for addressing the competitive threat posed by SourceOne in an email directed to Mr. Edens:

> State Associations fear we'll pull out all the time.  And most of these dental associations think selling dental supplies will help them pay the bills.  Well just PDCO or HSIC pulling out of their annual meeting will mitigate any profits they will make from the mail order sales.

(Dennis Decl., Ex. 42 (Dep. Ex. 678)).

By this time, Patterson had already been contacted by at least Benco.   As discussed on his call with Schein's Mr. Showgren, Benco's Mr. Fernandez then called Patterson's John Hyden, a regional manager for Patterson.  (Dennis Decl., Ex. 214 (Fernandez Dep.) at 27:24-28:12, 28:22-29:3). One of Mr. Fernandez's goals in this discussion was to avoid placing Benco at a competitive disadvantage if it pulled out of the TDA show but Patterson attended.  (*Id*. at 32:25-33:14).  In this discussion, Mr. Fernandez shared information with Mr. Hyden about Benco's decision making with respect to attendance at the TDA meeting, and solicited information from Mr. Hyden about Patterson's plans regarding the same.  (*Id*. at 37:5-13).  This was a *quid pro quo*: Mr. Fernandez offered information to induce Mr. Hyden to do the same.  (*Id*. at 37:14-19).  Mr. Fernandez testified that he is certain that he conveyed to Patterson's Mr. Hyden the possibility that Benco might not attend the TDA meeting, and certain that he discussed what he learned from Mr. Hyden with others at Benco.  (*Id*. at 37:5-9, 37:20-25).  For his part, Mr. Hyden conveyed at least the fact of his discussion with Mr. Fernandez to his supervisor at Patterson, Clint Edens.  (Dennis Decl., Ex. 212 (Edens Dep.) at 184:1-185:19).

Patterson's Mr. Edens summarized the outcome of this flurry of communications to his supervisors, David Misiak and Tim Rogan on October 23, indicating his commitment to boycott the TDA from Patterson's discussions with competitors:

> we have briefly discussed this TDAPerks site (not the source) with our dealer competitors at the local San Antonio & Houston level . . .  I am committed to

13

pulling from the TDA if they do not discountine competing with us via TDAPerks.

(Dennis Decl., Ex. 41 (Dep. Ex. 676)).   Days later, Henry Schein's Mr. Showgren was reporting information obtained from Patterson: "Patterson, Benco and Burkhart are also all considering pulling out of the show in protest."  (Dennis Decl., Ex. 52 (Dep. Ex. 420)).

Defendants continued to exchange information and assurances concerning their actions toward the TDA in retaliation for TDA Perks Supplies and its endorsement of SourceOne.  For example, sometime in November 2013, Mr. Hyden of Patterson and Mr. Fernandez of Benco again communicated regarding the TDA, with Mr. Hyden informing Mr. Fernandez that, as of that time, Patterson had decided to pull out of the 2014 TDA annual meeting, but was "considering options."  (Dennis Decl., Ex. 76 (Ex. 3012)).[2]

That same month, Henry Schein's Mr. McLemore visited the offices of Bob Ingersoll, a Patterson manager.  (Dennis Decl., Ex. 220 (McLemore Dep.) at 146:14-147:8; Ex. 72 (Dep. Ex. 453); Ex. 74 (Dep. Ex. 455)).  Mr. McLemore asked Mr. Ingersoll if Patterson was attending the meeting (Mr. Ingersoll stated that Patterson was not) and furnished to Mr. Ingersoll (upon Mr. Ingersoll's request) the non-public information that Schein was also considering not attending. (Dennis Decl., Ex. 220 (McLemore Dep.) at 28:21-29:4, 149:10-24; Ex. 216 (Ingersoll Dep.) at 55:3-18).  This communication violated Schein's antitrust compliance policy.  (Dennis Decl., Ex. 220 (McLemore Dep.) at 26:18-27:9).  The information furnished by Mr. Ingersoll to Mr. McLemore was non-public.  (Dennis Decl., Ex. 216 (Ingersoll Dep.) at 50:8-15).  Mr. McLemore admitted at his deposition that if Schein attended the meeting but Patterson did not, this would give Henry Schein a competitive advantage. (Dennis Decl., Ex. 220 (McLemore Dep.) at 29:24-

---

[2] Patterson contends that this is hearsay as to Patterson (Patterson Mem. at 11), but the statement is admissible under Federal Rule of Evidence 801(d)(2), both as a party admission and as a statement made by a party's coconspirator during and in further of a conspiracy.

30:9).  Mr. Ingersoll admitted the same.  (Dennis Decl., Ex. 216 (Ingersoll Dep.) at 55:12-56:4).

Once again, this was a *quid pro quo*: Mr. Ingersoll furnished information to Mr. McLemore

about Patterson's intentions with respect to attending the TDA meeting and with the expectation

that Mr. McLemore would furnish similar information in return.  (*Id*. at 57:24-58:7).  Mr.

McLemore later furnished the information that he learned from Mr. Ingersoll to his superiors, Joe

Cavaretta (Dennis Decl., Ex. 82 (Dep. Ex. 485)) and Dean Kyle (Dennis Decl., Ex. 220

(McLemore Dep.) at 27:20-28:3).  Mr. Ingersoll also reported the substance of his

communication to his superior, Clint Edens.  (Dennis Decl., Ex. 216 (Ingersoll Dep.) at 58:24-

59:3).

       Patterson and Schein communicated at the sales representative level as well.  Patterson's

Christopher (Shaun) Cobb and Schein's Tony Starnes communicated on several occasions in

October and November of 2013 concerning the TDA and TDA Perks Supplies. (See Dennis

Decl., Ex. 46 (Dep. Ex. 441); Ex. 47 (Dep. Ex. 443); Ex. 56 (Dep. Ex. 444); Ex. 71 (Dep. Ex.

661)).  Mr. Cobb texted Mr. Starnes to learn of Schein's plans with respect to attendance at the

2014 TDA annual meeting.  (Dennis Decl., Ex. 207 (Cobb. Dep.) at 148:24-149:10).  At the time

he solicited this information, there was no public source of that information, or any means for

Patterson to acquire that information other than from Schein.  (*Id*. at 152:7-153:21).  To induce

Mr. Starnes to share information about Schein's intentions, Mr. Cobb shared truthful information

about Patterson's intentions.  (*Id*. at 153:23-154:20).  Mr. Cobb admitted at his deposition that

learning that Schein was not attending the meeting would reduce the risk to Patterson in also not

attending the TDA meeting because of "less competition" at the meeting.  (*Id*. at 164:5-165:2).

Patterson's Mr. Cobb shared the information that he learned from Mr. Starnes with his

supervisors, including Mr. Edens.  (*Id*. at 154:21-155:7).  Schein's Mr. Starnes did so as well,

forwarding information that Patterson had learned about TDA Perks Supplies to his supervisors the same day they were meeting to discuss Henry Schein's response to TDA Perks Supplies. (Dennis Decl., Ex. 56 (Dep. Ex. 444; Ex. 57 (Dep. Ex. 445); Ex. 54 (Dep. Ex. 482); Ex. 55 (Dep. Ex. 483)).

In November 2013, Mr. Cobb had a second communication with Mr. Starnes, in which he informed Mr. Starnes of Patterson's decision not to attend the 2014 TDA meeting. (Dennis Decl., Ex. 207 (Cobb Dep) at 157:7-17; Ex. 73 (Dep. Ex. 454)). Mr. Cobb admitted that conveying this information was commercially risky behavior, putting Patterson at risk that Schein would use the information to put Patterson at a commercial disadvantage. (Dennis Decl., Ex. 207 (Cobb Dep.) at 158:1-159:2, 161:6-9). Mr. Cobb admitted that he does not frequently engage in commercially risky conduct, and that this was a "very unusual" circumstance. (*Id*. at 161:19-162:2). At the time he conveyed this information to Mr. Starnes, Mr. Cobb was aware of no other source that Schein could have obtained that information, other than in private communications with Patterson. (*Id*. at 162:21-164:3). Mr. Cobb admitted that he shared truthful, non-public information about Patterson's decision making with the expectation that Mr. Starnes would do the same for Schein. (*Id*. at 201:7-202:5). Patterson's Mr. Cobb again shared the information he learned from Mr. Starnes with his supervisors, including Mr. Edens. (*Id*. at 203:8-15). Still later, when Mr. Starnes shared with Mr. Cobb information that Schein would not be attending the 2014 TDA meeting, Mr. Cobb was not surprised that Mr. Starnes had informed him of this, based on their previous exchanges. (*Id*. at 220:24-221:11). Patterson's Mr. Cobb admits that he had no legitimate business justification for his communications with Schein's Mr. Starnes. (*Id*. at 227:11-228:4, 270:20-272:12).

16

By December 11, 2013, Benco's Mr. Fernandez summarized the agreement that had been reached: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them [i.e., TDA]." (Dennis Decl., Ex. 77 (Dep. Ex. 1355); Ex. 212 (Edens Dep.) at 258:14-259:24 (admitting that, as of December 11, 2013, it was not public knowledge that PDCO was committed to pulling out of the TDA if the TDA did not discontinue the TDA Perks program)).[3]   Two days later, Henry Schein's Mr. Kyle, who knew of his subordinates' communications with Patterson, reported to Mr. Cavaretta: "FYI Patterson pulled out of convention. I firmly believe they made the move expecting us to follow suit." (Dennis Decl., Ex. 81 (Dep. Ex. 912).  Mr. Cavaretta in turn forwarded Mr. Kyle's email to his superiors, including Dave Steck, Vice President of Schein, who remarked: "Personally I think we should get together with a group of other dealers and manufacturers and send them [i.e., TDA] a petition."  (*Id.*).  Although Mr. Steck's supervisor warned him that this was "collusion" (*id.*), Mr. Steck was not deterred by this observation.

Around the same time, Patterson's then-Vice President of Sales and current President, Dave Misiak, telephoned Mr. Steck to confirm that Patterson would not be attending the TDA meeting, and inquiring of Mr. Steck whether Schein was doing the same. (Dennis Decl., Ex. 236 (D. Steck Dep.) at 42:8-44:22, 377:18-22).  A jury could find that this conversation occurred in December 2013.  (Dennis Decl., Ex. 191 (Schein's Responses & Objections to SourceOne's Second Set of Interrogatories) at 9 (admitting that this call occurred "At some point between

---

[3] While Patterson contends that "Patterson had not made a final decision as of December 11, 2013," (Patterson Mem. at 9), the jury could find otherwise on the strength of this Benco document.

December 2013 and January 2014")).[4]  Mr. Steck testified that this telephone call was "unusual" and inappropriate.  (Dennis Decl., Ex. 236 (D. Steck Dep.) at 43:17-44:5, 49:22-50:6).  Mr. Steck admitted at his deposition that he may have answered Mr. Misiak's question by assuring him that Schein was also pulling out of the 2014 TDA meeting.  (*Id.* at 45:21-46:11).  And a subsequent email from Mr. Misiak to his subordinate confirms that Mr. Steck had in this conversation in fact told Mr. Misiak that Schein was "out" of the 2014 TDA meeting "full blown!".  (Dennis Decl., Ex. 96 (Dep. Ex. 731)).  Mr. Steck conveyed the information he learned from Mr. Misiak on this call to Tim Sullivan.  (Dennis Decl., Ex. 236 (D. Steck Dep.) at 46:13-47:18).

Afterwards, Schein's Mr. Steck felt obliged to provide Patterson with additional information about Schein's plans to attend the 2014 TDA meeting.  (*Id.* at 44:23-45:20).  Mr. Steck contacted Schein's Joe Cavaretta and Dean Kyle, writing "Guys, I have to get back to PDCO [i.e., Patterson] on whether or not we are attending the TDA." (Dennis Decl., Ex. 94 (Dep. Ex. 763)).  Mr. Steck's subordinates informed him that he could tell Patterson that Schein would not be attending the TDA in subsequent years if it continued with TDA Perks Supplies, and that there was a chance that Schein would not attend the 2014 meeting either, depending on what Schein learned in its meeting with the TDA.  (*Id.*; Dennis Decl., Ex. 95 (Dep. Ex. 764)).  Mr. Steck was gathering this information because he wanted to convey truthful information to Patterson.  (Dennis Decl., Ex. 95 (Dep. Ex. 764)).  Schein's Mr. Cavaretta admitted at his deposition that he believed Mr. Steck's communications with Mr. Misiak to be improper and without legitimate business justification.  (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 117:16-118:4).

---

[4] Schein's admission that this discussion could have occurred in December refutes Patterson's claim (Patterson Mem. at 15) that the earliest date a jury could assign to this first discussion in January 7, 2014.

Mr. Steck got back to Patterson's Mr. Misiak by email, informing him that "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days." (Dennis Decl., Ex. 96 (Dep. Ex. 731)).   Mr. Misiak reacted in shock to Schein's apparent vacillation in an email to his subordinate, complaining that Mr. Steck had previously assured him that Schein was pulling out of the 2014 TDA meeting "full blown!" (*Id.*).   In language that confirmed Patterson's preceding agreement with Schein, Mr. Misiak's subordinate accused Schein of back-sliding on its prior commitment to pull out of the 2014 TDA meeting, and suggesting that Mr. Misiak "should call him" and have a "'Thought I could trust you' type of conversation." (*Id.*).

On December 18, 2013, Clint Edens of Patterson (who was aware of his subordinates' communications with representatives of Benco and Henry Schein) met with the TDA concerning TDA Perks Supplies.  (Dennis Decl., Ex. 78 (Dep. Ex. 687)).  Prior to the meeting, Patterson had canceled its reserved space at the 2014 TDA annual meeting by not putting down a deposit during early registration (Dennis Decl., Ex. 68 (Dep. Ex. 431); Ex. 59 (Dep. Ex. 680)), although it could sign up to attend at any time prior to the show.  (Dennis Decl., Ex. 206 (Cavaretta Dep. 95:11-23); *see also* Ex. 237 (Sullivan Dep.) at 52:10-25.  When the TDA indicated that it had no intentions of discontinuing its relationship with SourceOne, Mr. Edens informed the TDA that Patterson would not attend the TDA annual meeting.  (Dennis Decl., Ex. 212 (Edens Dep.) at 281:2-15).  Mr. Edens was responsible for Patterson's decision not to attend the 2014 TDA annual meeting.  (*Id.* at 86:15-18).

Following Patterson's meeting with the TDA, Henry Schein representatives also attempted to schedule a meeting with the TDA at which Henry Schein would convey the same message as had Patterson: "make it clear that we can't continue to support TMOM [i.e., the

Texas Mission of Mercy, a charitable program of the TDA], TDA Annual Session, and other fund raising events while they are endorsing another dental distributor." (*Compare* Dennis Decl., Ex. 91 (Dep. Ex. 1497), *with* Ex. 212 (Edens Dep.) at 278:24-279:13).  Dean Kyle of Henry Schein was able to speak with Donovan Osio of the TDA on February 20, 2014.  In addition to setting up a meeting with the TDA for April 3, 2014, Mr. Kyle conveyed the "clear message" to Mr. Osio that if "they intend to continue down this path then we will threat [sic] them like any other competitor and certainly not participate in any [TDA] function." (Dennis Decl., Ex. 98 (Dep. Ex. 915)).  Thus, well in advance of its April meeting with the TDA, Schein had already decided to boycott the 2014 TDA meeting absent a change in course by the TDA. Henry Schein managers repeatedly reiterated this position in the weeks leading up to its meeting with the TDA.  (Dennis Decl., Ex. 99 (Dep. Ex. 1105) ("If they don't stop doing the Perks program we are pulling out"); Ex. 101 (Dep. Ex. 1107) ("if they [the TDA] don't agree to stop with the Perks program we are out starting this year. Put it this way I'm not making any travel arrangements to the meeting this year"); Dennis Decl., Ex. 103 (Dep. Ex. 491) ("Barring a huge shift in the TDA's direction we will not be attending the meeting, this will put us in the same boat as P[atterson]").

On April 3, 2014, Joe Cavaretta, Dean Kyle, and Kyle Steck of Henry Schein met with representatives of the TDA and communicated the same threat as Patterson had at its meeting in December and that Schein had made to the TDA in February: "if [the TDA] were going to endorse a competitor, then we just wouldn't be able to attend the meeting. . . . if this is the direction that they're heading or going to do, then we would not be able to attend the meeting in the current year, which would have been '14." (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 149:6-150:8).  Following the meeting, Henry Schein informed the TDA that it would not attend the

2014 TDA annual meeting.  (Dennis Decl., Ex. 104 (HS-00011992); Ex. 117 (HS-00008391) at -

8393).  Although discussions concerning Henry Schein's attendance continued in subsequent

days, Henry Schein's position remained the same: "if [the TDA] said it's going to be business as

usual, sorry, then we wouldn't have attended."  (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 163:1-

9).  The TDA released Henry Schein's booth space on April 8, 2014, after ultimately deciding to

continue TDA Perks Supplies.  (Dennis Decl., Ex. 110 (Dep. Ex. 1110); Ex. 122 (Dep. Ex. 809)

at HS-00004983).  Early the next morning, Mr. Kyle of Henry Schein informed Henry Schein's

Southwest team that "we have made the decision to not attend the TDA convention this May nor

participate in any TDA events going forward."  (Dennis Decl., Ex. 112 (Dep. Ex. 919) at HS-

00012265).[5]

        That same day, upon hearing that Henry Schein was no longer attending the 2014 TDA

annual meeting, Benco also pulled out.  (Dennis Decl., Ex. 118 (Dep. Ex. 1384): "Let's pull out,

if Schein and Patterson are as well").  Benco's decision was an about-face from the previous day,

when it planned to "encourage more vendor partners to join the big three dealers and boycott

future conventions" but apparently still intended to attend the 2014 meeting.  (Dennis Decl., Ex.

111 (Dep. Ex. 1192)).  Mr. Fernandez of Benco quickly notified Henry Schein that it was

following Schein's course and not attending (Dennis Decl., Ex. 116  (Dep. Ex. 1356)), while

simultaneously calling this information "confidential" and withholding it from his sales

representatives who were planning to attend the meeting.  (Dennis Decl., Ex. 77 (Dep. Ex. 1355);

Ex. 214 (Fernandez Dep.) at 109:4-21, 116:23-117:3, 122:9-123:2, 124:8-18).  Mr. Fernandez

---

[5]  Although Mr. Sullivan had to approve the decision, Messrs. Cavaretta and Kyle, for all
practical purposes, were the decision makers for Schein with respect to the 2014 TDA annual
meeting and, in fact, kept Mr. Sullivan shielded from the process (Dennis Decl., Ex. 206
(Cavaretta Dep.) at 87:9-19, 120:1-7; Ex. 108 (Dep. Ex. 917); Ex. 109 (Dep. Ex. 918); Ex. 97
(Dep. Ex. 1104)).

also contacted Mr. Hyden of Patterson (Dennis Decl., Ex. 77 (Dep. Ex. 1355) and telephoned

Kevin Upchurch, a Schein manager in Arizona, about the Arizona Dental Association. (Dennis

Decl., Ex. 188 (Schein's Responses & Objections to Class Plaintiffs' First Set of Interrogatories)

at 9). Benco's Mr. Rowe explained Benco's decision with reference to the interests of its

competitors: "The TDA's continued promotion and support of the PERKS program is in direct

competition with any and all dealers of dental supplies. This is unacceptable." (Dennis Decl.,

Ex. 120 (Dep. Ex. 1191)).[6]

Upon hearing the news from Mr. Fernandez that Benco was out of the 2014 TDA annual

meeting, Kyle Steck of Henry Schein boasted: "the [TDA] meeting is going to die." (Dennis

Decl., Ex. 113 (Dep. Ex. 1503) at HS-00006732).

Defendants' nonattendance at the 2014 TDA annual meeting was a sharp departure from

their longstanding practice of having a "big presence" and making a "huge splash" at the TDA

annual meeting (Dennis Decl., Ex. 14 (Dep. Ex. 532); Ex. 2 (Dep. Ex. 1180), which as recently

as 2012 was likened to a "cold war nuclear arms race" between Henry Schein, Patterson, and

Benco. (Dennis Decl., Ex. 5 (Dep. Ex. 401)). As Schein explained in 2014, "in the past we had

a race with Patterson to sign up for TDA to get the best booth space assignments. A lot of times

we'd verbally commit at the show for the following year." (Dennis Decl., Ex. 141 (Dep. Ex.

1513)). Just prior to the launch of TDA Perks Supplies, Mr. Fernandez of Benco remarked of the

TDA annual meeting: ███████████████████████████████████████████

███████████ (Dennis Decl., Ex. 18 (Dep. Ex. 1182)). Another Benco manager in Texas

similarly noted: ████████████████████████████████████████████████

████████ (Dennis Decl., Ex. 19 (Dep. Ex. 1183)).

---

[6]  Mr. Rowe was the relevant decision maker for Benco with respect to the 2014 TDA annual
meeting. (Dennis Decl., Ex. 227 (Rowe Dep.) at 79:21-23).

## 2.    In furtherance of their conspiracy, Defendants boycotted the AzDA.

In 2014, the Arizona Dental Association ("AzDA") and SourceOne entered into an agreement whereby SourceOne would offer for sale discounted dental supplies exclusively to AzDA's members through an online marketplace called AzDA Perks.  (Dennis Decl., Ex. 144 (Dep. Ex. 76)).  Within days, Defendants knew of the arrangement (Dennis Decl., Ex. 146 (Dep. Ex. 633)) and began making plans to boycott the annual meeting of the AzDA and withhold support from AzDA programs if the AzDA did not discontinue AzDA Perks Supplies. Defendants' boycott of the TDA provided the roadmap for Defendants' response in Arizona, as their employees in Arizona sought counsel from Mr. Edens (Patterson), Mr. Fernandez (Benco), and others in Texas and expressly referenced the TDA boycott in their communications between each other.

Plans began for a group boycott of AzDA after Mike Wade, Regional Manager of Benco's Cactus Region, contacted AzDA to complain about the AzDA's endorsement of SourceOne on July 17, 2014.[7]  (Dennis Decl., Ex. 241, Xelowski Dep. 148:2-152:1). Remarkably, Mr. Wade threatened AzDA on behalf of not only Benco, but also Schein. According to Mr. Wade, AzDA "messed up here … by not calling Upchurch (at Schein), by not calling me and saying hey, here's what we're doing." (*Id.* at 144:2-17.)  Following that conversation, Benco's Mr. Wade then called Schein's Kevin Upchurch, the Arizona manager who had earlier been contacted by Benco's Mr. Fernandez as part of a flurry of competitor communications Mr. Fernandez had on the day Benco decided to boycott the 2014 TDA meeting.  (Dennis Decl., Ex. 147 (Dep. Ex. 634); Ex. 240 (Wade Dep.) at 139:6-140:11).  Mr.

---

[7]  Mr. Wade, along with Brian Evans, was responsible for Benco's decision as to whether to attend the Western Regional Dental Conference hosted by AzDA.  (Dennis Decl., Ex. 240 (Wade Dep.) at 45:11-20).

Wade later explained to a sales representative, who had asked Mr. Wade to "get some pressure on the AZDA," that Mr. Wade was "on top of it…I will pull some local pressure…Playing phone tag with Upchurch at Schein and will get PDCO manager involved…" (Dennis Decl., Ex. 146 (Dep. Ex. 633)). Mr. Wade then asked his supervisor, Brian Evans, for the contact information of a Schein employee: "I wanted to reach out to him and Bushman at PDCO [Patterson] to see if they have had any communications with AZDA on this. Needless to say the natives are not happy nor am I." (Dennis Decl., Ex. 150 (Dep. Ex. 373)). The week before, Benco's Mr. Evans had reached out to Messrs. Rowe and Fernandez in Texas asking for an update regarding TDA Perks Supplies in light of AzDA's new relationship with SourceOne. (Dennis Decl., Ex. 149 (Dep. Ex. 1197)). Mr. Fernandez had helpfully informed Mr. Evans that the boycott of the TDA had worked: "any traction they had, has been lost due to the extremely low turnout at this year's [TDA] show." (*Id.*).

Mr. Evans himself called Schein's Mr. Upchurch, who informed his supervisor Mr. Cavaretta of Mr. Evans's call along with a recommendation to boycott the AzDA's meeting, and Mr. Cavaretta in turn informed his supervisor, Mr. Sullivan. (Dennis Decl., Ex. 148 (Ex. 812)). Schein's Mr. Upchurch then (July 14) left Benco's Mr. Wade a voicemail, informing him that Schein was likely not going to be supporting the AzDA's trade show and proposing that "everybody" do the same. Mr. Upchurch finished the call with a promise to get back to Mr. Wade with details of the Defendants' boycott of the TDA. (Dennis Decl., Ex. 151 (Dep. Ex. 636; Ex. 240 (Wade Dep.) at 178:17-180:6). Mr. Upchurch left another voicemail with Mr. Wade on July 18. The same day, Mr. Upchurch informed Mr. Cavaretta that "Benco is ready to cancel their involvement in the State meeting and from my past conversations with PDCO I would not be surprised if they also decided not to attend. It could make for an interesting state

24

meeting if no distributors were present." (Dennis Decl., Ex. 153 (Dep. Ex. 579)).

Three days later, on July 21, 2014, Benco's Mr. Wade emailed Chad Bushman at

Patterson, who at all relevant times was responsible for Patterson's decision as to whether to

attend the Western Regional Dental Conference (Dennis Decl., Ex. 205 (Bushman Dep.) at

53:13-17):

> I wanted to catch up and get your take on our friends at the AZDA becoming our
> competitors? I am sure you are hearing plenty from your reps about the AZDA
> partnership with SourceOne selling supplies. Needless to say we are not real
> happy and we are looking at pulling all our sponsorship including the AZDA
> meeting. I know that Patterson, Schein and Benco boycotted the Texas Dental
> Association meeting this year after the TDA did the same thing and wanted to see
> if we could create the same message here in AZ. Let me know your thoughts.
> Feel free to call me on my cell to discuss.

(Dennis Decl., Ex. 157 (Dep. Ex. 376) at PattersonDental 00001252). Two hours later,

Patterson's Mr. Bushman responded, adding Dan Reinhardt (Patterson) to the email chain:

> Mike, Thank you for reaching out. If the AZDA has in fact signed on with
> SourceOne (which it looks like they have) we will be pulling our sponsorship and
> attendance of the state meeting as they will have positioned themselves as a
> competitor. Thank you.

(*Id.* at PattersonDental 00001251). Mr. Wade promptly responded, paraphrasing the legal

definition of conspiracy:

> Chad, Thanks for the quick response. We are of the same mindset. It would be
> gratifying to see every distributor with a local presence make a unified statement
> on the AZDA's ill -conceived idea to become a distribution competitor.

(*Id.*).

Apparently recognizing the legal risk in communicating with competitors on

competitively sensitive future plans by email, Mr. Misiak admonished Mr. Reinhardt, and Mr.

Reinhardt admonished Mr. Bushman, to avoid email traffic on this discussion, using a phrase

("discuss live") that Schein's Mr. Cavaretta had earlier used with Schein's Dave Steck when

discussing email communications relating to interfirm communications among the Defendants

about the TDA.  (Dennis Decl., Ex. 155 (Dep. Ex. 735); Ex. 156 (Dep. Ex. 375); Ex. 94 (Dep.

Ex. 763)).  Several days later, Benco's Mr. Wade sent a text message to Mark Warren, another

Benco employee.  In response to Mr. Warren's query "Did you visit with other dealers?", Mr.

Wade responded: "Yep. They are indicating they will pull support from AZDA."  (Dennis Decl.,

Ex. 159 (Dep. Ex. 640) at 43-44). The same day, again using the language of conspiracy, Mr.

Wade informed Brian Goolsbee of Dentsply:

> Following up on my vmail. I hope you are doing well. Wanted to keep you apprised of our newest competition in AZ. AZDA! They have partnered with Source One Dental to provide dental supplies. Can you let me know if Source One is an authorized dealer of Dentsply? I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's meeting next year. Let me know your thoughts.

(Dennis Decl., Ex. 154 (Dep. Ex. 645)). And a few days after that, Mr. Wade informed his sales team:

> Needless to say we are extremely disappointed that the AZDA has decided to directly compete with Benco and our fellow distributors who have significant investments with the organization.
>
> At this point we have made our feelings known to AZDA executive leadership. If they continue to pursue this strategic partnership we will reevaluate our partnerships with the AZDA. This will include meetings, marketing, and community outreach events including annual MOM event.
>
> I can tell you that we are not alone in evaluating our participation in AZDA events. Both Patterson and Schein leadership have expressed that they will also review participation if the AZDA continues to compete.
>
> The most important thing you can do is to communicate to your dentists the implications in entering the highly competitive distribution arena.

(Dennis Decl., Ex. 160 (Dep. Ex. 581)).  Two days later, Mr. Wade wrote to a subordinate: "If all

the distribution companies stand firm and if we can pull some of the manufacturers our way

maybe [AzDA] will reconsider."  (Dennis Decl. Ex. 162 (Dep. Ex. 642)).

As a result of their boycott of AzDA, none of the Defendants attended the AzDA's

annual meeting, the Western Regional Dental Conference, in 2015. (Dennis Decl., Ex. 241 (Xelowski Dep.) at 172:5-174:5; Ex. 210 (Earle Dep.) at 45:5-10). As was the case with Texas, Defendants' nonattendance at the Western Regional Dental Conference was a marked deviation from their previous practice. (*E.g.*, Dennis Decl., Ex. 105 (Dep. Ex. 632); Ex. 240 (Wade Dep.) at 82:16-83:10; Ex. 205 (Bushman Dep.) at 116:5-11).

### 3. In furtherance of their conspiracy, Defendants boycotted manufacturers and dealers supplying SourceOne.

In addition to boycotts of the TDA and AzDA, Defendants furthered their conspiracy and objective to stifle SourceOne by pressuring manufacturers and dealers to join their boycotts of the TDA and AzDA and to remove products from SourceOne's websites.

Defendants enjoy ███████████████████████ with manufacturers. (Dennis Decl., Ex. 8 (Dep. Ex. 884) at PattersonDental 00001780). As explained above, direct selling to dentists is not feasible for most manufacturers, and thus these manufacturers must rely on Defendants to distribute their products to dentists. (Dennis Decl., Ex. 192 (Teece Rep.) at ¶¶ 17-18, 20). As Benco observed of Patterson's relationship with a specific manufacturer, A-dec: ████████████████████████████ (Dennis Decl., Ex. 7 (BDS00778087) at BDS00778087). Defendants have the power to, and do, steer dentists to manufacturer brands favored by them. (Dennis Decl., Ex 215, Guggenheim Dep. 230:19-231:12; Ex. 192 (Teece Rep.) at ¶¶ 18-19). This power has enabled Defendants to pressure manufacturers to cut off access to product lines for nascent businesses in the dental supply distribution industry, including ███████ (Dennis Decl., Ex. 92 (Dep. Ex. 1413) at BDS00102530 (Benco document regarding ████████ strategy: ██████████████████████████████ ███████████████ Ex. 169 (Dep. Ex. 1078)).

The situation with SourceOne was no different.  Immediately after the launch of TDA Perks Supplies, Defendants used their power over manufacturers to perpetuate their plan to shut down the program. (*E.g.*, Dennis Decl., Ex. 24 (Dep. Ex. 666); Ex. 34 (Dep. Ex. 669); Ex. 35 (Dep. Ex. 670); Ex. 36 (Dep. Ex. 671); Ex. 64 (Dep. Ex. 681); Ex. 66 (Dep. Ex. 682); Ex. 65 (Dep. Ex. 683); Ex. 41 (Dep. Ex. 676)).  In some cases, Defendants threatened to "shelve" and/or not promote the products of manufacturers who would not fall in line.  (*E.g.*, Dennis Decl., Ex. 54 (Dep. Ex. 482) (Schein: "I refuse to work with any manufacturer rep that sells through Perks. That's [what] every distributor should say. Then manufacturers will get scared and pull out. Easier to do now than later!"); Ex. 126 (Dep. Ex. 1113) (Schein: "What about GC and some of the manf supporting this? Should we be punishing them as well, co-travel, BDM, sales flyers?").  Ultimately, Defendants contacted no fewer than 25 manufacturers and dealers (Dennis Decl., Ex. 199 (SourceOne Dental, Inc.'s Third Supplemental Responses and Objections to Defs.' First Set of Interrogatories) at 19-24 (citing documents produced by Defendants and third parties), many of which, in turn, pressured their authorized dealers to pull products from SourceOne's websites and/or pulled out of the 2014 TDA annual meeting "to support" Defendants.  (*E.g.*, Dennis Decl., Ex. 195 (SourceOne Dental, Inc.'s Responses and Objections to Defs.' Second Set of Interrogatories) at 5; Ex. 199 (SourceOne Dental, Inc.'s Third Supplemental Responses and Objections to Defs.' First Set of Interrogatories) at Ex. B); Ex. 125 (Dep. Ex. 426); Ex. 89 (Dep. Ex. 693)).   In many cases, these reactions were immediate.  For example:

- On October 23, 2013, Clint Edens of Patterson informed Nate Smith of Ivoclar Vivadent that SourceOne was the company behind TDA Perks Supplies.  (Dennis Decl., Ex. 39 (Dep. Ex. 674)).  That same day, John Stack at Ivoclar Vivadent contacted Ahmed Shams at SourceOne.  (Dennis Decl., Ex. 87 (Dep. Ex. 162)).

- Later, Ivoclar Vivadent representatives spoke with Patterson representatives at the Greater New York dental meeting in early December.  (Dennis Decl., Ex. 83 (Dep. Ex. 689)).  Just a few weeks later, Ivoclar Vivadent instructed its authorized

28

distributor, Arnold Dental, to remove its products from SourceOne, and informed Defendants of its actions.  (Dennis Decl., Ex. 84 (Dep. Ex. 173); Ex. 83 (Dep. Ex. 689); Ex. 85 (Dep. Ex. 769); Ex. 86 (Dep. Ex. 1382)).  Mr. Stack testified that he asked Arnold Dental to stop dealing with SourceOne because he feared retaliation by the major distributors.  (Dennis Decl., Ex. 233 (Stack Dep.) at 65:17-67:4, 68:3-7).

- On October 23, 2013, Mr. Edens wrote his superiors that he "will stay on" Sybron Axis, a Kerr company, to discontinue its distribution agreement with Arnold Dental.  (Dennis Decl., Ex. 41 (Ex. 676)).  Six days later, on October 29, 2013, Frank Nowtash of Arnold Dental informed Mr. Shams of SourceOne: "Kerr called me and does not want us to sell Kerr Lab, Axis or Total Care through SourceOne."  Mr. Nowtash noted how much the Kerr line meant to Arnold Dental.  (Dennis Decl., Ex. 49 (Ex. 157)).

Frank Nowtash of Arnold Dental (SourceOne's largest supplier at the time) was besieged by manufacturers: "the pressure from vendors was tremendous."  (Dennis Decl., Ex. 222 (Nowtash Dep.) at 408:3-19).  Prior to September 2013, Mr. Nowtash could not recall any manufacturer expressing concern about Arnold Dental selling products through SourceOne (*id.* at 315:10-14), but following the launch of TDA Perks Supplies, at least five manufacturers— Heraeus Kulzer, Ivoclar Vivadent, Septodont, Kerr, and Sultan—contacted him and requested that he remove their products from SourceOne.  Mr. Nowtash feared losing access to these lines and had no choice but to comply.  (*Id.* at 373:2-374:3; Dennis Decl., Ex. 102 (Dep. Ex. 163) ("These lines are simply our life line!! . . . I have no choice but to comply")).  Ultimately, Arnold Dental discontinued its relationship in April 2014.  Spurred by a threat ███████████ ████████████████████████████████████████████████ ████████████████████████ (Dennis Decl., Ex. 131 (Dep. Ex. 1387) at BDS00009333), Mr. Nowtash contacted Mr. Shams the very next day to tell Mr. Shams that he wanted to terminate the relationship with SourceOne.  (Dennis Decl., Ex. 130 (Dep. Ex. 128) at ADS_1385).  Mr. Cohen's threat and the "tremendous pressure" Mr. Nowtash felt from

manufacturers caused Mr. Nowtash to terminate his relationship with SourceOne.  (Dennis Decl., Ex. 222, Nowtash Dep. 391:2-25, 407:19-409:23).

This was the exactly the outcome that Defendants desired and what Henry Schein had instructed manufacturers in early March 2014: "Need to boycott the TDA!"  (Dennis Decl., Ex. 100 (DENTSPLY413790)).[8]  Schein employees attempted to conceal evidence that they pressured manufacturers, which they acknowledged was unlawful.  (Dennis Decl., Ex. 125 (Dep. Ex. 426)).

Defendants' pressuring of manufacturers who did business with SourceOne continued after the 2014 TDA annual meeting.  On April 8, 2014, just one day prior to Benco's pulling out of the 2014 TDA annual meeting on the heels of Henry Schein, Mr. Fernandez informed his boss, Mr. Rowe: "I am also going to have discussions with all of the manufacturer's that support the TDA Perks program. Schein and Patterson have already told most of them that if they support the program, they will no longer be invited to attend their regional meetings."  Mr. Rowe responded: "I would encourage more vendor partners to join the big three dealers and boycott future conventions."  (Dennis Decl., Ex. 111 (Dep. Ex. 1192)).  Just four days later, Mr. Fernandez instructed one of his sales representatives that "We have to put pressure on these distributors" and specifically Kuraray, "One of the First to sell thru TDA perks."  (Dennis Decl., Ex. 123 (Dep. Ex. 3003)).  Mr. Fernandez then forwarded Chuck Cohen of Benco a list of "spotlighted" manufacturers on TDA Perks Supplies, including Kuraray.  In turn, Mr. Cohen sent that list and an article about TDA Perks Supplies to Paul Guggenheim at Patterson and Tim Sullivan at Schein; and Mr. Guggenheim and Mr. Cohen later had a phone call to discuss TDA Perks Supplies. (Dennis Decl. Ex. 133 (Dep. Ex. 1389)).  The next week Rick Dunn informed

---

[8] The author of this Schein email to Dentsply ("Need to boycott the TDA!") is within the subpoena power of the Court and is listed on SourceOne's trial witness list.

Benco management that he did not want Kuraray attending Benco's regional meetings with manufacturers; his superior, Mr. Rowe, concurred: "We will not b [sic] supporting Kurary in the great state of TX." (Dennis Decl., Ex. 135 (Dep. Ex. 1195)). Defendants also encouraged manufacturers to boycott AzDA following its endorsement of SourceOne. (*E.g.*, Dennis Decl., Ex. 174 (Dep. Ex. 654) at COLTENE000068 ("Boo, Ashley, boycott that stupid event!!")).

### 4. In furtherance of their conspiracy, Defendants threatened dentists purchasing from SourceOne.

Defendants also advanced their illegal conspiracy by targeting dentists considering purchasing supplies through SourceOne's websites. Sometimes their actions took the form of spreading false information about the provenance, quality, efficacy, or safety of the products sold by SourceOne. Many of these false statements took the form of allegations that SourceOne was selling so-called "gray market" products through its websites. So-called "gray market" dental supplies are dental supplies sold outside authorized channels of distribution. (Dennis Decl., Ex. 225 (Rogan Dep.) at 43:22-45:17). Defendants know that gray market dental supplies are a concern for some dentists. (*Id.* at 45:19-46:20 (gray market goods create "potential for bad things to happen to patients" and "could create liability for dentists"); Ex. 216 (Ingersoll Dep.) at 81:22-82:13.) Defendants also are aware that they and their sales representatives hold positions of trust with dentists. (Dennis Decl., Ex. 234 (Starnes Dep.) at 15:25-16:11; Ex. 213 (Evans Dep.) at 50:16-51:16; Ex. 216 (Ingersoll Dep.) at 28:25-29:20).

Defendants abused that trust and preyed upon fear of gray market supplies to dissuade dentists from purchasing supplies from SourceOne's websites. This fear-mongering campaign occurred between Defendants' sales representatives and their dentists (*e.g.*, Dennis Decl., Ex. 173 (PattersonDental 000030324) at PattersonDental 00030325; Ex. 137 (Dep. Ex. 496) ("I've been talking non-stop the past two weeks about Perks with docs. Even this morning. I'm telling

31

them how TDA is selling supplies and why we are protesting.  How they are using gray market

products and how that affects them . . . ."); Ex. 216 (Ingersoll Dep.) at 83:10-19 ("I do know that

reps -- yes, they did inform their customers that the product -- some of the product available on

the TDA Perks website was, by definition, gray market product"); between Defendants and

industry "opinion leaders" (*e.g.*, Dennis Decl., Ex. 132 (Dep. Ex. 1388); Ex. 208 (Cohen Dep.) at

88:6-19); between Defendants and state dental associations (*e.g.*, Dennis Decl., Ex. 212 (Edens

Dep.) at 246:25-248:6; Ex. 241 (Xelowski Dep.) at 60:24-61:21).  It continues to this day.

(Dennis Decl., Ex. 205 (Bennett Dep.) at 88:3-11).  Defendants have engaged in this campaign

despite long-knowing that SourceOne offered products for sale by authorized distributors.  (*E.g.*,

Dennis Decl., Ex. 41 (Dep. Ex. 676) (Patterson learning that distributors selling through

SourceOne were authorized to do so); Ex. 25 (Dep. Ex. 1380); Ex. 83 (Dep. Ex. 689)).

Defendants' representations to dentists were false; extensive discovery has revealed evidence of

no more than a handful of unauthorized sales by SourceOne's vendors.

Defendants threatened to withhold service from dentists doing business with SourceOne.

Defendants are aware that the financial health of a dental practice is predicated, in part, on the

ability of dentists to obtain rapid service for their installed equipment.  (Dennis Decl., Ex. 207

(Cobb Dep.) at 40:5-41:4, 45:18-47:2).  Defendants are also aware that threatening to withhold

or delay equipment service for dentists buying supplies from a competing distributor is improper

(Dennis Decl., Ex. 208 (Cohen Dep.) at 108:13-109:7), and contrary to their independent self-

interest.  (Dennis Decl., Ex. 214 (Fernandez Dep.) at 55:19-56:10).  Nevertheless, on several

occasions, Defendants failed to service equipment of dentists who purchased from or supported

SourceOne, including prominent members of the TDA.  (*E.g.*, Dennis Decl., Ex. 158 (Dep. Ex.

262) at VDA000361; Ex. 149 (Dep. Ex. 1197) ("There are a few like Josh Austin … that is

openly bashing dental distribution. As of right now, Schein, Patterson and Benco have all told

him he can have the Perks program handle his service needs as well"); Ex. 167 (Dep. Ex. 1519)

(Schein dropping Josh Austin); Ex. 223 (Osio Dep.) at 168:10-169:23, 460:3-21; Ex. 241

(Xelowski Dep.) at 70:9-71:11).

  **5.**  **Defendants' conspiracy caused injury and damage to SourceOne.**

  A number of state dental associations expressed interest in SourceOne in light of the

endorsement by the TDA.  In the months following that endorsement, Donovan Osio of the TDA

contacted more than 12 SDAs who were considering endorsing SourceOne.  (Dennis Decl., Ex.

223 (Osio Dep.) at 72:22-73:14, 123:25-124:22, 125:15-126:3, 126:20-127:3, 127:5-128:8,

129:2-20, 129:23-130:25, 134:5-135:8, 136:6-137:16, 141:13-25; Ex. 51 (Dep. Ex. 12); Ex. 58

(Dep. Ex. 13); Ex. 60 (Dep. Ex . 14); Ex. 62 (Dep. Ex. 15); Ex. 61 (Dep. Ex. 16); Ex. 67 (Dep.

Ex. 17); Ex. 69 (Dep. Ex. 18); Ex. 90 (Dep. Ex. 19)).  The same was true following AzDA's

endorsement of SourceOne.  (Dennis Decl., Ex. 210 (Earle Dep.) at 28:18-29:7 (Nevada, Florida,

and Georgia); Ex. 241 (Xelowski Dep.) at 99:11-24 (Florida, Georgia, Utah, Washington, and

California); Ex. 140 (Dep. Ex. 100) (Arkansas)).  The board of Louisiana Dental Services, the

for-profit subsidiary of the Louisiana Dental Association, voted to endorse SourceOne and wrote

Mr. Shams of SourceOne: "The likelihood of the LDA board not accepting the recommendation

of the LDS Board is quite slim."  (Dennis Decl., Ex. 168 (Dep. Ex. 210)).  SourceOne was

discussed among the financial council at the Colorado Dental Association and the for-profit

subsidiary boards of the Virginia Dental Association.  (Dennis Decl., Ex. 170 (Dep.  Ex. 247);

Ex. 93 (Dep. Ex. 261)).  SourceOne also presented to at least thirty state dental associations at

the for-profit subsidiary meeting of the American Dental Association ("ADA") in July 2014; at

that meeting, "most people were interested in the concept."  (Dennis Decl., Ex. 204 (Brockhaus

Dep.) at 69:15-71:19).

Defendants intended their boycotts of the TDA annual meeting and Western Regional Dental Conference to intimidate other state dental associations into not endorsing SourceOne. (*E.g.*, Dennis Decl., Ex. 42 (Dep. Ex. 678) ("State Associations fear we'll pull out all the time"); Ex. 114 (Dep. Ex. 765) ("The bulk of their revenue comes from their state meetings.  Without exhibitors, though, they have no meeting and lose huge revenue generator"); Ex. 119 (Dep. Ex. 925) ("if it works for the TDA, it would be reasonable to expect ODA to follow. . . . If they do, I would expect us to have a similar response"); Ex. 126 (Dep. Ex. 1113) ("Any association that follows suite we should automatically pull out the meeting.  We have over 10 companies that have followed our lead and more will do so next year if it continues"); Ex. 134 (Dep. Ex. 768) (4.24.2014 email from D. Steck: "I am going to reach out to Carol Summerhays, my former customers (still with HSD) and 2012 CDA President to find out what is real and fiction here.  I will also make clear that if state dental associations go this route, they better be prepared for economic losses on their shows, and that we will organize and start competing conventions")). That plan worked: following Mr. Shams' presentation at the 2014 ADA conference, a number of state dental associations voiced their fears of retaliatory actions by the Defendants should they follow the TDA's course and endorse SourceOne, expressly pointing to Defendants' boycott of the TDA annual meeting.  (Dennis Decl., Ex. 223 (Osio Dep.) at 227:20-228:23, 230:14-231:2; Ex. 241 (Xelowski Dep.) at 109:3-110:18, 111:14-112:1; Ex. 239 (Trotter Dep.) at 71:11-19; Ex. 158 (Dep. Ex. 262)).  This fear would be a common refrain among the state dental associations who, while initially interested in endorsing SourceOne, ultimately declined to do so in light of the threat of boycott.  (*E.g*., Dennis Decl., Ex. 239 (Trotter Dep.) at 41:21-42:11 (Washington); Ex. 223 (Osio Dep.) at 142:9-144:21 (Louisiana, Maryland, South Carolina); Ex. 204 (Brockhaus Dep.) at 39:17-43:15 (Colorado); Ex. 172 (Dep. Ex. 243) (same: "Our Finance Council met over

the weekend to discuss joining into the GPO with Texas and Arizona.  The group is a little concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA and our largest component society which hosts the Rocky Mountain Dental Conference each year"); Ex. 139 (Dep. Ex. 252) (Virginia: "the VDSC Board had no desire to tread down that treacherous path")).

Defendants also targeted specific state dental associations who Defendants knew were considering a relationship with SourceOne.  In Nevada, Patterson threatened to pull support for a local dental society "in response to the Nevada Dental Association and their participation with SourceOne."  (Dennis Decl., Ex. 180 (PattersonDental 00034418)).  And, at the 2015 New Orleans Dental Conference, a Patterson representative informed a representative of the Louisiana Dental Association that "that if we moved forward with that endorsement of SourceOne that they -- they were -- essentially we would be unlikely to see Patterson and Schein exhibiting at a future conference. And Benco may have been implied in that as well." (Dennis Decl., Ex. 203 (Blackwell Dep.) at 115:7-116:14; *see also* Ex. 176 (Dep. Ex. 211) at LDA 0112; Ex. 209 (Counce Dep.) at 84:5-85:22).  This has the desired effect: despite the "quite slim" odds of rejecting its for-profit subsidiary's recommendation of SourceOne, the LDA board did just that, with concern of a boycott by Defendants a "very big factor."  (Dennis Decl., Ex. 203 (Blackwell Dep.) at 185:24-186:24; Ex. 183 (Dep. Ex. 218) at LDA 0135, 0137; Ex. 176 (Dep. Ex. 211) at LDA 0112 ("Following issues the Texas Dental Association (TDA) encountered with their endorsement of SourceOne Dental, the LDS board had concerns about how companies like Patterson and Henry Schein would react").  Indeed, the Patterson representative bragged to his colleagues that, through his threats, he "had put a stop to it." (Dennis Decl., Ex. 177 (Dep. Ex. 710); Ex. 209, Counce Dep. 106:4-10).

35

Meanwhile, in Texas and Arizona, Defendants' boycotts stunted the growth of TDA Perks Supplies and AzDA Perks Supplies. The TDA estimated the financial implications of doing business with SourceOne to be $312,500. (Dennis Decl., Ex. 143 (Dep. Ex. 28); Ex. 223 (Osio Dep.) at 207:16-208:9). In Arizona the effect of net income on account of the boycott of the 2015 Western Regional Dental Conference was approximately $90,000. (Dennis Decl., Ex. 210 (Earle Dep.) at 38:22-39:6; Ex. 241 (Xelowski Dep.) at 174:8-19; Ex. 175 (Dep. Ex. 104)). Charitable causes also suffered. (*E.g.*, Dennis Decl., Ex. 210 (Earle Dep.) at 45:22-46:19; Ex. 241, (Xelowski Dep.) at 170:14-171:5; Ex. 210 (Dep. Ex. 1383) (Benco declining to support TDA Smiles Foundation event); Ex. 181 (Dep. Ex. 82); Ex. 182 (Dep. Ex. 83)).

In response, the TDA and AzDA scaled back their marketing efforts concerning SourceOne in light of Defendants' actions. (Dennis Decl., Ex. 241 (Xelowski Dep.) at 70:14-20, 180:4-181:1; Ex. 223 (Osio Dep.) at 113:6-17). At the same time, false information about the quality of SourceOne products and forced removal of products from SourceOne's websites—both caused by Defendants as part of their illegal conspiracy—made dentists once enthusiastic about SourceOne less likely to purchase supplies through its websites. (Dennis Decl., Ex. 223 (Osio Dep.) at 107:2-23; Ex. 241 (Xelowski Dep.) at 70:9-13; Ex. 161 (Dep. Ex. 105)). Texas experienced a "significant decline" in the number of both members registering to use SourceOne websites and members reordering supplies through SourceOne websites. (Dennis Decl., Ex. 223 (Osio Dep.) at 111:13-112:7). The results in Arizona were similar. (Dennis Decl., Ex. 241 (Xelowski Dep.) at 180:4-181:1). The TDA even considered a resolution that would discontinue the relationship with SourceOne. (Dennis Decl., Ex. 143 (Dep. Ex. 28)). This was the intended effect of Defendants' illegal conspiracy. (Dennis Decl., Ex. 149 (Dep. Ex. 1197) ("it appears that any traction they had, has been lost due to the extremely low turnout at this year's show. The

doctors know they need us and aren't willing to risk our support by gambling on a poorly planned and run program.").

## III.     Statement of Law

### A.  Summary Judgment Standard

Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  On a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "[S]ummary judgment is not a substitute for trial."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  "Thus, when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'"  *Id.* (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

### B.  Proof of an Agreement Under Section One of the Sherman Act.

Private plaintiffs pursuing claims under Section One of the Sherman Act, 15 U.S.C. § 1, must prove the existence of (i) a contract, combination or conspiracy that (ii) unreasonably restrains trade and (iii) causes antitrust injury to the plaintiff.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61.  A Section One conspiracy requires proof of a "unity of purpose or a common design and understanding or a meeting of minds" or "a conscious commitment to a common scheme."  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).[9]

---

[9] Defendants have not moved for summary judgment on the issue of whether their agreement, if proven, is an unreasonable restraint of trade, or whether SourceOne has suffered antitrust injury.

37

1.      **Conspiracy Evidence.**

A conspiracy may be proven by direct or circumstantial evidence.  "All evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion, though perhaps on average circumstantial evidence requires a longer chain of inferences." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63 (citation omitted). Unambiguous evidence of conspiracy precludes summary judgment against the plaintiff in a Section One case.  *Id.* at 64-65.

Conspiracies may be and often are proven entirely through circumstantial evidence and inferences drawn from the defendants' activities.  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) ("circumstantial evidence … including ambiguous statements … are not to be disregarded [at summary judgment] because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial.").  It is well settled that "[n]o formal agreement is necessary to constitute an unlawful conspiracy," *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946), and that "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement."  *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540 (1954).  "It is not necessary to find an express agreement in order to find a conspiracy.  It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement."  *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 614 (2d Cir. 1979) (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948)).

"As a practical matter," the "best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement." *Apex Oil*, 822 F.2d

at 253.  Courts thus "carefully examine the conduct and communications of the defendants in order to determine whether it evidences an agreement." *Id*.  Agreement may also be inferred from the conspirators' actions, including "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (internal citations omitted).

Conspiracies to engage in conduct that would be lawful when engaged in unilaterally are actionable under Section One.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, <u>as long as it does so independently</u>.'") (quoting *Monsanto*, 465 U.S. at 761 (emphasis in original)).  Accordingly, "[i]t is of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest."  *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142 (1966).

When the plaintiff seeks to prove a conspiracy through circumstantial evidence, courts evaluate a number of factors—often termed "plus factors"—that "tend to exclude the possibility that the defendants acted unilaterally."  *Apex Oil*, 822 F.2d at 253-54.  Plus factors include: (1) the presence of a strong motive to enter into the alleged conspiracy, *see, e.g., In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 366 (S.D.N.Y. 2011); (2) actions against independent economic self-interest, *see, e.g., id.*; (3) "evidence implying a traditional conspiracy," including competitors seeking assurances of common action, *see, e.g., In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004); and (4) abrupt, unanimous changes in longstanding business practices, *see Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 223

(1939).  In this Circuit, an antitrust plaintiff asking a court to infer a horizontal agreement from circumstantial evidence and plus factors must provide evidence that "might tend to exclude the possibility of independent parallel behavior[,]" *Apex Oil*, 822 F.2d at 254, or "that casts doubt on inferences of independent (not combined) action or proper conduct by defendants."  *Capital Imaging Assoc. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 545 (2d Cir. 1993).

### 2. *Matsushita* Did Not Rewrite Rule 56.

The more plausible the conspiracy, the less evidence needed to establish its existence. *High Fructose Corn Syrup*, 295 F.3d at 661.  Where, as here, the "conspiracy is economically sensible for the alleged conspirators to undertake," the "tends to exclude standard" is "more easily satisfied."  *See In re Publ'n Paper*, 690 F.3d at 63 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004)).  Summary judgment is typically only appropriate where the alleged anticompetitive conspiracy is economically implausible.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  *Matsushita* did not "introduce a special burden on plaintiffs facing summary judgment in antitrust cases[.]"*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992) (the alleged conspiracy in Matsushita was "economically senseless").

The courts have consistently found that group boycott conspiracies are plausible under *Matsushita*, and that *Matsushita's* "tends to exclude" standard is more easily satisfied in such cases.  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1086-87 (10th Cir. 2006) (reversing grant of summary judgment; "it is certainly economically rational for a group of established firms to attempt to keep an aggressive competitor out of the market, whether they are doing so to protect profits or simply to guard market share.  In light of this, the district court erred in drawing such limited inferences from Champagne's circumstantial evidence."); *Rossi v.*

40

*Standard Roofing*, 156 F.3d 452, 474 (3rd Cir. 1998) (reversing grant of summary judgment; "it is not difficult to divine the likely motive of the three distributors … in boycotting [plaintiff].  As [plaintiff's] horizontal competitors, they wanted to rid the market of a price-cutting competitor …"); *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 (3rd Cir. 1987) (reversing grant of summary judgment; group boycott conspiracy had a plausible motive: "to have one less competitor in a limited market.").

Moreover, the rationale for limiting the range of inferences that can be drawn from ambiguous evidence in certain types of cases under *Matsushita* is absent here.  The challenged conduct in *Matsushita* involved price discounting, and "cutting prices in order to increase business often is the very essence of competition."  475 U.S. at 594.  Inferring agreement from ambiguous evidence in such a case would risk "chill[ing] the very conduct the antitrust laws are designed to protect" and "discouraging legitimate price competition."  *Id.* (internal citation and quotation marks omitted).  No such concern is present here.  The only conduct that will be chilled by denying summary judgment on this record are the interfirm communications among the Defendants, communications that the Defendants' witnesses conceded were inappropriate and without legitimate business justification.  *Publ'n Paper*, 690 F.3d at 63 ("broader inferences are permitted, and the 'tend to exclude standard is more easily satisfied, when the … 'challenged activities could not reasonably be perceived as procompetitive.'") (citing *Flat Glass*, 385 F.3d at 358); *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993) ("Also in direct contrast to *Matsushita*, the defendants' challenged activities are not procompetitive. … Therefore, given the circumstances of this case, more liberal inferences from the evidence should be permitted than in *Matsushita* because the attendant dangers from drawing inferences recognized in *Matsushita* are not present.")

In *In re Publication Paper Antitrust Litigation*, the Court noted that "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff." 690 F.3d at 63. In support of its statement, the Court quoted the leading antitrust treatise:

> [i]t is important not to be misled by Matsushita's statement ... that the plaintiff's evidence, if it is to prevail, must "tend ... to exclude the possibility that the alleged conspirators acted independently." The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct. Not only did the court use the word "tend," but the context made clear that the Court was simply requiring sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.

*See id.* (citing Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW § 14.03b, at 14–25 (4th ed. 2011) (footnotes omitted) (emphasis added)).

In any event, "the standards established in Matsushita do not apply at all" when, as is true here, a plaintiff has produced direct evidence of an agreement. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.

### C. Proof of Participating in and Withdrawal From a Section One Agreement.

### 1. The Scope of a Conspiracy is an Issue of Fact.

It is axiomatic that "a single agreement may encompass multiple illegal objects." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). To prove a single conspiracy, the plaintiff "must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Friesel*, 224 F.3d 107, 114 (2d Cir. 2000) (citation omitted). "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *Id.*

 "Changes in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy." *United*

*States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).  "A single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres or phases of operation," *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), or that "it occur[ed] in more than one stage and at different times."  *United States v. Vazquez*, 113 F.3d 383, 387 (2d Cir. 1997); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("the mere fact that an operation consists first of a robbery, planned and executed with the aid of an insider, and then of concealment of the money, executed by persons other than the insider, does not necessarily entitle the defendants to a multiple-conspiracy change").  Nor is it "transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations."  *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989).  Whether the plaintiff has proved a single conspiracy or "multiple other independent conspiracies is a question of fact for a properly instructed jury."  *United States v. Alessi*, 638 F.3d 466, 472 (2d Cir. 1980).

The date on which a co-conspirator joins a conspiracy is immaterial.  *See Interstate Circuit*, 306 U.S. at 227 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) ("a conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception"); *accord United States v. Cont'l Group, Inc.*, 603 F.2d 444, 452 (3d Cir. 1979) (no need "to prove that [Defendant] participated in the conspiracy from its inception, but only that he knowingly became a member of the ongoing conspiracy") (citation omitted).

A defendant need not participate in every facet of a conspiracy to be liable as a co-conspirator.  *United States v. Curley*, 55 F.3d 254, 257 (7th Cir. 1995); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 690 ("the fact that [a defendant was] involved in only a portion of [a conspiracy] does not undermine the existence of the conspiracy itself or [the defendant's role] as a participant").  Neither different overt acts nor different groups of defendants require a finding of multiple conspiracies.  *United States v. Inryco, Inc.*, 1981 WL 2126, at *3 (D. Md. July 28, 1981).  "Simply because the overt acts which constitute the means and objectives of the conspiracy can logically be grouped into separate categories does not demonstrate that more than a single conspiracy is involved." *United States v. Hubbard*, 474 F. Supp. 64, 71-72 (D.D.C. 1979).

## 2. Knowledge of a Conspiracy Does Not Require Knowledge of the Whole.

To establish that a defendant joined a conspiracy, the plaintiff "need not show that the defendant knew all of the details of the conspiracy, so long as he knew of its general nature and extent." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008).  A single act may support an inference of involvement in a conspiracy if it is "of a nature justifying an inference of knowledge of the broader conspiracy." *Id.*

## 3. Liability for the Acts Performed by Co-Conspirators is Joint and Several.

In an antitrust conspiracy, like other conspiracies, conspirators are jointly and severally liable for the acts of each co-conspirator.  *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011).  In addition, "[a]bsent proof that any conspirator has withdrawn from the conspiracy, he is liable for all acts performed in furtherance of the conspiracy by the other conspirators." *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1267, 1271 (6th Cir. 1995)

### 4.      Withdrawal from a Conspiracy Requires Affirmative Steps.

To establish withdrawal from a conspiracy, a defendant must discharge its burden by showing that it has communicated its withdrawal to its co-conspirators, and that it has "not take[n] any subsequent acts to promote the conspiracy … and [it does] not receive any additional benefits from the conspiracy."  *United States v. Berger*, 224 F. 3d 107, 118 (2d Cir. 2000) (citations omitted); *see also Hyde v. United States*, 225 U.S. 347, 369 (1912) (to withdraw from conspiracy a defendant must present evidence of some "affirmative action [taken] ... to disavow or defeat the purpose" of the conspiracy).  Until affirmative evidence of withdrawal has been produced, a defendant's participation in the conspiracy is presumed to continue until the last overt act by any of the conspirators.  *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1976).

### 5.      The Test for Participating in a Conspiracy is Slight Participation.

In a civil action, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  *Apex Oil*, 822 F.2d at 257.  Slight evidence in this context refers to slight participation in furthering the goals of the conspiracy rather than the quantity of evidence.  A defendant may have a "slight connection" to a conspiracy even if the defendant did not know all the conspirators, did not participate in the conspiracy from its beginning or participate in all its enterprises, or otherwise know all its details.  *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009).  In *Huezo*, 546 F.3d at 184-85, the Court of Appeals recognized that the "slight evidence" doctrine was incompatible with the standard of proof required in criminal cases. That concern is inapplicable here.  *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 438 (S.D.N.Y. 2014) (recognizing that the "slight evidence" standard applies in civil antitrust conspiracy cases after *Huezo*).

IV.     Argument

   **A.  The Existence of an Antitrust Conspiracy is a Disputed Issue of Material Fact.**

   **1.     Unambiguous Evidence of an Agreement among Defendants and Co-Conspirators.**

There is unambiguous evidence of an agreement among the Defendants that precludes the grant of summary judgment.  The first cluster of such unambiguous evidence relates to the communications of the Defendants between October 2013 and January 2014 relating to a boycott of the Texas Dental Association.  The Texas evidence on its face and without the need for further inferences shows an agreement to boycott the TDA if the TDA did not discontinue its relationship with SourceOne.  After December 2013 the Defendants consistently demonstrated a "conscious commitment to a common scheme" to this end.

   The jury could reasonably find that (i) Benco communicated a plan for conspiracy to Schein, and told Schein that it would be communicating the same plan to Patterson; (ii) after several communications with Patterson, Schein implemented the plan communicated by Benco; and (iii) after communications with Benco and Schein, Patterson implemented the plan communicated by Benco.  Along the way, employees of Patterson, Benco and Schein had numerous private communications that they admit were improper and that refined and solidified their agreement.  After December 2013, the documents consistently show an unwavering commitment to boycotting the TDA if it did not discontinue its relationship with SourceOne:

- Patterson manifested this commitment no later than October 23, 2013: "we have briefly discussed this TDAPerks site (not the source) with our dealer competitors at the local San Antonio & Houston level … *I am committed to pulling from the TDA* if they do not reconsider competing with us via TDAPerks." (Dennis Decl., Ex. 41 (Dep. Ex. 676) (emphasis added)).

- Benco manifested this commitment no later than December 11, 2013: "I have been talking to the directors of Schein and Patterson. *We are going to be taking a stand*

> ***together against them*** [TDA]."    (Dennis Decl., Ex. 77 (Dep. Ex. 1355) (emphasis added)).

- Schein manifested this commitment no later than January 8, 2014: "The approach is to . . . make it clear that we can't continue to support TMOM [i.e., the Texas Mission of Mercy, a charitable program of the TDA], TDA Annual Session, and other fund raising events while they are endorsing another dental distributor."  (Dennis Decl., Ex. 91 (Dep. Ex. 1497)).

- Even before learning of Schein's decision not to attend the 2014 TDA meeting, Benco on April 8, 2014, was certain that there was an agreement to boycott future TDA meetings: "I would encourage more vendor partners ***to join the big three dealers and boycott future conventions***.  Their meeting dying a slow death will have more impact than matching prices."  (Dennis Decl., Ex. 111 (Dep. Ex. 1192) (emphasis added)).

Defendants' primary response to this evidence is to ignore it, inventing and attacking instead a strawman conspiracy allegation that focuses myopically on a boycott of the 2014 TDA meeting.  According to Benco, the "conspiracy claimed by SourceOne … [had the] purpose of boycotting the TDA 2014 meeting."  (Benco Mem. at 10; *see also id*. at 16 (discussing "the 2014 TDA meetings at issue")).  According to Patterson, SourceOne alleges a "conscious commitment to the common scheme of boycotting the 2014 TDA meeting[.]"  (Patterson Motion at 16).  But neither SourceOne's Complaint nor its responses to Defendants' contention interrogatories are so narrow, alleging a broad and unitary conspiracy to exclude SourceOne.  (ECF No. 1 at ¶¶ 1, 4; Dennis Decl., Ex. 199 (SourceOne Dental, Inc.'s Third Supplemental Responses and Objections to Defs.' First Set of Interrogatories) at 4-17).

A jury could also reasonably find that Defendants' agreement was part of a pre-existing conspiracy to boycott dentists forming group purchasing arrangements, that this pre-existing conspiracy was conceived and monitored through interfirm communications among the Defendants, and that Defendants' pre-existing conspiracy extended to SDAs who endorsed SourceOne.  Defendants identified SourceOne's relationships with SDAs as a form of group purchasing arrangement.  As a Schein employee succinctly explained: "TDA = GPO = Sworn

47

enemy of dental sales reps".  (Dennis Decl., Ex. 138 (Dep. Ex. 1514); *see also* Ex. 75 (Dep. Ex. 457), Ex. 32 (Dep. Ex. 478), Ex. 128 (Dep. Ex. 927)).

Defendants' myopic focus on the 2014 TDA meeting conceals three mistakes about the law of conspiracy.  The first mistake the Defendants make is to assume that a conspiracy is not formed until the participants agree on all of the details.  The evidence shows that each of the Defendants had a conscious commitment to the common scheme of punishing third parties doing business with SourceOne, including the TDA.  (Dennis Decl., Ex. 41 (Dep. Ex. 676); Ex. 77 (Dep. Ex. 1355); Ex. 95 (Ex. 764)).  The fact that Defendants may not have agreed at first as to whether that common scheme specifically encompassed a boycott of the 2014 TDA meeting, as opposed to the 2015 TDA meeting, is immaterial.  "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *Friesel*, 224 F.3d at 114.

The second mistake Defendants make is to confuse a conspiracy with the overt acts in furtherance of the conspiracy.  Boycotting the 2014 TDA meeting was an overt act in furtherance of their conspiracy, not the conspiracy itself, and there is no requirement that all of the Defendants agree to engage in the same overt act.  *United States v. Salameh*, 152 F.3d 88, 145-46 (2d Cir. 1998) (in a conspiracy to blow up buildings, co-conspirators need not all agree on which buildings are to be detonated).  Thus, although there is substantial circumstantial evidence that the Defendants agreed specifically to boycott the 2014 TDA meeting (*see* Sec. IV.A.2), there is no requirement that they reached such an agreement, and because there is direct evidence of an agreement to boycott TDA meetings in 2015 and beyond, summary judgment should be denied on the strength of that evidence alone.

The third mistake lurking in Defendants' myopic focus on the 2014 TDA meeting is to compartmentalize SourceOne's conspiracy allegations as if they were separate lawsuits, overlooking the conspiracy claim itself.  In a conspiracy case involving multiple actors and multiple overt acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole[.]"  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  In fact, this type of improper compartmentalization of the evidence is a pervasive mistake made throughout the Defendants' summary judgment briefs.

The absurdity implied by Defendants' myopic focus on the 2014 TDA meeting is best illustrated with a Benco document.  On April 8, 2014, Benco was demonstrably a card-carrying member of Defendants' conspiracy to boycott third parties dealing with SourceOne, including the TDA, despite the fact that it had not yet made the decision not to attend the 2014 TDA meeting.  On that date, Benco's Mr. Fernandez wrote to his supervisor that Schein and Patterson were punishing manufacturers dealing with SourceOne, and that Mr. Fernandez was also "going to have discussions with all of the manufacturer's [sic] that support the TDA Perks program." (Dennis Decl., Ex. 111 (Dep. Ex. 1192)).  Mr. Fernandez identified to Mr. Rowe the specific coercive mechanism that Schein and Patterson were using, and then soon after Benco deployed the exact same coercive mechanism against Kuraray, a manufacturer dealing with SourceOne. (*Id.*; Dennis Decl., Ex. 135 (Dep. Ex. 1195); Ex. 133 (Dep. Ex. 1389); Ex. 123 (Ex. 3003)).  Also on April 8, Benco's Mr. Rowe responded to Mr. Fernandez, suggesting that Mr. Fernandez also "encourage more vendor partners to join the big three dealers and boycott future conventions"

49

because "their meeting dying a slow death will have more impact than matching prices." (Dennis Decl., Ex. 111 (Dep. Ex. 1192)).  Thus, as of April 8, 2014, Benco demonstrably had a conscious commitment to a common scheme with Patterson and Schein to both pressure manufacturers dealing with SourceOne, and to "boycott future conventions" of the TDA, including the 2015 TDA meeting.  But according to Defendants, none of this evidence on April 8 matters, because Benco did not decide to boycott the 2014 TDA meeting until April 9.

The second cluster of unambiguous evidence of conspiracy relates to the communications of the Defendants in the summer of 2014 relating to a boycott of the Arizona Dental Association. In a precise replay of the Texas playbook, Benco first contacted and obtained assurances from Schein, and then contacted Patterson to do the same.  Along the way, Benco generated two unambiguous admissions of guilt, despite the efforts of Patterson to suppress evidence:

- After Patterson's Mr. Bushman accepted Benco's invitation to collude on July 21, 2014, Benco's Mr. Wade memorialized their pact: "Chad, Thanks for the quick response. *We are of the same mindset*. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill -conceived idea to become a distribution competitor."  (Dennis Decl., Ex. 157 (Dep. Ex. 376) (emphasis added)).

- Days later, Mr. Wade wrote the following: "I have communicated with our competition at Schein and Patterson and *we are all of the same mind* that we will not be supporting a competitor's meeting next year."  (Dennis Decl., Ex. 154 (Dep. Ex. 645) (emphasis added)).

In addition to these communicated expressions of a commitment to a common scheme, Benco's threat to the AzDA delivered on behalf of Schein (Dennis Decl., Ex. 241 (Xelowski Dep.) at 148:2-152:1), is also highly probative of agreement, and several courts have found precisely that type of threat—delivered by one competitor on behalf of another—to be highly probative of agreement.  *Champagne Metals*, 458 F.3d at 1083 (reversing grant of summary judgment; threat by a defendant to a third-party dealing with the plaintiff that included a

reference to another defendant-competitor was direct evidence of conspiracy); *Rossi*, 156 F.3d 452, 468 (same).  In another group boycott case denying summary judgment, a statement by one defendant to a third-party dealing with the plaintiff that acknowledged the interest of another defendant in stopping that course of dealing with the plaintiff "undercut defendants' contention that they acted independently."  *In re Tableware Antitrust Litig.,* 484 F. Supp. 2d 1059, 1074 (defendant thanked third party for "doing 'the right thing for all partners in the game'"), 1076 (N.D. Cal. 2007).  And in this case, unlike *Champagne Metals* or *Tableware*, there is in this case undisputed evidence that the defendant delivering the threat actively communication about the boycott with the co-conspirator on whose behalf the threat was delivered.

Moreover, there is substantial evidence that ties the Defendants' conspiratorial conduct in Texas and Arizona together in a single conspiracy.   First, Benco's Mr. Fernandez (a central figure in the Texas component of the conspiracy) called Schein's Kevin Upchurch (a central figure in the Arizona component of the conspiracy) to discuss the AzDA on the same day that Mr. Fernandez called Texas-based employees of Schein and Patterson to relay Benco's decision to boycott the 2014 TDA meeting.  (Dennis Decl., Ex. 188 (Schein's Responses & Objections to Class Plaintiffs' First Set of Interrogatories) at 9).  Second, Messrs. Upchurch (Schein), Evans (Benco), Wade (Benco), and Bushman (Patterson)—the *dramatis personae* in Arizona— carefully researched the TDA boycott before, during and after their communications with one another, including communicating with their Texas colleagues about the boycott of the 2014 TDA annual meeting.  (Dennis Decl., Ex. 149 (Dep. Ex. 1197); Ex. 155 (Dep. Ex. 735); Ex. 205 (Bushman Dep.) at 142:5-143:9; 180:15-181:16).  Third, Benco's invitation to collude to Patterson in Arizona expressly includes and references the Texas boycott and invites Patterson to extend that conspiracy to Arizona.   (Dennis Decl., Ex. 157 (Dep. Ex. 376)).

## 2.    Circumstantial Evidence of an Agreement among Defendants and Co-Conspirators.

Although the direct evidence of agreement outlined above entitles SourceOne to a jury trial, there is also ample circumstantial evidence of agreement among the Defendants.  A jury could find that Defendants engaged in consciously parallel conduct, and that no fewer than five "plus factors" tend to "cast[] doubt" on the possibility of independent action by the Defendants. *Capital Imaging*, 996 F. 2d at 545.  No case cited by the Defendants involved circumstantial evidence of conspiracy remotely as strong as is present here.

Defendants' arguments in favor of summary judgement repeat two of the "traps" that Judge Posner cautioned that courts must avoid when examining motions for summary judgment in conspiracy cases.  *High Fructose Corn Syrup*, 295 F. 3d at 655.  Specifically, the Court should not weigh conflicting evidence, because that is the job of the jury, or attach great significance to the lack of a single piece of evidence that unequivocally demonstrates the existence of the entire conspiracy.  *Id*. at 655-56.  Evidence that is "susceptible of differing interpretations" is not "devoid of probative value" for the nonmoving party (*id.*), and it is the role of the jury to determine whether the evidence considered as a whole establishes the conspiracy alleged by SourceOne.

### a)   Defendants Engaged in Consciously Parallel Conduct That Was Against Their Independent Interest Absent Collusion.

Consciously parallel conduct occurs when defendants act similarly, know of each other's actions, and take that knowledge into account when making decisions.  *Petruzzi's*, 998 F.2d at 1242–44.  Similar treatment of suppliers or customers—and awareness that similar treatment is occurring—can also demonstrate conscious parallelism. *Id*. at 1243 (recognizing as parallel behavior buyers' similar actions in refraining from competing for each other's accounts).

Consciously parallel conduct can support the inference of agreement when supplemented with other "plus factor" evidence. *Apex Oil*, 822 F.2d at 253-54.

There is ample evidence of consciously parallel conduct. Three such examples come from the files of Benco.

First, Benco engaged in consciously parallel conduct with respect to its decision to boycott the 2014 TDA annual meeting; Benco learned that Patterson and Schein were boycotting the 2014 meeting and promptly did the same. On April 9, 2014, having learned that Schein had pulled out of the 2014 TDA meeting, Benco did the same, reversing its previous plans within hours. Benco's rationale was a textbook example of conscious parallelism. (Dennis Decl., Ex. 118 (Dep. Ex. 1384): "Let's pull out, if Schein and Patterson are as well"). The jury could find that this consciously parallel conduct was contrary to Benco's unilateral self-interest absent an agreement, because ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████ (Dennis Decl., Ex. 2 (Dep. Ex. 1180); Ex. 18 (Dep. Ex. 1182); Ex. 19 (Dep. Ex. 1183); Ex. 15 (Dep. Ex. 1392)).

Second, Benco engaged in consciously parallel conduct with respect to pressuring manufacturers dealing with SourceOne. Having learned that Patterson and Schein were pressuring manufacturers by restricting their access to the dealers' sales representatives, Benco promptly did the same. (Dennis Decl., Ex. 111 (Dep. Ex. 1192); Ex. 135 (Dep. Ex. 1195); Ex. 133 (Dep. Ex. 1389); Ex. 123 (Dep. Ex. 3003)). The jury could find that this consciously parallel conduct was contrary to Benco's unilateral self-interest absent an agreement, as Benco's Mr. Fernandez testified that "Benco's too small of a company to – to throw weight around like that." (Dennis Decl., Ex. 214 (Fernandez Dep.) at 127:16-128:11).

Third, Benco engaged in consciously parallel conduct with respect to withholding service from dentists dealing with SourceOne; having learned that Patterson and Schein were withholding service from specific TDA members supporting SourceOne, Benco promptly did the same. (*E.g.*, Dennis Decl., Ex. 149 (Dep. Ex. 1197)). The jury could find that this consciously parallel conduct was contrary to Benco's unilateral self-interest absent an agreement, as Benco's Mr. Fernandez testified that such conduct would not make business sense for Benco. (Dennis Decl., Ex. 214 (Fernandez Dep.) at 55:19-56:10; Ex. 198 (Benco's Amended Objections and Responses to SourceOne Dental, Inc.'s First Set of Requests for Admission ¶ 293 (admitting that withholding service from dentists doing business with SourceOne was against Benco's business interests)).

Defendants highlight what they take to be non-parallel conduct by Benco and Patterson with respect to attendance at the 2014 TDA meeting. The fact that Benco decided to boycott the 2014 meeting (as opposed to the 2015 meeting) only after seeing Patterson and Schein do the same does not preclude the inference of agreement. The inference of agreement can be drawn "from parallel conduct that is sequential rather than simultaneous." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011); *In re Currency Conversion*, 773 F. Supp. 2d at 367-68 (six month period of gradual and incremental parallelism can support inference of agreement). "[N]ot all conspiracies require swift, simultaneous parallelism." *Ross v. Am. Express Co.*, 35 F. Supp. 3d at 439. And as explained above, Benco at all times from December 2013 onwards consistently manifested its belief that it had joined an antitrust conspiracy to penalize third-parties doing business with SourceOne. (Dennis Decl., Ex. 111 (Dep. Ex. 1192); Ex. 77 (Dep. Ex. 1355)). Whether the conspirators had reached agreement on the precise details of that plan before April 2014 is immaterial.

Patterson makes much of the fact that it was the first firm to boycott the 2014 TDA meeting. Patterson ignores the evidence that its conspiratorial communications with Benco preceded its decision to boycott the 2014 TDA meeting, easily allowing a jury to find that Patterson dropped out of the 2014 meeting pursuant to an understanding with Benco and Schein. *Fears v. Wilhelmina Model Agency, Inc.*, 2004 U.S. Dist. LEXIS 4502 at *30 (S.D.N.Y. March 23, 2004) ("While it is possible that [defendant] simply took the lead in raising its commissions, with the blind hope that other members would follow, it is far more reasonable to assume that [defendant] sought some guarantee that the other defendants would acquiesce …."). Substantial evidence supports that conclusion in this case. *Fears*, 2004 U.S. Dist. LEXIS at *30-33 (noting interfirm communications preceding sequentially parallel conduct in denying summary judgment). There are at least five reasons a jury could find that Patterson's decision to boycott the 2014 TDA meeting was taken in furtherance of a conspiracy with Schein and Benco.

First, while Patterson on October 23, 2013, was "committed" to pulling out of the TDA after discussions "with our dealer competitors," it had earlier on October 11, 2013, discussed internally only the possibility of such a step: "Once we address the TDA, an outcome may be no longer supporting the TDA meeting." (Dennis Decl., Ex. 24 (Dep. Ex. 666)). Something changed between October 11, when it was only possible that Patterson would not attend the TDA meeting, and October 23, when it was "committed" to doing so. (Dennis Decl., Ex. 41 (Dep. Ex.

676)).[10]   The jury could find that Patterson's communications "with our dealer competitors" was what pushed Patterson from possibly not attending the TDA to being "committed" not to do so.[11]

Second, Benco certainly thought it had an agreement with Patterson as of December 11, 2013, when Mr. Fernandez wrote "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them [TDA]." (Dennis Decl., Ex. 77 (Dep. Ex. 1355)).  According to Patterson, it did not make a decision not to attend the 2014 TDA meeting until December 18, 2013, but it communicated to Benco (in November 2013) and Schein (in November and December 2013) that it had already made that decision.  (Dennis Decl., Ex. 76 (Dep. Ex. 3012); Ex. 72 (Dep. Ex. 453); Ex. 74 (Dep. Ex. 455); Ex. 220 (McLemore Dep. 28:21-29:4, 149:10-24; Ex. 216 (Ingersoll Dep.) at 55:3-18; Ex. 73 (Dep. Ex. 454)).  A jury could find that Patterson met with the TDA on December 18 with its mind made up, already committed to conspiracy with Benco and Schein.

Third, Schein believed that Patterson was dropping out of the TDA meeting with the expectation that Schein would do the same, and Schein indeed acted as if it was obligated to Patterson.  On December 13, 2013, Schein's regional manager informed his supervisor "FYI Patterson pulled out of [the TDA] convention. I firmly believe they made the move expecting us to follow suit."  (Dennis Decl., Ex. 81 (Dep. Ex. 912)).  In the same email chain, Schein's Vice President proposed that Schein "get together with a group of other dealers and manufacturers and send them [TDA] a petition[,]" a proposal rejected by Schein's President as "collusion."  (*Id.*)

___

[10] Patterson contends that Mr. Edens was merely voicing his "internal commitment" (Patterson Mem. at 9), but does not include this assertion in its 353-paragraph Rule 56.1 Statement, thus acknowledging that the interpretation of Mr. Edens' email is a disputed material fact.

[11] This chronology dispenses with Patterson's bald assertion that "From the very first point in time that Patterson learned of TDAPerksSupplies, Patterson's consistent position and view was that it would not support an organization that directly competed, and marketed against, it." (Patterson Mem. at 6).

Patterson has no persuasive explanation as to why Schein knew of Patterson's decision making as of December 13. Schein's Vice President (the same individual who had proposed a plan for "collusion") later manifested a consciousness of obligation with respect to informing Patterson of its decision making with respect to attendance at the 2014 TDA meeting: "Guys, I have to get back to PDCO on whether or not we are attending the TDA." (Dennis Decl., Ex. 94 (Dep. Ex. 763)). Schein's employees admitted that there was no legitimate business purpose for Schein's desire to communicate this information to Patterson. (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 117:16-118:4).

Fourth, a jury could find that Patterson believed that it had Schein's assurance to pull out of the 2014 TDA meeting as of December 2013. When Schein's Vice President (the one with the plan for "collusion") did communicate with Patterson in January, the response of Patterson's President and Vice President show that they believed that they had earlier received assurances from the same Schein Vice President that Schein would not be attending the 2014 TDA meeting. The jury could find that this earlier exchange of assurances between Schein's Vice President and Patterson's President occurred in December, and before Patterson made its decision not to attend the 2014 TDA meeting. (Dennis Decl., Ex. 96 (Dep. Ex. 731) Ex. 236 (D. Steck Dep.) at 377:18-22); Ex. 191 (Schein's Responses & Objections to SourceOne's Second Set of Interrogatories) at 9).

Fifth, Benco contacted Patterson and Schein when it decided to pull out of the 2014 TDA meeting before it informed its own sales representatives, allowing a jury to infer an agreement among those three to engage in that conduct. (Dennis Decl., Ex. 116  (Dep. Ex. 1356); Ex. 77 (Dep. Ex. 1355); Ex. 214 (Fernandez Dep.) at 109:4-21, 116:23-117:3, 122:9-123:2, 124:8-18).

For all these reasons, the fact that Benco and Schein did not immediately follow Patterson in boycotting the 2014 TDA meeting (although they ultimately did just that), at most goes to the weight of the competing inferences that can be drawn from the chronology of events in Texas, but does not entitle Defendants to summary judgment on this ground.  *Apex Oil*, 822 F.2d at 253 ("the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial.").  Patterson's reliance on *Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*, 22 F. Supp. 447, 467 (D. Md. 1998) is unavailing.  SourceOne is not contending that the Defendants' parallel decisions to boycott the 2014 TDA meeting are in and of themselves sufficient to infer an agreement among the Defendants.  Moreover, the disparities in the "manner and timing" of the *Merck-Medco* defendants' parallel conduct were substantially greater than the minor differences in the parallel conduct of the Defendants in this case, as one of the defendants in Merck-Medco actually worked with the plaintiff.  22 F. Supp. at 467.  And Patterson is overstating the differences among the Defendants' parallel conduct, as a jury could find all three Defendants settled on a boycott of the TDA in December 2013 or earlier.  (Dennis Decl., Ex. 41 (Dep. Ex. 676); Ex. 77 (Dep. Ex. 1355); Ex. 91 (Dep. Ex. 1497); Ex. 96 (Dep. Ex. 731)).  Any differences in the timing of the implementation of this boycott can be explained by the delay Schein experienced in getting a meeting scheduled with the TDA, which Schein wanted before implementing its portion of the boycott of TDA.  (Dennis Decl., Ex. 91 (Dep. Ex. 1497); Ex. 94 (Dep. Ex. 763); Ex. 97 (Dep. Ex. 1104); Ex. 98 (Dep. Ex. 915)).

Finally, Patterson would still be liable if it independently dropped out of the TDA meeting but then joined the conspiracy at a later date.  *Ross*, 35 F. Supp. 3d at 439 (rejecting argument that defendant that implemented an arbitration clause before a conspiracy to adopt

58

those clauses began could not be liable for participating in that conspiracy). Both leaders (e.g., Patterson) and followers (e.g., Benco) are liable in an antitrust conspiracy. *See Paramount Pictures*, 334 U.S. at 161 ("acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of" the illegal scheme). It does not matter whether a leading defendant initially made a unilateral decision to engage in the conduct underlying the combination or conspiracy prior to its formation. *See United States v. W.F. Brinkley & Son Constr. Co.*, 783 F.2d 1157, 1160 (4th Cir. 1986) (rejecting an argument that one company was not a member of a bid rigging conspiracy because it decided to submit a losing bid prior to contacting other members of the conspiracy); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (leader announced its prior decision to raise prices during a dinner party, mailed notice of the change and competitors followed).

### b) Defendants Frequently Communicated About the Conspiracy.

Undisputed evidence shows no fewer than 12 discrete pairs of employees of the Defendants communicated privately with one another, several multiple times, relating to boycotts of dental associations and pressuring manufacturers dealing with SourceOne. An illustrative (not exhaustive) compilation of this evidence is presented below, reflecting the inferences that the jury could reasonably draw. Additional communications among several of the communicating employee-pairs are described in the statement of facts, above.

| Exhibit | Date | Communicating Parties | Nature of Communication |
|---------|------|----------------------|-------------------------|
| 30 | October 15, 2013 | Benco (Fernandez) and Schein (Showgren) | Benco contacted Schein, communicated Benco's willingness to boycott the TDA, and asked for the contact information of a Patterson employee to learn if Patterson would be willing to do the same. |

| Exhibit | Date | Communicating Parties | Nature of Communication |
|---|---|---|---|
| 214 (27:24-28:12, 28:22-29:3)<br><br>41 | Before October 23, 2013 | Benco (Fernandez) and Hyden (Patterson) | Benco contacted Patterson, communicated Benco's willingness to boycott the TDA, and asked whether Patterson would be willing to do the same.<br><br>(In November, Hyden confirmed that Patterson was boycotting 2014 TDA meeting, although "considering options." See Ex. 76.) |
| 73 | November 21, 2013 | Cobb (Patterson) and Starnes (Schein) | Patterson confirms to Schein that it intends to boycott the 204 TDA meeting.<br><br>(On April 9th, 2014, Fernandez also confirms to Hyden that Benco is boycotting 2014 TDA meeting before sharing that information widely internally. See. Ex. 77.) |
| 216 (55:3-18)<br><br>220 (28:21-29:4, 149:10-24) | November 2013 | McLemore (Schein) and Ingersoll (Patterson) | Schein contacted Patterson, and asked for and received confirmation that Patterson would boycott the TDA. |
| 96 | December 2013 | D. Steck (Schein) and Misiak (Patterson) | Patterson contacted Schein, told Schein that Patterson would be boycotting the TDA, and asked whether Schein would do the same. Schein assured Patterson that it would boycott the TDA, as Patterson later reacts to signs of Schein vacillating in boycott of 2014 TDA meeting : "Thought I could trust you". |
| 116 | April 9, 2014 | Fernandez (Benco) and K. Steck (Schein) | Benco confirms to Schein that it is boycotting 2014 TDA meeting before sharing that information widely internally. |
| 188 | April 9, 2014 | Fernandez (Benco) and Upchurch (Schein) | Fernandez contacts Upchurch about Arizona Dental Association. |
| 133 | April 16, 2014 | Cohen (Benco) and Sullivan (Schein) | Chuck Cohen emails list of manufacturers supporting SourceOne to Schein. |
| 133 | April 22, 2014 | Cohen (Benco) and Guggenheim (Patterson) | Telephone discussion regarding SourceOne, following up on Cohen email regarding manufacturers supporting SourceOne. |
| 240 (139:6-140:11) | July 2014 | Wade (Benco) and Upchurch (Schein) | Upchurch and Wade play phone tag about AzDA's endorsement of SourceOne. |
| 148 | July 2014 | Evans (Benco) and Upchurch (Schein) | Evans and Upchurch discuss boycott of AzDA. |

| Exhibit | Date | Communicating Parties | Nature of Communication |
|---------|------|----------------------|-------------------------|
| 157 | July 22, 2014 | Wade (Benco) and Bushman (Patterson) | Wade and Bushman exchange assurances about AzDA boycott; they "are of the same mind." |

This substantial indisputable evidence of interfirm communications is a plus factor. *Apex Oil*, 822 F.3d at 253-254; *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 167 (D. Conn. 2009).  Indeed, the Second Circuit has reversed the grant of summary judgment where plaintiffs relied solely on circumstantial economic evidence suggesting the existence of a conspiracy without any evidence of interfirm communications at all. *Capital Imaging*, 996 F.2d at 545.

The substantial volume, content and pattern of interfirm communications between the Defendants is especially probative of agreement for six additional reasons.

First, the communications were between high-level executives of the Defendants, or were forwarded on or relayed to those executives. *In re Publ'n Paper*, 690 F.3d at 67 (recognizing increased weight of communications between conspirators' executives who possess decision-making authority).  The relevant decision makers at Benco were Mr. Rowe, with respect to attendance at the TDA annual meeting, and Messrs. Wade and Evans, with respect to attendance at the AzDA annual meeting.  (Dennis Decl., Ex. 227 (Rowe Dep.) at 79:21-23); Ex. 240 (Wade Dep.) at 45:11-20).  All of Benco's interfirm communications, other than those that took place at the highest levels of the firm, were either made by or made available to Messrs. Rowe, Wade and Evans.  (Dennis, Decl., Ex. 76 (Dep. Ex. 3012); Ex. 111 (Dep. Ex. 1192)).  The relevant decision makers at Patterson were Mr. Edens in Texas and Mr. Bushman in Arizona.  (Dennis Decl., Ex. 212 (Edens Dep. 86:15-18); Ex. 205 (Bushman Dep.) at 53:13-17).   Once again, Messrs. Edens and Bushman either learned of interfirm communications with Schein and Benco or had them

directly, while Patterson's President and CEO also communicated directly with Schein and Benco.  (Dennis Decl., Ex. 212 (Edens Dep.) at 184:1-185:19; Ex. 216 (Ingersoll Dep.) at 58:24-59:3; Ex. 47 (Dep. Ex. 443); Ex. 207 (Cobb Dep.) at 154:21-155:7, 203:8-15).  The relevant decision makers for Schein were Messrs. Cavaretta and Kyle (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 87:9-19, 120:1-7; Ex. 108 (Dep. Ex. 917); Ex. 109 (Dep. Ex. 918); Ex. 97 (Dep. Ex. 1104)), who learned of communications with Benco and Patterson.  (Dennis Decl., Ex. 27 (Dep. Ex. 409); Ex. 29 (Dep. Ex. 410); Ex. 82 (Dep. Ex. 485); Ex. 94 (Dep. Ex. 763); Ex. 148 (Dep. Ex. 812); Ex. 153 (Dep. Ex. 579); Ex. 220 (McLemore Dep.) at 27:20-28:3).

Second, these communications were unusual and an aberrant departure from past practice.  The Defendants' witnesses testified uniformly that they had not communicated about attendance at the TDA or AzDA annual meetings in the past.  *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D.N.Y. 2013) (communication that "represent[] a departure from the ordinary pattern" of communication among defendants are probative of agreement).  The Defendants' witnesses also testified to considerable discomfort with these communications: they were "unusual," and even "very unusual."  (Dennis Decl., Ex. 207 (Cobb Dep.) at 161:19-162:2; Ex. 236 (D. Steck Dep.) 43:17-44:5, 49:22-50:6).  Defendants' witnesses admitted that there were no legitimate business justifications for these communications.  (*E.g.*, Dennis Decl., Ex. 207 (Cobb Dep.) at 227:11-228:4, 270:20-272:12; Ex. 206 (Cavaretta Dep.) at 117:6-118:4).  *In re High Pressure Laminates Antitrust Litig.*, 2006 U.S. Dist. LEXIS 29431, at **12-15 (S.D.N.Y. May 15, 2006) (jury entitled to infer an agreement from clandestine communications characterized by the defendants as "inappropriate").

Third, Defendants in some instances tried to conceal evidence of their communications. *Id*. (identifying this as a factor probative of agreement).  Patterson employees were admonished

to "discuss live and no further emails" when discussing their communications with Benco. (Dennis Decl., Ex. 155 (Dep. Ex. 735); Ex. 156 (Dep. Ex. 375)).

Fourth, Defendants knew the details of one another's decision making.  Schein knew in October and November 2013 that Benco and Patterson were considering boycotting the TDA. (Dennis Decl., Ex. 29 (Dep. Ex. 410); Ex. 71 (Ex. 661); Ex. 220 (McLemore Dep.) at 28:21- 29:4, 146:14-147:8, 149:10-24).  Benco knew in November 2013 that Patterson intended to boycott the TDA (Dennis Decl., Ex. 76 (Dep. Ex. 3012)), knew in December 2013 that it would be "taking a stand" with Patterson and Schein against the TDA (Dennis Decl., Ex. 77 (Dep. Ex. 1355)), and wrote in April 2014 of a plan by the "big three to boycott future meetings."  (Dennis Decl., Ex. 111 (Dep. Ex. 1192)).

Fifth, the Defendants' senior executives are friendly and routinely share information among themselves.  (Dennis Decl., Ex. 208 (Cohen Dep.) at 96:14-18, 466:6-12; Ex. 215 (Guggenheim Dep.) at 193:24-194:1).  Close relationships between the executives of competitors can be a plus factor.  *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d at 173 ("whether competing executives view one another as friends and colleagues first, and competitors second, is a factor in determining the plausibility of the conspiracy's mechanics.").

Sixth, several of the communications documented in the record are express invitations to collude, including Mr. Fernandez's calls to Schein and Patterson in October of 2013, Mr. Upchurch's voice mail to Mr. Wade/Evans, and Mr. Wade's email to Patterson's Mr. Bushman. *Gainesville Utilities Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 300–01 (5th Cir. 1978) (holding that correspondence that "contemplated and invited" concerted action was a plus factor); *Fishman v. Wirtz*, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest

circumstantial indicators of a conspiracy is the existence of a common invitation or request to

join into a concerted plan of action."). Evidence of a plan for conspiracy can be "the most

damaging piece of evidence" of conspiracy, particularly when coupled with evidence of

compliance with the terms of the plan by the Defendants. *In re Sulfuric Acid Antitrust Litig.*, 743

F. Supp. 2d 827, 858 (N.D. Ill. 2007); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 59

(E.D. Pa. 2007). Evidence of action in conformity with a written plan for conspiracy is sufficient

to infer an agreement to engage in that conduct. *Apex Oil*, 822 F.2d at 254.

　　　The substantial volume of interfirm communications in this case is even more impressive

when considered in light of the fact that Benco's Mr. Fernandez—a central player in the

communications between the Defendants—admitted that text messages on his phone (which was

used to organize the Texas component of the conspiracy) were deleted despite the litigation hold

in place due to the investigation of the Texas Attorney General and this lawsuit. (Dennis Decl.,

Ex. 214 (Fernandez Dep.) at 158:15-159:8). For this reason alone, the jury could reasonably

infer still more private price-related communications among the Defendants that were not

memorialized or the evidence of which has been lost. *In re Coordinated Pretrial Proceedings in

Petroleum Prods Antitrust Litig.*, 906 F.2d 432, 454 n.18 (9th Cir. 1990).

　　　Benco's reliance on *Anderson News, L.L.C. v. American Media, Inc.*, 123 F. Supp. 3d 478

(S.D.N.Y. 2015), for the proposition that the high volume of interfirm communications in this

case is not a plus factor is unavailing. In *Anderson News* the plaintiff, a wholesale distributor of

magazines, announced a price increase and threatened to stop distributing the magazines of

publishers who did not accept the price increase within two weeks. *Id*. at 498. As other

wholesalers were not demanding such a price increase, nearly all publishers refused to agree to

the plaintiff's demands. This left the publishers with two weeks to arrange alternative

distribution for their magazines, and they discussed among themselves the possibility of moving their business to certain competitors of the plaintiff.  Importantly, the publishers in *Anderson News* had a legitimate business reason in discussing their plans for alternative distribution outlets with one another: the more publishers move their business to a new distributor, the more viable that distributor is.  *Id.* at 503-504.

There is no such legitimate business justification for the communications in this case. The Defendants' communications were meant to facilitate the boycott of the SDAs and others doing business with SourceOne, not (as in *Anderson News*) to arrange for the alternative distribution of Defendants' products.  The interfirm communications in *Anderson News* were not a plus factor in that case not because there were not enough of them, or because it would have been permissible for the publishers to coordinate the terms of a boycott of the plaintiff, but rather because the interfirm communications in *Anderson News* were procompetitive.  No witness for the Defendants has come up with any legitimate business purpose served by the communications at issue here.

Benco elides another important distinction between *Anderson News* and this case.  In *Anderson News*, the defendant publishers had a financial stake in the continued survival of the plaintiff wholesaler—more wholesalers means more competition and lower distribution costs for publishers—and the plaintiff also owed the defendants money it would be unable to pay if forced out of business, both of which suggested that the defendants had no incentive to conspire to force the plaintiff out of business.  *Anderson News*, 123 F. Supp. 3d at 501-502.  In contrast, the Defendants had ample anticompetitive reasons to conspire to force SourceOne out of business, or to slow its growth.

Benco's reliance on *Ross v. American Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014) is similarly unavailing.  First, *Ross* was decided after a full trial on the merits and <u>after</u> summary judgment on the same fact pattern had been denied.  *In re Currency Conversion Antitrust Litig.*, 773 F. Supp. 2d at 365-372 (outlining evidence of parallel conduct and plus factors sufficient to defeat summary judgment).  Benco's reliance on *Ross* is thus procedurally inapt, as that case simply did not involve the application of the summary judgment standard.  Second, *Ross* does not help Benco because the high volume of interfirm communications in that case (and as in *Anderson News*) had substantial procompetitive justifications, and were more on the order of trade association or public petitioning conduct than the clandestine and unjustified communications between the Defendants in this case.  *Ross*, 35 F. Supp. 3d at 452-453.

### c)  Defendants Had a Consciousness of Obligation to One Another.

The substantial evidence of a consciousness of obligation to one another in the Defendants' pattern of communications and business conduct is a plus factor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007) (identifying parallel conduct accompanied by the "sort of restricted freedom of action and sense of obligation that one generally associates with agreement" as creating an inference of conspiracy).

Schein and Patterson manifested this consciousness of obligation in their pattern of communications.  A Schein manager wrote "FYI Patterson pulled out of [the TDA] convention. I firmly believe they made the move expecting us to follow suit." (Dennis Decl., Ex. 81 (Dep. Ex. 912)). Later, Schein's Vice-President wrote "I have to get back to PDCO [Patterson] on whether or not we are attending the TDA." (Dennis Decl., Ex. 94 (Dep. Ex. 763)). And when Schein appeared to be wavering in its participation, the President of Patterson Dental was advised to

have a "thought I could trust you type of conversation" with Schein. (Dennis Decl., Ex. 96 (Dep. Ex. 731)).

Benco manifested this consciousness of obligation in its business conduct.  After planning to attend the 2014 TDA annual meeting, Benco reversed course within hours after learning of Schein's decision to pull out.  This about-face is suggestive of a "restricted freedom of action," especially because Benco (i) identified the decisions of Patterson and Schein to pull out as the dispositive factors in its decision to pull out; (ii) then promptly communicated the fact of its about-face directly to Schein and Patterson before informing its own sales representatives; and (iii) referenced its competitors' interests in explaining its decision to third-parties.  (Dennis Decl., Ex. 118 (Dep. Ex. 1384) ("Let's pull out, if Schein and Patterson are as well"); Ex. 77 (Dep. Ex. 1355); Ex. 214 (Fernandez Dep.) at 109:4-21, 116:23-117:3, 122:9-123:2, 124:8-18); Ex. 120 (Dep. Ex. 1191).)  *SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660, 670 (E.D. Pa. 2011) (about face in business conduct within two days can suggest a "restricted freedom of action" under *Twombly*).

Similarly, shortly after learning that Patterson and Schein were punishing manufacturers dealing with SourceOne, Benco's managers ordered another about-face, directing Benco's sales representatives to refrain from supporting those manufacturers in language once again evincing an obligation to do so: "We have to put pressure on these distributors." (Dennis Decl., Ex. 123 Dep. Ex. 3003)).   This evidence of Benco's "restricted freedom of action" refutes its claim that the evidence shows "without exception, that Benco believed itself free to make its own decision on whether to attend the TDA meeting independently" (Benco Mem. at 10), as a jury could reasonably find otherwise.

### d) Defendants' Conduct Was Contrary to Unilateral Self-Interest.

An act against economic self-interest is one in which "there is risk of substantial loss" unless conspirators perform it in a "substantially unanimous" way. *Interstate Circuit*, 306 U.S. at 222; *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 418–19 (S.D.N.Y. 2003) (finding that banks' imposition of currency exchange fee was against self-interest, absent collusion, because "they would stand to lose some of their best customers").

Substantial evidence supports the conclusion that Defendants' boycott of third parties dealing with SourceOne was contrary to the economic self-interest absent an agreement.  In August 2013, just two months before the conspiracy began, Benco employees ███████████ ████████████████████████████████████████████████████████████████ ███████ (Dennis Decl., Ex. 18 (Dep. Ex. 1182); Ex. 19 (Dep. Ex. 1183)).  According to its Managing Director, speaking the same year, "not attending trade shows is not an option for us." (Dennis Decl., Ex. 15 (Dep. Ex. 1392)).  One way that Defendants competed with one another in Texas was through attendance at the TDA meeting.  (Dennis Decl., Ex. 221 (Misiak Dep.) at 69:24-71:12; Ex. 207 (Cobb Dep.) at 147:9-148:16; Ex. 212 (Edens Dep.) at 75:22-25). Defendants transacted business at the TDA meeting.  (Dennis Decl., Ex. 207 (Cobb Dep.) at 144:9-145:20; Ex. 212 (Edens Dep.) at 69:10-70:16).  Defendants promoted themselves and developed good will at the TDA meeting.  (Dennis Decl., Ex. 232 (Showgren Dep) at 66:14-67:14; Ex. 212 (Edens Dep.) at 72:22-73:9). Because attendance at the TDA trade show was an important commercial opportunity for all Defendants, their parallel decisions not to attend were contrary to their unilateral self-interest.   In particular, Benco's decision not to attend the 2014 TDA meeting after learning that Schein and Patterson had pulled out is highly suggestive of

concerted action, as Benco could have benefitted significantly from attendance if its two largest rivals were absent.

Although Benco now attempts to minimize the importance of state dental association trade shows, and the TDA and AzDA shows in particular, the evidence belies this built-for-litigation argument.  In fact, the evidence shows that Benco ███████████████████████ ███████████████████████████████████████████ ███████████ (Dennis Decl., Ex. 190 (Benco's Responses & Objections to SourceOne's Second Set of Interrogatories) at Ex. A). █████████████████████████ █████████████████████

Benco also boycotted dentists and manufacturers after learning that Patterson and Schein were doing the same.  Once again, Benco's employees admitted that this conduct was contrary to their self-interest.  (Dennis Decl., Ex. 214 (Fernandez Dep.) at 55:19-56:10).

Defendants' employees also admitted that their interfirm communications were risky and contrary to self-interest because they conveyed confidential information that could be used against the communicating party. ((Dennis Decl., Ex. 212 (Edens Dep.) at 166:14-22, 167:15-25; Ex. 207 (Cobb Dep.) at 158:1-159:2, 161:6-9).  *In re Currency Conversion Fee*, 773 F. Supp. 2d at 369 (providing competitors with sensitive business information is against unilateral interest). Although Defendants dispute the degree to which this information was competitively sensitive, this is a question for the jury.  *In re High Pressure Laminates Antitrust Litig.*, 2006 U.S. Dist. LEXIS 29431, at *11-12 ("Wilsonart notes that this cost data was five years-old when it was faxed to Ringler in April of 1994, and therefore would have been useless in any price fixing scheme. This presents a jury issue. If it was so dated and useless, why was it shared? … A likely inference is that this information was considered useful on some level, to members of the HPL

industry. The jury is ultimately free to agree with Defendants on this issue, but there are genuine disputed issues of fact.").  And Defendants' employees consistently acknowledged that the information they were sharing was competitively sensitive material that could be used to disadvantage the disclosing party.  (Dennis Decl., Ex. 214 (Fernandez Dep.) at 32:25-33:14; Ex. 220 ( (McLemore Dep.) at 29:24-30:9); Ex. 216 (Ingersoll Dep.) at 55:12-56:4; Ex. 207 (Cobb Dep.) at 158:1-159:2, 161:6-9).

Defendants claim that they had "strong unilateral incentives to cease supporting a dental association that had aligned itself with, and essentially become, a competitor" (Patterson Mem. at 1, 14-15), but if this incentive were as strong as Defendants claim they would have continued their boycotts of new SDAs endorsing SourceOne in 2016 and 2017.  However, Defendants continue to attend the trade shows put on by the Florida Dental Association (Dennis Decl., Ex. 196 (Patterson's Supplemental Answers to SourceOne's Second Set of Interrogatories) at 31; Ex. 190 (Benco's Responses & Objections to SourceOne's Second Set of Interrogatories) at Ex. A). and Schein returned to the TDA annual meeting as an exhibitor in 2016, decisions which the jury could reasonably find were informed by the open investigation into Defendants' conspiracy by the Texas Attorney General and by the Federal Trade Commission.

### e)   Defendants Had a Motive to Conspire to Jointly Boycott.

Although a motive to conspire in a price fixing case may simply restate oligopolistic interdependence and be of limited value to the plaintiff,  in a group boycott case such evidence is significant.  A motive to conspire may be inferred where the parallel "action taken [by defendants] had the effect of creating a likelihood of increased profits," *First Nat'l Bank of Ariz. v. Cities Serve. Co.*, 391 U.S. 253, 287 (1968), or where "defendants were primarily motivated by a desire to damage plaintiff or put it out of business." *Joseph E. Seagram and Sons, Inc. v.*

*Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71, 78 (9th Cir. 1969).  The evidence of a motive to

conspire to eliminate SourceOne as an effective competitor is overwhelming.  Defendants were

concerned that SourceOne would quickly be endorsed by state associations around the country if

it was not stopped in Texas. As explained by a Schein Texas manager, the purpose and effect of

the conspiracy was to "take them [SourceOne] out @ the knee so it doesn't metastasize" into

other regions of the country.  (Dennis Decl., Ex. 31 (Dep. Ex. 477)).

  Patterson argues that there is insufficient evidence to connect its boycott of the TDA, the

AzDA, and their members with a conspiracy to exclude SourceOne nationwide.  (Patterson

Mem. at 4).  The evidence shows that each Defendant was aware that a boycott of these early-

endorsers of SourceOne could deter other SDAs from taking the same step.  Patterson and Schein

both acknowledged the leverage they had over the commercial viability of SDA tradeshows as a

component of their strategy in dealing with SourceOne.  (*E.g.*, Dennis Decl., Ex. 42 (Dep. Ex.

678) ("State Associations fear we'll pull out all the time"); Ex. 114 (Dep. Ex. 765) ("The bulk of

their revenue comes from their state meetings.  Without exhibitors, though, they have no meeting

and lose huge revenue generator").  Schein described the Texas boycott as a way to send a

message to other SDAs interested in entering into similar arrangements with SourceOne.  (*E.g.*,

Dennis Decl., Ex. 119 (Dep. Ex. 925) ("if it works for the TDA, it would be reasonable to expect

ODA to follow. . . . If they do, I would expect us to have a similar response"); Ex. 126 (Dep. Ex.

1113) ("Any association that follows suite we should automatically pull out the meeting.  We

have over 10 companies that have followed our lead and more will do so next year if it

continues").  When describing the desired boycott to Patterson in Arizona, Benco explicitly

referenced its desire to send the "same message" that Defendants had sent through the boycott of

TDA. (Dennis Decl., Ex. 157 (Dep. Ex. 376).  Schein explained that the boycott of TDA was part

of a communicative strategy to SDAs: "if associations go this route, they better be prepared for economic losses on their shows[.]"  (Dennis Decl., Ex. 134 (Dep. Ex. 768)).

Benco argues that it had no motive to "act jointly, rather than going it alone" with respect to attending the TDA (Benco Mem. at 13-15), but its employees felt differently at the time.  Mr. Fernandez exchanged text messages with a manufacturer's sales representative in which he explained that Benco and Schein had pulled out of the TDA meeting, and that Benco was "Trying to take a stance against these freaking idiots", and that "I wish all of the manufacturers would.  We need to show solidarity in our approach to dismissing them."  (Dennis Decl., Ex. 77 (Dep. Ex. 1355))  Mr. Fernandez explained at his deposition that "I did not want the TDA Perks program to compete with us", that many manufacturers pulling out of the TDA meeting would "Probably shut it down", and that Benco felt the need for "solidarity" because "Benco's the little guy … when a little guy stomps his feet and threatens you it's not a big deal.  But I think when – when you can have a group of people together those little guys become bigger."  (Dennis Decl., Ex. 214 (Fernandez Dep.) at 110:5-112:23).  This is the motive to conspire—to act jointly rather than going it alone—that Benco claims is absent from the record.

Another Benco document also illustrates the need for collective action.  In 2013, Benco's Managing Director Mr. Cohen was asked what options Benco had to deter SDAs from dealing with Association Gloves, a company that sells a much more limited range of dental supplies than SourceOne makes available, but like SourceOne competes by seeking the endorsements of dental supplies.  Mr. Cohen noted that one option was to ███████████████████

███████████████████████████████

███████████████████████████████

(Deenis Decl., Ex. 10 (Dep. Ex. 1378)).  Collective action, on the other hand, would tend to

increase the effectiveness of this strategy (as Mr. Fernandez admitted), and insulate Benco from the risk of unilateral action.  That is what happened here.

This evidence of a substantial motive to conspire, combined with the high volume of interfirm communications between the Defendants, requires the denial of Defendants' summary judgment motions.  Summary judgment was reversed in *Champagne Metals*, 458 F.3d at 1086, a group boycott case with much weaker evidence than is present here.  In that case, a single statement by a customer relaying a defendant's threat on behalf of itself and its competitors, coupled with strong evidence of a motive to conspire, was sufficient to send the case to the jury.  *Id.* at 1086-1087.  Summary judgment was also denied on the strength of similar evidence in *Tableware*, despite the absence of any evidence of interfirm communications between the *Tableware* defendants.  *Tableware*, 484 F. Supp. at 1075.  SourceOne has significantly more evidence than the plaintiffs in *Champagne Metals* or *Tableware*, including extensive, documented, and unjustifiable interfirm communications, actions against interest, and other plus factor evidence.

### f)   Defendants All Chose the Same Coercive Methods with the Same Coercive End.

The striking similarity in the coercive mechanisms adopted by the Defendants is also probative of the existence of an agreement.  "It is one thing for competitors all to charge the same price, as a perfectly competitive market could lead them to do so," but there is no similar explanation for strikingly similar parallel coercive conduct.  *Petruzzi's*, 998 F.2d at 1246.  The adoption of identical coercive strategies makes the inference of agreement plausible.  *Id.* at 1244-45 ("One logical explanation [for parallel coercive conduct] is that the defendants set up the rules this way"); at 1246 (agreement is a plausible inference when "competitors … use the same enforcement mechanism").

There is no dispute that each Defendant boycotted the 2014 and 2015 TDA annual meetings, and the 2015, 2016, and 2017 annual meeting of the AzDA, and that Benco and Patterson also boycotted the 2016 and 2017 TDA annual meetings.  Moreover, it is striking that each Defendant articulated the purpose of this strategy in very similar ways: to make an endorsement of SourceOne unprofitable for dental associations by ensuring economic pain for endorsing DAs.  (Dennis Decl., Ex. 42 (Dep. Ex. 678); Ex. 114 (Dep. Ex. 765); Ex. 134 (Dep. Ex. 768); Ex. 111 (Dep. Ex. 1192)).

There is admissible evidence from which a jury could find that each Defendant pressured manufacturers dealing with SourceOne to either boycott the TDA annual meeting, discontinue the availability of their products through SourceOne, or both.  (*See supra*, Section II.C.3).

This evidence refutes Patterson's remarkable claim that "no evidence exists of Patterson pressuring manufacturers."  (Patterson Mem. at 30.)  Moreover, Patterson's approach to this evidence repeats the persistent fallacy in its brief that all conspirators must engage in all overt acts in furtherance of the conspiracy.  *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.").  Patterson's liability is sealed through its boycotts of the TDA and the AzDA, and its numerous and improper competitor communications regarding the same, although as the evidence shows Patterson participated in all aspects of the Defendants' conspiracy.

Patterson's claim that there is no foundation for Benco's statement that Patterson was pressuring manufacturers (Patterson Mem. at 31) ignores the fact that this is a party admission.  Patterson's claim that "there is **no testimony** by any manufacturer that they were subjected to any pressure by defendants" (Patterson Mem. at 40 (emphasis in original)) is belied by the testimony of Ivoclar.  (Dennis Decl., Ex. 233 (Stack Dep.) at 65:17-67:4, 68:3-7).  Patterson's

claim that SourceOne's distributors did not know which of the Defendants were pressuring the manufacturers that then demanded that their products be pulled from SourceOne (Patterson Mem. at 41) is unsurprising—the evidence shows that Patterson contacted manufacturers, then those manufacturers contacted SourceOne's distributors, and then manufacturers contacted Patterson.  (*See supra*, Section II.C.3).  SourceOne's distributors did not communicate directly with Patterson, and would have had no reason to know where the pressure was coming from.  However, ██████████████████████████████████ (Dennis Decl., Ex. 131 (Dep. Ex. 1387) at BDS00009333).

Patterson's speculation that manufacturers had "strong unilateral incentives to control their own distribution channels and thus not to want to deal with SourceOne" (Patterson Mem. at 1, 42-46), ignores the uncontradicted evidence that (i) manufacturers did not pull their products from SourceOne before Defendants began contacting them in October 2013 and (ii) manufacturers largely allowed their products to return to SourceOne's platform (where they are widely available today) after the Texas Attorney General opened an investigation of Defendants' conduct and ultimately sued Benco in 2015 (and later Schein).  If manufacturers had the incentives Patterson ascribes to them, they would have pulled their products earlier (many manufacturers were aware of SourceOne offering their products for sale before being contacted by Defendants, but took no action until they were contacted) and would not have allowed those products to return.  Conversely, if manufacturers had the incentives Patterson ascribes to them, the manufacturers that pulled their products from SourceOne at the apex of Defendants' coercive campaign in early 2014 would have kept those products away from SourceOne, but instead almost all of the products have returned.  (Dennis Decl., Ex. 199 (SourceOne Dental, Inc.'s Third Supplemental Responses and Objections to Defs.' First Set of Interrogatories) at Ex. B).  The

fact that the products largely returned to SourceOne suggests that the Defendants, aware of the risk of antitrust liability, modulated their conduct to minimize litigation risk.  Although the answer to this riddle need not detain the Court at summary judgment, a jury could easily find that Defendants' pressure was a material factor in manufacturers' decisions to pull their products from SourceOne in 2013 and 2014.  *McWane, Inc. v. FTC*, 783 F.3d 814, 822 (11th Cir. 2015) (noting factual dispute about effectiveness of defendant's anticompetitive conduct caused by industry awareness of government antitrust investigation).

Patterson points to the fact that some manufacturers issued letters identifying SourceOne's products as gray market products, and suggests that this undercuts the inference that Defendants were responsible for these statements.  (Patterson Mem. at 49).  Patterson ignores the evidence that Schein had contacted manufacturers to write these letters on the Defendants' behalf:

> Let's see if we can get an official statement from Kerr on their letterhead about Sourceonedental.com selling gray market products. . . . If we can get letters from Kerr and some other manufacturers to leverage to get this stopped we can also keep our name off it so we aren't hit with any back splatter.

(Dennis Decl., Ex. 43 (Dep. Ex. 415) at HS-00013649).  As Benco's Managing Director Mr. Cohen had noted, one option to deter SDAs to endorse suppliers like SourceOne is to █████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████ (Dennis Decl., Ex. 10 (Dep. 1378)).  Thus, Defendants had an incentive to pressure manufacturers to defame SourceOne rather than engage in the risky course of doing so directly.

Finally, there is admissible evidence from which a jury could find that each Defendant boycotted dentists dealing with SourceOne.  (Dennis Decl., Ex. 149 (Dep. Ex. 1197) ("There are a few like Josh Austin (same Josh Austin that sat on a panel at our NSM in Dallas) that is openly bashing dental distribution. As of right now, Schein, Patterson and Benco have all told him he can have the Perks program handle his service needs as well"); Ex. 167 (Dep. Ex. 1519) (Schein dropping Josh Austin); Ex. 223 (Osio Dep.) at 168:10-169:23, 460:3-21; Ex. 241 (Xelowski Dep.) at 70:9-71:71:11). Statements by dentists relaying the fact of these boycott threats to the SDA witnesses in this case are admissible to show their effect on the hearer including the effect that these statements had on SDAs decision to endorse, not endorse, or promote aggressively their relationships with SourceOne.  *United States v. Certified Envt'l Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013).

Patterson claims there is an absence of evidence of a dentist boycott in its files, but Patterson's Mr. Edens admits that ███████████████████████████ ████████████████████████████████████ (Dennis Decl., Ex. 53 (Dep. Ex. 704); Ex. 80 (Dep. Ex. 705); Ex. 212 (Edens Dep. 411:412:6).  Benco's email that provides that Patterson, Benco and Schein were all boycotting a specific Texas dentist supportive of TDA Perks Supplies, combined with Benco's admission that it had no legitimate business justification for that conduct, standing alone entitle SourceOne to a trial.  (Dennis Decl., Ex. 149 (Dep. Ex. 1197); Ex. 198 (Benco's Amended Responses & Objections to SourceOne's Requests for Admission) at 77-78).  And Schein learned that "Benco has not only called to threatened to pull out of the 2014 TDA but has also threatened to turn in a few doctors to the State who have tested the new GPO and found they weren't charged sales tax."  (Dennis Decl., Ex. 63 (Dep. Ex. 421).

### 3.    Defendants' Information Exchange Violated the Rule of Reason.

In addition to their *per se* unlawful agreement to boycott third parties dealing with SourceOne, Defendants also violated Section One of the Sherman Act by agreeing to exchange information.  The Supreme Court first held almost a century ago that agreements to exchange information may violate the antitrust laws. *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 389-90 (1923); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 411-12 (1921). Although information exchanges are sometimes used as evidence of another, typically *per se* unlawful, agreement, "[t]here is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself." *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (Sotomayor, J.).

In the context of agreements to exchange information, horizontal competitors engage in concerted action through the simple reciprocal act of sharing material information. In *United States v. Container Corp. of America*, 393 U.S. 333 (1969), for example, the Court condemned an "informal" agreement characterized by "an infrequency and irregularity of price exchanges" between competitors. *Id.* at 335-38. "[A]ll that was present was a request by each defendant of its competitor" for recent price information and that the competitor "usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it." *Id.* at 335.

The Court emphasized that sharing information creates an expectation of reciprocity: "when a defendant requested and received price information, it was affirming its willingness to furnish such information in return." *Id*. Similarly, Professors Areeda and Hovenkamp, in their leading treatise on antitrust law, explain that "[n]othing more" than a simple conversation is needed to prove concerted action: "[t]he respondent forms an agreement to give information to its interrogator when it answers the question." VI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1406f, at

36 (3d ed. 2010).  "Telephone calls among rivals are not inevitable and are not inherent in doing business. This is extra-market behavior involving consensual and collaborative activity."  *Id.*

Proof of an agreement to exchange information is established through evidence that Defendants exchanged information privately among one another with the expectation of reciprocal exchanges of information.  Defendants provided information about their plans to boycott the TDA to other Defendants as a *quid pro quo* to receive similar information from the other Defendants. (Dennis Decl., Ex. 214 (Fernandez Dep.) at 37:10-19; Ex. 207 (Cobb Dep.) at 153:23-154:20).  This is an agreement: each defendant responded to inquiries of its competitors "with the expectation that it would be furnished reciprocal information when it wanted it." *Container Corp. of Am.*, 393 U.S. at 335; *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 631 (E.D. Mich. 2012) (sharing information in order to receive information establishes an agreement to exchange information).  Patterson appears to admit that the evidence establishes this agreement: "The testimony by both Fernandez and Cobb was that they shared information in the hope they would receive it back."  (Patterson Mem. at 30).

Agreements to exchange information are evaluated under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).  A rule of reason claim requires the plaintiff to present evidence of actual anticompetitive effects, or to provide circumstantial evidence of such effects through proof of a relevant market and Defendants' market power. *Capital Imaging*, 996 F.2d at 546.  SourceOne's experts offered testimony about the definition of the relevant market and the Defendants' market power, and Defendants neither moved for summary judgment on those issues nor moved to exclude SourceOne's expert testimony on these issues under *Daubert*.  For this reason, evidence from which a jury could reasonably find an agreement to exchange information entitles SourceOne to a jury trial on its information exchange

claim. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (The summary judgment movant bears the initial burden of demonstrating "the absence of a genuine issue as to any material fact.").

In *Gypsum*, 438 U.S. 422, the Supreme Court directed courts to consider two factors "most prominently" in determining the likely effects of an information-sharing agreement: "the structure of the industry involved and the nature of the information exchanged." *Id.* at 441 n.16. Here, both factors lead to the conclusion that Defendants' illegal agreements to exchange information are of the type to harm competition: they were entered into by senior executives with decision-making authority, concerned forward-looking competitive information, and occurred in a highly concentrated market.

As to the first *Gypsum* factor, the Defendants have market power within a well-defined relevant market for the distribution and sale of dental supplies. *Todd*, 275 F.3d at 199 ("An important factor to analyze in a Gypsum data exchange case is the market power of the defendants."). The oligopolistic nature of the dental supplies market makes susceptible to the exercise of market power through tacit coordination." *Todd*, 275 F.3d at 207-208 (citation and quotation marks omitted). "Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries." *Id.* at 208. Benco admits that the dental supplies distribution market is concentrated. (Benco Mem. at 14).

As to the second *Gypsum* factor, the information Defendants exchanged was of the type most likely to be anticompetitive. They discussed future information regarding their willingness and plans to deal with third parties dealing with SourceOne, including dental association, manufacturers, and individual dentists. Exchanges of current and future strategic information have the "greatest potential for generating anticompetitive effects and . . . have consistently been

held to violate the Sherman Act." *Gypsum*, 438 U.S. at 441 n.16; *see also Am. Column*, 257 U.S. at 398-99 (finding Section 1 violation where information exchange concerned future prices and production); *Am. Linseed Oil*, 262 U.S. at 389-90 (ordering entry of injunctive relief when defendants shared "intimate knowledge" of their business affairs because such practice "destroy[s] the kind of competition to which the public has long looked for protection").  Indeed, the Defendants shared information among themselves before making that information publicly available or even informing their own sales representatives.  (Dennis Decl., Ex. 77 (Dep. Ex. 1355); Ex. 214 (Fernandez Dep.) at 109:4-21, 116:23-117:3, 122:9-123:2, 124:8-18).  *See Publ'n Paper*, 690 F. 3d at 65 ("ample evidence of conspiratorial behavior" when competitors "disclosed to each other their companies' intentions to increase prices before those decisions had been publicly announced."); *Todd*, 275 F.3d at 213 ("A court is therefore more likely to approve a data exchange where the information is made public.").

The evidence also shows that the Defendants' information exchanges had an effect on their competitive decision making.  For example, after confirming that Patterson "was out" of the 2014 TDA annual meeting, Benco contacted the TDA the same day to deliver a threat that it too would boycott the TDA.  (Dennis Decl., Ex. 79 (Dep. Ex. 1353).  *See Flat Glass*, 385 F.3d at 369 (concluding that exchanges of pricing information that are "tightly linked" with subsequent parallel price increases permit the inference that "the exchanges of information had an impact on pricing decisions").

The evidence also shows that the Defendants' information exchanges harmed competition.  *Capital Imaging*, 996 F.2d at 546.  The jury could find that Defendants were constrained by competitive uncertainty about one another's decision making with respect to boycotting third parties dealing with SourceOne, and that their extensive exchanges of

information ameliorated this uncertainty, giving the Defendants' confidence to engage in the anticompetitive conduct that injured SourceOne.  (Dennis Decl., Ex. 220 (McLemore Dep.) at 29:24-30:9); Ex. 216 (Ingersoll Dep.) at 55:12-56:4; Ex. 214 (Fernandez Dep.) at 32:25-33:14).  This is sufficient to show harm to competition from Defendants' agreement to exchange information.  *Cason-Merenda*, 862 F. Supp. 2d 603 at 644-45.

There were no legitimate business justifications for the Defendants' information exchange.  While each Defendant might want to know whether its competitor is attending a trade show, that does not explain why a Defendant would be willing to share with its competitor whether it was planning to attend.  Unsurprisingly, the Defendants' witnesses consistently testified to the improper nature of these communications.  (Dennis Decl., Ex. 206 (Cavaretta Dep.) at 117:16-118:4; Ex. 207 (Cobb Dep.) at 161:19-162:2; Ex. 236 (D. Steck Dep.) 43:17-44:5, 49:22-50:6).

### 4.    Defendants Are Not Entitled to Summary Judgment on Damages.

Defendants are not entitled to summary judgment on damages for two reasons.  First, the *Daubert* motion to exclude the admissible expert testimony of SourceOne's expert Dr. Leitzinger is ill-founded and should be denied, especially insofar as that *Daubert* challenge is itself based on hearsay evidence.  Second, SourceOne can establish damages through fact witness testimony, including the testimony of SourceOne's CEO and the testimony of SDA officials.  "[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."  Fed. R. Evid. 701, advisory committee note.  Third, there is substantial evidence of injury and damage to SourceOne in the record.  (*See* Sec. II.C.5 *supra*.)

Defendants' baseless motion for summary judgment on damages is based entirely on inadmissible hearsay and speculation.  Benco cites 13 affidavits of specific SDAs as the support

for its summary judgment motion (Benco Mem. at 33-35), but these are all hearsay statements (some submitted months after the close of fact discovery and after the submission of the pre-trial order) and none of the affiants or anyone else associated with those SDAs are on Defendants' trial witness list.  Moreover, for all of the reasons discussed in SourceOne's opposition to Defendants' *Daubert* motion, these affidavits do not meaningfully affect SourceOne's damages, let alone bar SourceOne's claims for damages entirely.  Benco's remarkably false claim that Dr. Leitzinger failed to account for the reaction of SDAs to Defendants' boycott of the TDA and the AzDA (Benco Mem. at 32-33) is refuted by the extensive discussion Dr. Leitzinger gives of that very topic.  (Dennis Decl., Ex. 193 (Leitzinger Rep.) at ¶¶ 149-150 & Appendix A.)

### B.  Defendants Are Not Entitled to Summary Judgment on SourceOne's State Law Claims.

Regardless of the applicable state law, the evidence adduced in discovery presents triable issues of fact as to each element of SourceOne's claims for tortious interference with prospective business relationships, civil conspiracy, and aiding and abetting, thus precluding summary judgment on those claims.

### 1.    Arizona Law Applies to SourceOne's State Common Law Claims.

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).  In New York, "'the relevant analytical approach to choice of law in tort actions' is the 'interest analysis' . . . 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'" *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 n. 5 (2d Cir. 1997) (quoting *Schultz v. Boy Scouts*, 65 N.Y.2d 189, 197 (1985)). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating

behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). "The place of the tort is usually the place where the alleged injury is inflicted, rather than where the actions causing the injury originated." *Mark Andrew of Palm Beaches, Ltd. v. GMAC Commercial Mortgage Corp.*, 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003).

SourceOne's state common law claims involve conduct-regulating laws. *Arista Records, Inc. v. Mp3Board, Inc.*, 2002 WL 1997918, at *16 (S.D.N.Y. Aug. 29, 2002) (applying interests analysis to claims for tortious interference with prospective economic advantage); *Okimoto v. Youngjun Cai*, 2015 WL 3404334, at *4 (S.D.N.Y. May 21, 2015) (same with respect to claims for aiding and abetting and listing cases); *Emjayco v. Morgan Stanley & Co., Inc.*, 1996 WL 452266, at *4 (S.D.N.Y. Aug. 8, 1996) (same with respect to claims for civil conspiracy). As such, Arizona law applies to those claims because SourceOne is headquartered and incorporated in Arizona and suffered damage from Defendants' conduct there. *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 39 (Bankr. S.D.N.Y. 2007) ("the law applicable to the tort claims in this case shall be the law of Pennsylvania, where Adelphia had its principal place of business, and where the injury should be deemed to have been suffered"). Moreover, Defendants' tortious conduct occurred, in part, in Arizona; and Defendants interfered with SourceOne's relationships in Arizona, including with the Arizona Dental Association. *Reed Constr. Data, Inc. v. McGraw-Hill Cos.*, 638 F. App'x 43, 47 (2d Cir. 2016) ("Applying New York choice of law principles, where the solicited customer and the aggrieved plaintiff are both within a given state, that state has the greatest interest in regulating the behavior at issue, even if the allegedly tortious solicitation originates in a different state"); *Arista Records*, 2002 WL 1997918, at *16 (applying California law when plaintiff was located in California and its relationship with another California company was allegedly interfered with in California).

### 2. There Are Material Factual Disputes as to SourceOne's Tortious Interference Claims.

Under Arizona law, a plaintiff asserting a claim of tortious interference with a business expectancy/prospective business relationships must establish (1) the existence of a valid business expectancy; (2) the interferer's knowledge of the business expectancy; (3) the interferer intentionally induced or caused termination of the business expectancy; and (4) damage suffered as a result of termination of the business expectancy." *Telesaurus VPC, LLC v. Power,* 623 F.3d 998, 1009 (9th Cir. 2010) (applying Arizona law).  As Defendants admit (Patterson Mem. at 51, Benco Mem. at 26 (incorporating the choice-of-law analysis set forth in Patterson's brief)), the elements are similar under Texas law.  *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (elements under Texas law are "1) There was a reasonable probability that the parties would have entered into a business relationship; 2) The defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; 3) The defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and 4) The plaintiff suffered actual harm or damages as a result of the defendant's interference.").  Under Arizona law, however, a plaintiff need not establish that the defendant committed an independently tortious or unlawful act; rather, the Arizona courts apply the seven-factor test as articulated in the Second (Restatement) of Torts § 767.  *Bar J Bar Cattle Co. v. Pace*, 763 P.2d 545, 547–48 (Ariz. App. 1988).

There are triable issues of fact with respect to SourceOne's claim for tortious interference with prospective business relationships under both Arizona and Texas law.

### a)  Defendants' Conduct Was Improper.

In determining whether conduct is improper, "the court should consider: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.*  Arizona courts "give the greatest weight to the first two factors, the nature of the defendant's conduct and the defendant's motive."  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 32 (Ariz. 2002) (en banc).  "Conduct specifically in violation of statutory provisions or contrary to public policy may for that reason make an interference improper."  *Id.* at 32-33.

Defendants do not address the seven-factor test of the Restatement.  Instead, citing Texas law, Defendants contend that SourceOne's claim cannot succeed because SourceOne cannot show an underlying tort.   (Patterson Mem. at 53-54; Benco Mem. at 27).  As explained above, triable issues of fact exist as to whether Patterson and Benco violated the antitrust laws by conspiring to thwart SourceOne's entry into the dental supplies distribution market.  Moreover, even if that were not the case and even if Defendants acted unilaterally (despite voluminous evidence to the contrary), there would still be triable issues of fact as to whether Defendants engaged in tortious conduct by misrepresenting the nature and quality of SourceOne's products. *See In re Lipsky*, 460 S.W.3d 579, 591-94 (Tex. 2015) (setting forth the elements for defamation and business disparagement under Texas law).[12]  Patterson cannot, and do not, dispute that its employees told market participants that SourceOne offered grey market products for sale.

---

[12]      As noted in Section IV.B.1, SourceOne does not concede that Texas law applies.

(Dennis Decl., Ex. 216 (Ingersoll Dep.) at 83:10-19 ("I do know that reps -- yes, they did inform their customers that the product -- some of the product available on the TDA Perks website was, by definition, gray market product")).  Benco makes the remarkable claim that there is no evidence that it misrepresented the nature and quality of SourceOne's products (Benco Mem. at 27), even though the record is replete with evidence of its employees informing state dental associations and dentists that SourceOne offered gray market products for sale.  (*E.g.*, Dennis Decl., Ex. 201 (Bennett Dep.) at 75:12-16 (tape recorded conversation in which Benco representative told Terry Xelowski of the Arizona Dental Association "And I know for a fact that they must be getting them through gray market"); 88:3-88:11).

Defendants also claim that, under Texas law, they were justified, as competitors, in interfering with SourceOne's prospective business relations, citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001).  (Patterson Mem. at 53-54; Benco Mem. at 27).  In *Wal-Mart Stores*, however, the Texas Supreme Court clarified that justification is not a separate defense to a claim of tortious interference: "Justification and privilege are defenses in a claim for tortious interference with prospective relations only to the extent that they are defenses to the independent tortiousness of the defendant's conduct.  Otherwise, the plaintiff need not prove that the defendant's conduct was not justified or privileged, nor can a defendant assert such defenses." *Id.* at 726-27.[13]  As previously discussed, there is ample evidence to support that Defendants engaged in tortious conduct.   Moreover, interference cannot be justified on the grounds of competition "when the business diverted by the actor does not relate to his

---

[13]     *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89 (Tex. App. 1997), to which Defendants also cite in support of their purported justification defense, was prior to *Wal-Mart Stores* and is cited multiple times in *Wal-Mart Stores* as an example of the confusing body of law concerning justification that *Wal-Mart Stores* sought to clarify.  *Wal-Mart Stores*, 52 S.W.3d at 723 & n.59, 724 & n. 69.

competition."  Restatement (Second) of Torts § 768 cmt. d; *see also id.* § 768 cmt. e ("For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.").  SourceOne and Defendants do not compete for the endorsement of state dental associations.  (Dennis Decl., Ex. 22 (Dep. Ex. 664) ("The TDA came to us about this 3 - 4 years ago .... all the dealers and major manufacturers chose not to participate")).  Thus, even if competition could serve as a defense under Texas law, it would not be applicable here.

### b)  SourceOne Had Valid Business Expectancies.

To establish a claim for tortious interference with prospective business relations, "there must be a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship."  *Dube v. Likins*, 167 P.3d 93, 101 (Ariz. App. 2007) (internal quotation marks omitted).  Although a plaintiff must establish "facts showing the expectancy constitutes more than a mere 'hope'", *id*. at 99 (quoting *Marmis vs. Solot Co.*, 573 P.2d 899, 902 (Ariz. App. 1977)), certainty is not required.  *Marmis*, 573 P.2d at 902.  "Reasonable assurance thereof in view of all the circumstances is sufficient."  *Id.* (quoting 45 Am. Jur. 2d, Interference § 12 (1969)); *see also Southern Union Co. v. Sw. Gas Corp.*, 180 F. Supp. 2d 1021, 1048 (D. Ariz. 2002) ("when the relationship is prospective, there must be a reasonable assurance that the contract or relationship would have been entered into").  The same is true under Texas law.  *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475-76 (Tex. App. 2006) ("Though it is not necessary to prove that the contract would have certainly been made but for the interference, that result must have been reasonably probable, considering all of the facts and circumstances attendant to the transaction.").  "[A] pre-existing business relationship can suffice to show a reasonable probability of prospective contractual

relations." *Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*, 2017 WL 2729998, at *9 (N.D. Tex. June 26, 2017).  Moreover, "when the business expectancy is with a group, such as customers," courts have allowed the claim to proceed so long as the group is "specifically identifiable."  *Dube*, 167 P.3d at 101 (collecting cases); *cf. Antwerp Diamond Exchange of America v. Better Business Bureau of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981) (reversing grant of summary judgment: "the reports of the Better Business Bureau would certainly have the effect of dampening sales or other business transactions. Purchasers might be persuaded that a company under investigation by the Phoenix Organized Crime Bureau and operating a 'boiler room' business is not one with which to do business").

Patterson claims that SourceOne "can offer no evidence, other than speculation, that it was reasonably probable that it would have entered into a business relationship" with state dental associations and dentists.  (Patterson Mem. at 54).  That is not correct.  First, there is ample evidence in the record of specific relationships with state dental associations that had progressed beyond "mere negotiations" and "initial interest."  (E.g., Dennis Decl., Ex. 168 (Dep. Ex. 210) (letter regarding recommendation of endorsement by Louisiana Dental Services, the for-subsidiary of the Louisiana Dental Association, which notes: "The likelihood of the LDA Board not accepting the recommendation of the LDS Board is quite slim."); Ex. 204  (Brockhaus Dep.) at 86:19-87:5 ("I was definitely pro going with SourceOne.  I thought it would be an amazing member benefit for our group"). Second, SourceOne had pre-existing business relationships with the Texas Dental Association and Arizona Dental Association that "suffice to show a reasonable probability" of prospective business relations/expectancies, see *Santander Consumer USA, Inc*., 2017 WL 2729998, at *9; SourceOne has alleged (Compl. ¶ 69), and has demonstrated through fact discovery, that these relationships were impaired due to Defendants' tortious conduct.

(Dennis Decl., Ex. 143 (Dep. Ex. 28) (resolution 120-2014-HR for FSI (TDA's for-profit subsidiary) to discontinue relationship with SourceOne); Ex. 241 (Xelowski Dep.) at 70:14-20 ("we actually backed off of our marketing the first year because we had a lot of pushback")). Finally, SourceOne has identified, and established through fact discovery, that specific groups of customers (state dental associations and their members) were dissuaded from entering business relationships with SourceOne on account of Defendants' illegal actions.  See *Dube*, 167 P.3d at 101 (collecting cases).

### c) Defendants' Conduct Injured SourceOne.

A plaintiff seeking to prove a claim for tortious interference with prospective business relations must also show damages or harm as a result of the interfering conduct, although neither Texas nor Arizona law requires that the interfering conduct be the sole cause of the plaintiff's damages.   See *Southern Union Co.*, 180 F. Supp. 2d at 1053-55 (rejecting argument that plaintiff must establish that defendant "alone" caused termination of business relationship: "Arizona courts have not interpreted "inducing or causing" to be limited to situations in which a defendant either initiates interference or physically prevents a third party from performing its contractual obligations, but instead have relied on the "but for" causation standard");  *COC Servs., Ltd. v. CompUSA, Inc.*, 130 S.W.3d 654, 679 (Tex. App. 2004) ("The test for cause in fact, or 'but for causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred'" (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995))).

Patterson argues, without any support at all, that "there is no evidence that state dental associations refused to do business with SourceOne as a result of Patterson's actions." (Patterson Mem. at 55).  Benco raises a similar argument.  (Benco Mem. at 28 ("There is nothing

in the record that shows a likelihood that, but for Benco's alleged conduct, SourceOne would

have entered into any business relationship with any identified SDA or dentist")).  Neither has

any merit.  (*E.g.*, Dennis Decl., Ex. 176 (Dep. Ex. 211) at LDA 112 (LDA tabling consideration

of SourceOne and not following its for-profit subsidiary's recommendation of endorsement in

light of concerns that Defendants would boycott New Orleans conference); Ex. 172 (Dep. Ex.

243: "Our Finance Council met over the weekend to discuss joining into the GPO with Texas

and Arizona.  The group is a little concerned about the major dental suppliers in our area, Schein,

Patterson and others pulling their support to the CDA and our largest component society which

hosts the Rocky Mountain Dental Conference each year")).  Moreover, the record shows that

Defendants' conduct harmed SourceOne's prospective business relationships with not only state

dental associations, but also dentists.  (*E.g.*, Dennis Decl., Ex. 223 (Osio Dep.) at 111:13-112:7,

246:8-247:7; Ex. 241 (Xelowski Dep.) at 70:9-13, 180:4-181:1).

### 3. There Are Material Factual Disputes as to SourceOne's Civil Conspiracy Claim.

"[L]iability for civil conspiracy requires that two or more individuals agree and thereupon

accomplish 'an underlying tort' which the alleged conspirators agreed to commit.'"  *Wells Fargo

Bank*, 38 P.3d at 36 (quoting *Baker v. Stewart Title & Trust of Phoenix*, 5 P.3d 249, 256 (Ariz.

App. 2000)); *accord First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214,

222 (Tex. 2017).  Defendants' sole argument in support of summary judgment on SourceOne's

claim for civil conspiracy is that SourceOne cannot show an underlying tort.  As previously

discussed, triable issues of fact exist as to SourceOne's antitrust claims, which preclude

summary judgment on SourceOne's civil conspiracy claim.

4.     **There Are Material Factual Disputes as to SourceOne's Aiding and Abetting Claim.**

"Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that a person who aids and abets a tortfeasor is him liable for the resulting harm to a third person." *Wells Fargo Bank*, 38 P.3d at 23.  To establish a claim for aiding and abetting, a plaintiff must show: "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Id.*

In addition to the regurgitating their baseless argument that SourceOne cannot put forth any triable issues of fact concerning an underlying unlawful act, Defendants contend that, under Texas law, an aiding and abetting claim is limited to "highly dangerous, deviant, or anti-social" behavior (Patterson Mem. at 56; Benco Mem. at 29), such that "Texas courts have found that no aiding and abetting claim existed where the underlying tort was not physically dangerous in nature." (Patterson Mem. at 56-57).  Assuming *arguendo* that Texas law even applies—which, for the reasons discussed in Section IV.B.1 above, it does not—Defendants overstate Texas law. Rather than imposing a requirement that "[t]he conduct at issue must involve a 'high degree of risk to others'" (Patterson Mem. at 56), the Texas Supreme Court in *Juhl v. Arlington*, 936 SW.2d 640 (Tex. 1996), merely noted: "Other instances where concert of action has been imposed have almost always involved conduct posing a high degree of risk to others."  *See id.* at 645 (emphasis added) (collecting cases).  Texas courts, including several post-*Juhl*, have recognized aiding and abetting claims in other contexts. *E.g.*, *Woloshen v. State Farm Lloyds*, No. 3:08-CV-0634-D, 2008 WL 4133386, at *3 (N.D. Tex. Sept. 2, 2008) (breach of the duty of

good faith and fair dealing); *Clayton v. Richards*, 47 S.W. 3d 159, 154 (Tex. App. 2001)

(invasion of privacy).

## V.     Conclusion

For the foregoing reasons, Defendants' motion should be denied.


Date:   November 15, 2017                    */s/ William A. Isaacson*

Jack G. Stern (Bar Number JS-1394)
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
7th Floor
New York, NY  10022
(212) 446-2300

James P. Denvir (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Michael S. Mitchell (*pro hac vice*)
Abby L. Dennis (*pro hac vice*)
Christopher G. Renner (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727

***Counsel for Plaintiff SourceOne Dental, Inc.***

93

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2017, the foregoing document was filed with

filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail

notification of such filing to counsel of record in this matter, and was also sent via e-mail to the

following:

Howard D. Scher
Kenneth L. Racowski
Samantha L. Southall
Thomas P. Manning
Jackson E. Warren
BUCHANAN INGERSOLL & ROONEY PC
50 S 16th Street, Suite 3200
Philadelphia, PA 19102
howard.scher@bipc.com
kenneth.racowski@bipc.com
samantha.southall@bipc.com
thomas.manning@bipc.com
jackson.warren@bipc.com

Carrie G. Amezcua
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW
Suite 300
Washington, DC 20006
carrie.amezcua@bipc.com

*Counsel for Benco Dental Supply Co.*

James J. Long
Scott M. Flaherty
Jay William Schlosser
Ruvin Jayasuriya
BRIGGS AND MORGAN, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
jlong@briggs.com
jschlosser@briggs.com
sflaherty@briggs.com
rjayasuriya@briggs.com

Michael B. Miller
MORRISON & FOERSTER LLP
250 West 55 Street
New York, NY 10019
mbmiller@mofo.com

*Counsel for Patterson Companies, Inc.*

/s/ William A. Isaacson
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
wisaacson@bsfllp.com

***Counsel for Plaintiff SourceOne Dental, Inc.***

94