UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                 :

SOURCEONE DENTAL, INC.,            :

                                    :     **MEMORANDUM**

                         Plaintiff,     :     **DECISION & ORDER**

                                    :

          - against -           :     15-cv-5440 (BMC) (GRB)

                                    :

PATTERSON COMPANIES, INC. and     :
BENCO DENTAL SUPPLY COMPANY,    :

                                    :

                      Defendants.     :
-------------------------------------------------------- X

**COGAN**, District Judge.

       Plaintiff SourceOne, Inc. has sued fellow dental-supplies distribution companies

Patterson Companies, Inc. and Benco Dental Supply Company, accusing them of violating § 1 of

the Sherman Act. SourceOne contends that defendants conducted a group boycott against

SourceOne's distribution partners and pressured manufacturers and at least one individual dentist

to join the boycott. SourceOne also brought various state-law claims based on the same conduct.

Before the Court are defendants' motions for summary judgment on all of SourceOne's claims.

       Because SourceOne has produced evidence that tends to exclude the possibility that

defendants acted independently (in other words, evidence that the inference that defendants

conspired is reasonable in light of the competing inference of independent action), defendants'

motions for summary judgment on the Sherman Act claim are DENIED. Defendants' motions

for summary judgment on plaintiff's damages claim are also DENIED. As to the state-law

claims, the Court concludes that under applicable law, SourceOne has demonstrated a genuine

issue of material fact as to its civil-conspiracy and tortious-interference claims, and therefore

defendants' motions for summary judgment are DENIED as to those claims. However, the Court

concludes that the applicable state law would not recognize an aiding-and-abetting claim in this context, so defendants' motions for summary judgment are GRANTED as to that claim.

## BACKGROUND

SourceOne alleges that dental-supplies distributors Patterson and Benco, as well as distributor Henry Schein, Inc. (which was originally named in the complaint but which settled with SourceOne), conspired to exclude it from the market and took overt acts in furtherance of that conspiracy by boycotting the Texas and Arizona Dental Associations' annual meetings and by pressuring manufacturers and individual dentists not to do business with SourceOne. The following is a non-exhaustive summary of the key evidence. As is required on a motion for summary judgment, the Court views the contested facts in the light most favorable to SourceOne.

### I.     Texas Dental Association's 2014 Meeting

SourceOne alleges that defendants formed the conspiracy sometime between October 2013 and January 2014. In October 2013, the Texas Dental Association (TDA) launched "TDA Perks Supplies," a TDA-branded online marketplace for dental supplies and equipment created through a partnership with SourceOne. Defendants found out about TDA Perks Supplies in mid-October 2013.

Sometime before October 23, 2013, Ron Fernandez, Benco's regional manager for San Antonio, Austin, and Houston, called John Hyden, Patterson's San Antonio regional manager, to discuss the TDA's upcoming annual meeting and whether their respective companies would be attending in light of the TDA's partnership with SourceOne. Fernandez testified at his deposition that one of his goals during this discussion was to identify whether Patterson would be attending the TDA meeting to avoid placing Benco at a competitive disadvantage if it pulled out of the TDA meeting and Patterson attended. Fernandez told Hyden that Benco was

2

considering pulling out of the 2014 TDA, and asked Hyden if Patterson planned to do the same. Fernandez testified that he offered information to Hyden to induce Hyden to share similar information.  Fernandez discussed what Hyden told him with others at Benco, and Hyden discussed the call with Clint Edens, his supervisor at Patterson.

On October 23, 2013, Clint Edens, Patterson's decision-maker on attending the TDA meeting, emailed his superiors, informing them that "[a]s for Patterson, we have briefly discussed this TDAPerks site (not the source) with our dealer competitors at the local San Antonio & Houston level . . . I am committed to pulling from the TDA if they do not reconsider competing with us via TDA perks [sic]."  Glenn Showgren, a manager at Schein, also reported internally as early as October 31, 2013 that Patterson, Benco, and another distributor, Burkhart, were considering pulling out of the 2014 TDA meeting.

Sometime before November 20, 2013, Randall McLemore, Schein's Dallas branch manager, visited his Patterson counterpart, Bob Ingersoll, to discuss the TDA annual convention. At his deposition, McLemore conceded that this in-person conversation with Ingersoll violated Schein's antitrust policy.

By December 11, 2013 (before Patterson had publicly announced that it would pull out of the 2014 TDA), Benco's Fernandez claimed that Patterson had already decided not to attend based on a conversation he had with a Patterson manager "about three weeks ago."  That same day, Fernandez told Barrett Spencer, a Benco salesperson, in a text message:  "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them [the TDA]."

Patterson announced that it would not attend the 2014 TDA meeting on December 13, 2013.  Immediately after Patterson's announcement, a regional manager at Schein informed his

supervisor that Patterson had dropped out of the 2014 TDA convention and that "I firmly believe they made the move expecting us to follow suit."

Dave Steck, a Schein vice president, later echoed this same sense of obligation to Patterson, or at least an obligation to keep Patterson apprised of Schein's decision.  In late December 2013 or early January 2014, Dave Misiak, then-Vice President of Sales at Patterson, called Steck to tell him that Patterson was not going to attend the 2014 TDA convention and asking Steck if Schein was attending.  Steck testified that, although he had known Misiak for five or six years, it was "unusual" for Misiak to contact him.  Steck told Misiak that Schein had not yet decided, but that Steck would let Misiak know once it had.  Steck testified at his deposition that he felt some obligation to tell Misiak Schein's final decision because Misiak had told him of Patterson's plans.  Steck testified that he informed his boss, Tim Sullivan, of the call because he thought it was important for Sullivan to know of Patterson's plans for the 2014 TDA.

A few weeks after the Misiak-Steck call, on January 21, 2014, Schein's Steck told his employees in an internal email that he needed to inform Patterson about whether Schein was attending the 2014 meeting ("Guys, I have to get back to PDCO on whether or not we are attending the TDA.").  That same day, Steck emailed Misiak at Patterson to say that he would "be calling you to let you know about our decision on the matter we recently discussed in the next couple of days."  In the same email thread, Misiak expressed outrage to Tim Rogan, another Patterson higher-up, because Steck "already told me that they were out.  Full blown!"  Rogan replied to Misiak immediately:  "That sucks.  You should call him. 'Thought I could trust you' type of conversation."

On April 8, 2014 (the day before Schein and Benco officially announced that they were not attending the 2014 TDA), Mike Rowe, Benco's Director of Sales, rejected a suggestion from

Fernandez, his direct report, that Benco advertise at the TDA that it would match the prices of TDA Perks Supplies, and said that Fernandez should instead "encourage more vendor partners to join the big three dealers and boycott future conventions.  [The TDA convention] dying a slow death will have more impact than matching prices."

On April 9, 2014, Schein announced that it would not attend the 2014 TDA.  Later that day, Benco's Fernandez informed Steck (his counterpart at Schein) that Benco had officially decided to pull out of the 2014 TDA – before Fernandez had informed the sales representatives he managed.  Fernandez also called Kevin Upchurch, a Schein manager in Arizona, that same day.

## II.    Arizona Dental Association's 2015 Meeting

Patterson's decisions not to attend the 2014 TDA and 2015 AZDA conventions[1] were made at the local level by different managers (Clint Edens for the TDA convention and Chad Bushman, Patterson's Arizona branch manager, for the AZDA convention), but both defendants' Arizona decision-makers knew about the Texas boycott and discussed it with their Texas counterparts.

On July 21, 2014, Dan Reinhardt, Patterson's Mountain West Region Manager (which included Arizona) contacted Clint Edens, the Patterson's South-Central Regional Manager, saying that Patterson's Arizona team had heard that the AZDA was collaborating with SourceOne and asking Edens about the status of Patterson's relationship with the TDA and SourceOne.  Dave Misiak replied to both Reinhardt and Edens less than an hour later, instructing them to "[p]lease discuss live and no more emails on this topic."

---

[1] The "AZDA convention" is officially called the Western Regional Dental Convention.

On April 17, 2014, Chuck Cohen, Benco's managing director in Texas, emailed Brian Evans, Benco's Director for the Western District (including Arizona), informing Evans about "a new program called #TDAPerks, an effort by the Texas Dental Association to compete with traditional dental distributors" and about Schein, Patterson, and Benco's decision "independently to withdraw as an exhibitor [*sic*] at the TDA meeting this year."  The email noted that Benco's Texas team was "monitoring this development closely," but that they were "not overly concerned about it growing quickly."  The email asked Evans to let members of Benco's Texas team "know if you hear anything more on this issue."  On July 10, 2014, Evans responded to Cohen, informing him that the AZDA had confirmed that SourceOne was an "endorsed vendor."

The Arizona decision-makers at Patterson and Benco also discussed with each other their companies' respective plans to withdraw support from the 2015 AZDA.  As early as June 18, 2014, Mike Wade, Benco's regional manager in Arizona and the decision-maker on the AZDA convention, responded to an email from his salesperson asking if Benco was planning to sit out the 2015 AZDA convention.  Wade said that he would "pull some local pressure" and that he was "[p]laying phone tag with Upchurch at Schein and will get PDCO Manager involved."

A month later, on July 21, 2014, Benco's Wade emailed Patterson's Bushman, asking for "his take on our friends at the AZDA becoming our competitors."  Wade told Bushman that Benco was "looking at pulling all our [AZDA] sponsorship including the AZDA meeting."  He continued, "I know that Patterson, Schein and Benco all boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ."  Patterson's Bushman replied an hour or so later, stating that, "[i]f the AZDA has in fact signed on with SourceOne (which it looks like they have), we will be pulling our sponsorship and attendance of the state meeting."  Benco's Wade replied the next day:  "We

are of the same mindset.  It would be gratifying to see every distributor with a local presence

make a unified statement on the AZDA's ill-conceived idea to become a distribution

competitor."

A week or so later, on July 30, 2014, Benco's Wade sent an email to a representative of

Dentsply, a dental supplies manufacturer, asking if SourceOne was an authorized dealer of

Dentsply's products and informing the representative that "I have communicated with our

competition at Schein and Patterson and we are all of the same mind that we will not be

supporting a competitor's meeting next year."

On September 2, 2014, Benco announced that it would not attend the AZDA; Patterson

announced a few weeks later, on September 19, 2014.  Neither defendants nor Schein attended

the 2015 AZDA meeting.

### III.    Pressuring Manufacturers and at Least One Individual Dentist

Upon first learning about SourceOne, Patterson's Clint Edens contacted at least six

manufacturers and asked about their involvement in the platform, stating that Patterson is

"strongly opposed and . . . would appreciate your support."[2]

Months later, on April 8, 2014, Ron Fernandez of Benco sent an email to his supervisor,

Mark Rowe, informing him that Fernandez was "going to have discussions with all of the

manufacturer's [*sic*] that support the TDA Perks program" and that "Schein and Patterson have

already told most of them that if they support the program, they will no longer be invited to

attend their regional meetings."  A few days later, Fernandez expressed the same sentiment in a

text message to a manufacturer's representative who lauded Benco for backing out of the

---

[2] Two of the manufacturers Edens contacted, Sybron Axis and Ivoclar Vivadent, would later pressure Arnold, another distributor, to stop supplying products to SourceOne.

7

convention.  Fernandez appeared to ask that representative to contact other manufacturers on his behalf:  "I wish all of the manufacturers would.  We need to show solidarity in our approach to dismissing them. I will have my admin send you a roster."

Around the same time, Rick Dunn, Benco's Dallas regional manager, announced in an email sent to other regional managers that because Kuraray (a manufacturer) "has chosen to support the TDA Perks program here in Texas, and I personally don't want them attending the [Benco's upcoming regional] meeting.  Unless my director instructs me otherwise, I will not be contacting them."  Rowe, Benco's Director of Sales, and Fernandez also replied to the chain, agreeing that Benco "will not b [*sic*] supporting Kurary [*sic*] in the great state of TX."  And in Arizona, Benco's decision-maker, Mike Wade, in conveying his commitment to withdrawing Benco's AZDA sponsorship unless the dental association ended its relationship with SourceOne, told a member of his team that "[i]f all the distribution companies stand firm and *if we can pull some of the manufacturers our way maybe they* [the AZDA] *will reconsider*." (emphasis added).

In mid-April 2014, Chuck Cohen, managing director at Benco, emailed Frank Nowtash of Arnold Dental (a smaller distributor), informing him that Benco would no longer be able to serve as Arnold's "larger inventory" because Arnold supplied products to SourceOne.  Nowtash confirmed that he received a phone call from Cohen to that effect, and that, along with significant pressure from manufacturers and his employees, Benco's displeasure with Arnold for selling to SourceOne was part of Nowtash's decision to end Arnold's relationship with SourceOne.  Nowtash testified that the risk of losing Benco as a major supplier was "a factor," but not a "major factor" in this decision.  In an internal email between Cohen and Mike McElaney, Benco's Vice President of Sales, McElaney told Cohen to "cut him off" if Nowtash did not agree to stop supplying to SourceOne because McElaney "would not want any of our

8

Texas team to find out about our relationship with Frank [Nowtash] and his support of the Perks

program."  Once Nowtash decided that Arnold would no longer supply to SourceOne, he called

Cohen to inform him.

In response to a July 11, 2014 email from Mark Rowe, Benco's Texas decision-maker,

asking for updates on the TDA Perks Supplies program, Benco's Ron Fernandez responded that

there was extremely low turnout at the TDA's 2014 convention and that "the doctors know they

need us and aren't willing to risk our support by gambling on a poorly planned and run

program," but that there are "a few like Josh Austin . . . that is [*sic*] openly bashing dental

distributors."  (Josh Austin is a prominent individual dentist in Texas.).  Fernandez continued

that, "[a]s of now, Schein, Patterson and Benco have all told him [Josh Austin] he can have the

Perks program handle his service needs as well.  Really interested to see how that turns out to

him."

## DISCUSSION

### I.      Sherman Act Claim

To prevail on a claim under § 1 of the Sherman Act, a plaintiff must prove the existence

of a contract, combination or conspiracy that unreasonably restrains trade and causes antitrust

injury to the plaintiff.  In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012).  There

are certain well-established situations which courts consider *per se* violations of § 1, such as

price-fixing, and, as relevant here, group boycotts involving concerted refusals to deal with a

competitor.  See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d

537, 542-43 (2d Cir. 1993).  Outside of those cases, a plaintiff can show that a conspiracy was an

unreasonable restraint of trade by showing an actual adverse effect on competition as a whole in

the relevant market – a so-called "rule of reason" violation.  Id.

A plaintiff can withstand a motion for summary judgment on a § 1 conspiracy claim by presenting direct or circumstantial evidence "that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, (1984). "No formal agreement is necessary to constitute an unlawful conspiracy." Am. Tobacco Co. v. United States, 328 U.S. 781, 809 (1946); see Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012); Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir. 1987).

But a plaintiff relying on circumstantial evidence to demonstrate an illegal conspiracy must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Ambiguous evidence – evidence that is equally consistent with independent conduct as with illegal conspiracy – is not enough. United States v. Apple, Inc., 791 F.3d 290, 315 (2d Cir. 2015). "Parallel action is not, by itself, sufficient to prove the existence of a conspiracy; such behavior could be the result of 'coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" Apple, 791 F.3d at 315 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 n.4 (2007)). Even when parties engage in parallel conduct knowing that their competitors are acting similarly, that is not enough to overcome the "more than ambiguous" standard. See Apex Oil, 822 F.2d at 253; see also Apple, 791 F.3d at 315.

Therefore, to prevail on summary judgment using circumstantial evidence such as parallel conduct, an antitrust plaintiff must "show the existence of additional circumstances, often referred to as 'plus' factors, which . . . allow the fact-finder to infer a conspiracy." Apex Oil, 822 F.2d at 253. These plus factors include, but are not limited to: evidence that shows that

the parallel acts were against the apparent individual economic self-interest of the alleged conspirators;[3] evidence of a high level of inter-firm communications; and a common motive to conspire.  Mayor & City Council v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (citations omitted).

The Court's task is to decide whether a jury could reasonably conclude from the totality of the evidence that the defendants' actions were taken as the result of a conspiracy, rather than through independent, parallel action.  See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984); In re Publ'n Paper, 690 F.3d at 64; see also Apex Oil, 822 F.2d at 253.  Such an inference may be more easily drawn where the "challenged activities could not reasonably be perceived as procompetitive."  In re Publ'n Paper, 690 F.3d at 63 (citation omitted).

In assessing the totality of the evidence, the Court bears in mind the Second Circuit's admonition that "[a] court deciding whether to grant summary judgment should not view each piece of evidence in a vacuum.  Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place."  Apex Oil, 822 F.2d at 254-55.  Conduct that would be lawful when undertaken unilaterally may still be actionable under § 1 when competitors agree to that conduct together. Anderson News, 680 F.3d at 183.

Based on the evidence presented, a jury could reasonably find that at some point between October 2013 and January 2014, defendants agreed with each other or with Schein to exclude SourceOne from the market, including by agreeing to boycott the conventions hosted by the Texas Dental Association and the Arizona Dental Association if those associations did not

---

[3] As explained further below, acts taken "against apparent individual economic self-interest" are those that would have contravened a defendant's individual self-interest in the absence of collusion.

discontinue their relationship with SourceOne, and by pressuring individual manufacturers and at least one prominent dentist to also discontinue their relationship with SourceOne in furtherance of this conspiracy.  SourceOne has shown both parallel conduct and evidence to support at least three "plus factors."  Based on this evidence, a jury could reasonably infer collusion over ambiguous conduct.

Defendants make two primary arguments in support of their motions:  first, that their conduct was not really parallel, because Patterson announced that it would not attend the 2014 TDA convention nearly five months before Benco (and Schein) announced the same.  Second, defendants argue that even if their conduct was parallel, it was at worst ambiguous as to any conspiracy because both companies had plausible independent reasons for the actions they took.

A. *Parallel Conduct*

SourceOne's circumstantial evidence of a *per se* illegal agreement to exclude is founded on defendants' parallel action in declining to attend the 2014 TDA and 2015 AZDA conventions and subsequent conventions,[4] which Patterson, Benco, and Schein had attended for many years.

As defendants point out, there was a significant delay between Patterson's December 18, 2013 announcement that it would not attend the 2014 TDA convention and Schein and Benco's announcements of the same on April 9, 2014.  But the communications between Patterson, Benco, and Schein leading up to Patterson's announcement that it would not attend the 2014 TDA convention and all three companies' communications immediately afterward raise an inference that Patterson made its decision not to attend based on the explicit or implied

---

[4] Neither Benco nor Patterson have attended a TDA or AZDA convention since, at least through the 2017 conventions.

agreement of its competitors to do the same if the TDA refused to drop its partnership with SourceOne.

Well before Patterson officially announced that it would not attend the 2014 TDA meeting, all three companies were communicating with each other or, at least, were aware of and monitoring each other's decision-making on the issue.  A jury could find that the inter-firm communications leading up to Patterson's announcement on December 13, 2013 that it would not attend the 2014 TDA meeting demonstrate that defendants and Schein had reached some kind of agreement by then.

Communications between representatives of all three companies leading up to the announcements by Benco and Schein that they too would not attend the 2014 TDA convention could also support an inference that defendants colluded with each other or with Schein.  A Benco manager contacted people with Schein's Texas and Arizona teams immediately after Benco decided internally not to attend the 2014 TDA convention, before the manager had informed his sales representatives.  A jury could reasonably conclude that the Benco manager made the calls to assure Schein that Benco would follow through on the agreement to take coordinated action against dental associations unless they ended their partnerships with SourceOne.

Based on certain aspects of the above evidence – "plus factors" – a jury could find that the parallel conduct outlined above was the result of illegal collusion to exclude SourceOne, rather than purely independent parallel conduct.  Those plus factors include:  the high level of inter-firm communications and their timing, the actions taken by defendants that were contrary to their unilateral self-interest, and the market structure that gave defendants a common motive to conspire.

### B.   Plus Factor:  High Level of Inter-Firm Communications

In examining inter-firm communications, the Court is cognizant that "evidence of the mere exchange of information by competitors cannot establish a [*per se*] conspiracy." Apex Oil, 822 F.2d at 257-58.  Cf. Todd v. Exxon Corp., 275 F.3d 191, 198-99 (2d Cir. 2001) (information exchange alone is not a *per se* Sherman Act violation but may violate the rule of reason).  But a high volume of communications, or communications that represent a departure from the ordinary pattern of communications among defendants, can be probative of an agreement.  See Apple, 952 F. Supp. 2d at 655 n.14.

Inter-firm communications involving Patterson, Benco, and Schein were pervasive. There were emails, text messages, phone calls, and one in-person meeting.  Patterson and Schein employees at various levels testified at their depositions that these inter-firm communications were unusual.  The communications involved people at many levels of the companies, from salespeople to managers and decision-makers and vice presidents.  And the intra-firm communications show that higher-ups at all three companies knew, at least to some extent, about the inter-firm communications between lower-level employees.

Defendants do not dispute that these communications were unusual; they argue that their irregularity does not necessarily indicate collusion in light of the unprecedented stimulus of two dental associations teaming up with another distributor to compete against them.  Defendants are missing the point.  What is suspicious about these inter-firm communications, in addition to their quantity, is that competitors communicated information with each other when, absent assurances of mutual support, doing so would have put each company individually at a competitive disadvantage.

14

*C.  Plus Factor:  Actions Contrary to Apparent Individual Economic Self-Interest*

Defendants' argument that their inter-firm communications were innocuous is closely related to their argument that not attending the TDA and AZDA conventions was in each company's individual economic self-interest once the TDA and the AZDA announced their partnerships with SourceOne.  Defendants argue that after the dental associations became their competitors through the associations' partnerships with SourceOne, it was no longer in defendants' individual self-interest to attend the conventions because the money they spent on booth fees would benefit their new competitor.  From there, defendants argue that their parallel acts of withdrawing from these conventions were, at best, ambiguous, because there is an equally plausible, non-collusive business explanation for their parallel conduct.

The problem with defendants' argument is that it assumes a definition of "apparent individual economic self-interest" in which defendants each know about each other's plans (and those of Schein).  An action that is contrary to a firm's apparent economic self-interest is one that is implausible if undertaken alone, without the guarantee of cooperation by competitors.  A unilateral economic incentive makes the inference of concerted action less plausible precisely because a jury confronted with such an incentive could just as easily infer that a defendant's actions were taken in response to that incentive, rather than as the product of collusion.  From the correct perspective, defendants' actions in deciding not to attend the TDA and AZDA annual meetings were not clearly in their own individual economic self-interest.

As alluded to above, Patterson, Benco, and Schein hesitated to drop out of the TDA and AZDA annual conventions after they learned about the dental associations' partnerships with SourceOne.  This is unsurprising, because all three distributors had, at least in the years leading up to SourceOne's endorsements by the TDA and AZDA, perceived the annual conventions to

15

be an important marketing opportunity, competing with each other for prime booth location and overall presence. Before the TDA Perks Supplies website was announced, Rick Dunn, Benco's Dallas regional manager, encouraged the company to prioritize major dental-association events over smaller ones, stating that "Benco not attending the Dallas midwinter or TDA would be detrimental to our markets." And Benco's position as a relatively small participant in the dental-supplies-distribution market meant that it had an additional incentive to conspire with its larger competitors to ensure that its "stance" against the dental associations partnering with SourceOne did not disadvantage it competitively – something Benco employees acknowledged in their deposition testimony.

Benco implicitly recognizes this conclusion in its brief when it points out that the potential for commercial harm that Benco might have suffered by not attending the TDA annual convention was "substantially reduced" once Benco learned that neither Patterson nor Schein were attending. This implies that Benco *did* risk commercial harm if it chose not to attend the TDA or AZDA conventions while its primary competitors did. Although Benco makes this point to argue that, as a smaller firm in a concentrated industry, its decision not to attend the convention after its larger competitors had already announced that they would not is evidence against a conspiracy, it also suggests that each defendant individually would not have been willing to boycott the TDA or AZDA conventions without assurances from the other major players that they too would not participate unless the associations ended their partnerships with SourceOne.

These incentives could also explain the high volume of inter-firm communications before each company's announcement that it would not attend the conventions. Benco's Fernandez testified at his deposition that he reached out to his counterpart at Patterson to find out if

16

Patterson was planning to attend the TDA annual meeting because it would be "favorable" to Benco to attend if Patterson did not and unfavorable for Benco to opt out if Patterson attended.

Patterson's Bob Ingersoll, a branch manager, testified similarly at his deposition.  He said that when Schein's Randall McLemore paid him a visit (sometime in November 2013) to ask whether Patterson was attending the 2014 TDA convention, Ingersoll returned the question because Patterson would be disadvantaged if Schein attended while Patterson did not. Christopher Cobb, a Patterson salesperson, echoed McLemore's concerns about Patterson not attending the TDA in his deposition testimony.  Clint Edens, Patterson's decision-maker on the TDA convention, acknowledged that Schein could have exploited Patterson's decision not to attend the convention for its own economic benefit by attending.  All three distributors shared this concern:  Randall McLemore of Schein testified that he asked Bob Ingersoll whether Patterson was planning to attend the 2014 TDA because he "thought it would be advantageous for my organization if they weren't there and we were."

Tellingly, defendants have not advanced a legitimate business reason for these inter-firm communications, such as the in-person conversation between Schein's McLemore and Patterson's Ingersoll and the phone call between Patterson's Dave Misiak and Schein's Dave Steck, in which Steck told Misiak that Schein had not yet decided whether it would attend the 2014 TDA, but that Steck would tell Misiak when Schein did make the decision.

Not only have defendants failed to advance a legitimate business reason for these communications, but, in addition, their employees acknowledged that there was no such legitimate business reason in their deposition testimony:  Joe Cavaretta, a member of Schein's Texas decision-making team, admitted at his deposition that Schein did not have a legitimate business reason to share with Patterson the information Ingersoll provided during his in-person

meeting with McLemore.  Patterson salesperson Christopher Cobb agreed that there was no legitimate business reason for the text messages that he exchanged with Schein salesperson Tony Starnes about whether their respective companies were attending the 2014 TDA meeting. Schein's Dave Steck testified at his deposition that he believed making a call like the one David Misiak had made to him in late December 2013 or early January 2014 would have violated Schein's antitrust policy.

A jury could reasonably conclude that not attending the TDA or AZDA annual conventions would be contrary to each defendant's individual interests, absent assurances from the other defendant or from Schein that they too would not be attending.  This "plus factor" could support the inference that defendants' conduct was the product of collusion, rather than innocuous, independent motivations.

### D.  Plus Factor:  Motive to Conspire

All of the above evidence is further bolstered by the structure of the dental-supplies market, which gave defendants a common motive to conspire against SourceOne.  According to the uncontested market evidence presented by SourceOne's expert, more than three-quarters of dental supplies are purchased through distributors (the other quarter are purchased directly from manufacturers).  And the distribution market is concentrated:  when SourceOne launched, Patterson and Schein each controlled approximately 35% of the national market, while Benco controlled approximately 10% (thus, about 80% total).  Defendants enjoyed the same relative control of the market in Texas and Arizona.  Defendants' market positions are protected by significant barriers to entry and expansion, including the substantial economies of scale necessary for distribution to the 80% of dentists who practice alone or with one other dentist, high fixed costs, and access to the most popular brands of dental supplies (the top ten

manufacturers produce about 40% of dental supplies).  Defendants and Schein perceived themselves to hold significant sway over the commercial viability of state dental association annual conferences because of their control of the market.  Defendants' secure positions in the market and the relative ease of excluding others make the allegations of collusive behavior all the more plausible.

These plus factors also make more plausible the allegation that defendants conspired to pressure manufacturers and individual dentists to boycott SourceOne as part of their conspiracy to exclude.  SourceOne has presented evidence that managers at both Patterson and Benco contacted manufacturers individually to pressure them not to deal with SourceOne.  The email evidence recited in Part III of the Background shows that Benco at least thought that Schein and Patterson were also pressuring manufacturers not to support SourceOne and believed that their competitors were committed to excluding those manufacturers who continued to support SourceOne from the companies' regional meetings.  Benco was similarly committed to excluding manufacturers, such as Kuraray, who supported SourceOne.  Furthermore, despite Nowtash's testimony that pressure from Benco was not a "major factor" in his decision that distributor Arnold would cease doing business with SourceOne, a jury, given his admission that it was a factor, could reasonably discount his conclusion and instead find that pressure from Benco, both directly and indirectly, was the primary cause.  A reasonable jury could conclude that defendants pressured manufacturers and distributor Arnold not to deal with SourceOne in furtherance of their conspiracy to exclude SourceOne.

As for the allegations that defendants pressured individual dentists as an overt act in furtherance of their conspiracy to boycott SourceOne, SourceOne has produced sufficient evidence to create a genuine dispute of material fact that defendants did so for at least one

19

prominent dentist.  The plus factors described above make the inference of collusion more plausible.  As of July 2014, Benco's Texas decision-maker knew that the company was withholding service from Josh Austin as retaliation for promoting SourceOne and thought that its competitors were doing the same.  Benco's Fernandez reported that he knew how other distributors were responding to pressure from this customer (confidently enough to report it to his boss, decision-maker Rowe) which suggests, at a minimum, that the distributors were taking consciously parallel action with respect to individual dentists they perceived to be siding with SourceOne, and also suggests that they were communicating with each other about it or agreed to act the same way.

Defendants argue that this evidence as to a single dentist is not enough to show that they conspired to pressure dentists generally.  There is some evidence that Mike Wade, a member of Benco's Arizona division leadership and Benco's decision-maker on the AZDA, instructed his team to pressure dentists in their jurisdiction who supported SourceOne:  Wade informed his team via email on August 1, 2014, that Benco would "reevaluate" its partnerships with AZDA if the dental association continued to partner with SourceOne, and instructed his team that "[t]he most important thing you can do is to communicate to your dentists the implications in entering the highly competitive distribution arena."  But even if the evidence as to Josh Austin were the only evidence SourceOne presented at trial, the issue would go to damages, not to whether SourceOne has demonstrated a genuine dispute of material fact that defendants violated the Sherman Act by conspiring to boycott SourceOne and to pressure at least one individual dentist to do the same.

The above evidence (although certainly not exhaustive) demonstrates how SourceOne has marshalled sufficient evidence for a jury to reasonably conclude from the totality of the evidence

that defendants' actions were taken as the result of a conspiracy, rather than through independent, parallel action.  There remains a genuine dispute of material fact as to whether defendants entered into a conspiracy to exclude SourceOne.[5]

## II.   Information-Sharing Claim Under the Rule of Reason

In its opposition to defendants' motions for summary judgment, SourceOne argues a second theory:  that defendants violated § 1 of the Sherman Act by agreeing to exchange information.  SourceOne alleges that this concerted action of sharing material information by horizontal competitors violates the Sherman Act's prohibition on unreasonable restraints of trade.

Information-sharing is not a *per* se violation of the Sherman Act, but courts have recognized the claim under the rule of reason.  See United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978); Todd, 275 F.3d at 198-99.  Courts apply the rule of reason using a three-step burden-shifting framework.

First, the plaintiff bears the initial burden of demonstrating that the defendant's challenged behavior "had an *actual* adverse effect on competition as a whole in the relevant market."  Capital Imaging, 996 F.2d at 543.  A plaintiff can establish this actual adverse effect either "directly by showing an actual adverse effect on competition as a whole within the relevant market" or "indirectly by showing that the defendant has 'sufficient market power to cause an adverse effect on competition.'"  United States v. Am. Express Co., 838 F.3d 179, 194

---

[5] In a cursory paragraph in its opposition brief, SourceOne alleges that "[a] jury could also reasonably find that Defendants' agreement was part of a pre-existing conspiracy to boycott dentists forming group purchasing arrangements."  But as defendants correctly point out, the four pieces of evidence SourceOne cites to support this argument (three email chains and a text message thread) are all inter-firm communications by Schein employees. None of them involve defendants.  If SourceOne's Sherman Act claim were based solely on this theory of a pre-existing conspiracy about group-purchasing arrangements, it would fail as a matter of law.

21

(2d Cir. 2016) (quoting Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998)).[6]

However, because market power is merely a "surrogate for detrimental effects," a plaintiff

seeking to prove anticompetitive effects through market power "must show market power, plus

some other ground for believing that the challenged behavior could harm competition in the

market, such as the inherent anticompetitive nature of the defendant's behavior or the structure

of the interbrand market." Am. Express, 838 F.3d at 195-96 (quoting Tops Mkts., 142 F.3d at

96-97).

Once the plaintiff satisfies its initial burden to demonstrate anticompetitive effects, the

burden shifts to the defendant to offer evidence of any procompetitive benefits of the agreement

or concerted action. Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 507 (2d Cir.

2004). If the defendant can show such proof of procompetitive benefits, then the burden shifts

back to plaintiff to demonstrate that whatever procompetitive benefits defendant has shown

could have been achieved through less restrictive means. Id.

In its opposition, SourceOne argues that its experts offered testimony about the definition

of the relevant market and defendants' market power, and because defendants neither moved for

summary judgment on those issues nor moved to exclude SourceOne's expert testimony on those

issues, a jury could reasonably find that defendants had "sufficient market power to cause an

adverse effect on competition." For the "other ground" to support its argument that defendants'

conduct could harm competition in the market, SourceOne argues that the information

defendants exchanged – whether they would continue to do business with dental associations,

---

[6] For this reason, defendants' argument that SourceOne has not produced any evidence that the challenged conduct had an actual adverse effect on competition as a whole is misplaced.

manufacturers, and at least one individual who supported SourceOne – was of the type most likely to be anticompetitive.

Defendants argue that SourceOne's rule-of-reason argument is facially insufficient because the information that defendants allegedly shared is not significant enough for an agreement to share it to be an unreasonable restraint of trade under the Sherman Act.  Defendants argue that exchanging information about their attendance at dental conventions is fundamentally different from the price, cost, or wage information sharing that courts have determined violate the Sherman Act.

The Supreme Court has distinguished "current price information" as "having the greatest potential for generating anticompetitive effects" within the category of "the exchange of price data and other information."  Gypsum, 438 U.S. at 441 n.16.  But Gypsum does not say that only price information (current or otherwise) could possibly support a rule-of-reason violation.  In the Gypsum footnote defendants cite, the Supreme Court emphasized how courts should consider the "structure of the industry involved" and the "nature of the information exchanged" when determining whether information sharing is pro- or anticompetitive.  Id.  The two considerations the Supreme Court provided would be unnecessary if only price information could support an information-exchange claim.

Here, SourceOne has put forth evidence from which a jury could conclude that defendants entered into an agreement to exchange information and that the information that defendants shared – their willingness and plans to deal with (or boycott) third parties who transacted with SourceOne – was significant based on the highly concentrated industry and the importance that the defendants placed on the annual dental conventions (based on their own internal communications).

23

SourceOne has evidence from which a jury could conclude that defendants agreed (with each other or with Schein) to exchange information.  Several employees of both Benco and Patterson testified that they shared information with each other and or with Schein to induce the other party to share similar information.  As discussed above, Benco's Ron Fernandez testified that he contacted John Hyden at Patterson to discuss the 2014 TDA and offered him information about whether Benco was planning to attend to induce Hyden to share similar information about Patterson.  A few months later, after Patterson had announced it would not be attending the 2014 TDA, Dave Misiak, a Patterson vice president, contacted Dave Steck, a Schein vice president to tell him personally and to ask Steck if Schein was going to attend.  Steck testified that although he told Misiak that Schein hadn't decided yet, he felt some obligation to tell Misiak once Schein decided because Misiak had told him of Patterson's plans.  A few months later, when Benco announced that it too would not attend the 2014 TDA, Benco's Fernandez called Schein's Steck that day to tell him personally – before Fernandez had even informed the sales representatives he managed.  Fernandez also called Kevin Upchurch, a Schein manager in Arizona, that same day. In addition to these specific communications, SouceOne has cited several emails in which defendants' employees reference communicating with their competitors about the dental conventions during the weeks leading up to the companies' respective decisions not to attend the TDA convention.

SourceOne has also presented evidence that the information defendants were sharing with each other and with Schein was material and competitively sensitive based on the structure of the industry and the nature of the information.  As described in Part I.C above, defendants and Schein were initially very hesitant to drop out of the dental association conventions for fear of losing business to competitors who did attend.  SourceOne has produced evidence from which a

jury could conclude that defendants' communications facilitated their anticompetitive conduct in boycotting dental associations who partnered with SourceOne and pressuring manufacturers and at least one individual dentist not to deal with SourceOne, all to exclude SourceOne from the market, therefore harming competition.

Because SourceOne has produced sufficient evidence that a jury could conclude that it has satisfied its initial burden in the rule-of-reason burden-shifting scheme, defendants are not entitled to judgment as a matter of law on a claim based on SourceOne's information-exchange theory.[7]

### III.    Damages on Sherman Act Claim

Defendants moved for summary judgment on SourceOne's damages claim, arguing that the damages model created by Dr. Jeffrey Leitzinger, one of SourceOne's experts, fails to separate out the damages attributable to the different alleged actions (*e.g.*, the alleged boycott of state dental-association conventions, the alleged pressure on manufacturers, *etc.*).  Defendants argue that if they prevail on summary judgment as to one or more of the alleged actions, SourceOne's damages model will be entirely inadmissible and SourceOne will have no way to prove its damages claim.  This concern does not support summary judgment on defendants' damages claim, because, as described in Parts I and II of the Discussion, the Court concludes that SourceOne has produced enough evidence to create a genuine dispute of material fact as to each of the alleged actions by defendants.

Defendants have already moved *in limine* to exclude Dr. Leitzinger's expert testimony; the Court will not address that motion here.  But even if the Court were to exclude the testimony

---

[7] In their reply briefs, defendants argue only that SourceOne's rule-of-reason claim fails as a matter of law and that SourceOne has not produced enough evidence to satisfy its initial burden.  Defendants did not argue that they could satisfy their burden at the second step, nor did they point to any evidence that their information-sharing had procompetitive effects.

defendants are seeking to exclude, that would not prevent SourceOne from establishing damages through fact-witness testimony by its own corporate officers or through the testimony of dental-association officials.  See Fed. R. Evid. 701, advisory committee's note to 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.").  Defendants' motions for summary judgment on the damages claim are therefore denied.

## IV.    State Statutory Antitrust Claims

SourceOne also brought state-law antitrust claims under New York's Donnelly Act (New York General Business Law §§ 340-347), and Arizona's Uniform State Antitrust Act (Arizona Revised Statutes Annotated §§ 44-140).  Defendants moved for summary judgment on both of these claims.  Both statutes are interpreted in accordance with federal antitrust laws.  None of the parties identify any reason to analyze the state claims differently than the federal claims.  See, e.g., Williams v. Citigroup, Inc., 659 F.3d 208, 211 n.2 (2d Cir. 2011); Mothershed v. Justices of the Supreme Court, 410 F.3d 602, 609 (9th Cir. 2005).  Therefore, summary judgment is denied for the same reasons given in Parts I-III of the Discussion.

## V.    State Common-Law Claims

Defendants also move for summary judgment on SourceOne's state common-law claims for tortious interference with prospective business relations, civil conspiracy, and aiding and abetting tortious and anticompetitive conduct.

### A.  Choice of Law

A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which the court sits.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496

(1941).  New York courts faced with a decision about which law to apply first determine if there

is a conflict between the laws of the jurisdictions involved.  In re Allstate Ins. Co. (Stolarz), 81

N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).  There is a conflict if "'the applicable law from

each jurisdiction provides different substantive rules' and those differences are 'relevant to the

issue at hand[ ] and . . . have a significant *possible* effect on the outcome of the trial.'"  First Hill

Partners, LLC v. BlueCrest Capital Mgmt. Ltd., 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014)

(alteration in original) (quoting Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325,

331 (2d Cir. 2005)).  If there is no actual conflict, New York courts apply New York law.  See

Wall v. CSX Transp., Inc., 471 F.3d 410, 422 (2d Cir. 2006).

Here, the potentially relevant jurisdictions are New York, Texas, and Arizona, and those

states' laws conflict only as to the aiding-and-abetting claim.  First, for a tortious-inference claim

in which the defendant's interference is intended, at least in part, to advance its own competing

interest, New York law requires the plaintiff to prove that the defendant interfered with the

prospective relationship using criminal or fraudulent means.  See S.O. Textiles Co. v. A & E

Prod. Grp., 18 F. Supp. 2d 232, 240 (E.D.N.Y. 1998).  The laws of Arizona and Texas do not

impose such a requirement.  See BP Automotive LP v. RML Waxahachie Dodge, LLC, 517

S.W.3d 186, 208 (Tex. App. 2017); Dube v. Likins, 216 Ariz. 406, 412-13, 167 P.3d 93, 99-100

(Ariz. Ct. App. 2007).

Although the complaint does not use the words "criminal" or "fraudulent," it alleges that

defendants violated federal and state antitrust acts, which, if proven, would be sufficiently

criminal to constitute the predicate required for the tort of tortious interference.  See Anti-

Monopoly, Inc. v. Hasbro, Inc., No. 94 CIV. 2120, 1995 WL 380300, at *7 (S.D.N.Y. June 27,

1995).  The difference in the elements is therefore immaterial; there is no actual conflict as to the

laws of the three relevant jurisdictions, so the Court applies New York law to SourceOne's
tortious-interference claim.

For a civil-conspiracy claim, Texas and Arizona both recognize the claim and require
essentially the same elements.  See First United Pentecostal Church of Beaumont v. Parker, 60
Tex. Sup. Ct. J. 608, 514 S.W.3d 214, 222 (2017); Wells Fargo Bank v. Ariz. Laborers,
Teamsters, & Cement Mason Local No. 395 Pension Tr. Fund, 201 Ariz. 474, 498, 38 P.3d 12,
36 (2002) (en banc).  New York only recognizes civil conspiracy when it is connected to a
separately pleaded underlying tort.  See ACR Sys., Inc. v. Woori Bank, 232 F. Supp. 3d 471, 479
(S.D.N.Y. 2017).  Tortious interference with prospective business relations qualifies as an
underlying tort, if adequately pleaded.  See Alexander & Alexander of N.Y., Inc. v. Fritzen, 68
N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547 (1986).  Because SourceOne has adequately pleaded a
separate claim for tortious interference with prospective business relations, it can satisfy this
additional requirement.  And because the remaining elements are the same in all three
jurisdictions, there is no conflict and, as with the tortious-interference claim, the Court will apply
New York law.

Finally, as to the aiding-and-abetting claim, New York and Arizona both recognize the
claim as to tortious conduct generally.  Although Texas recognizes a claim for aiding and
abetting a breach of fiduciary duty, Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565,
574, 160 S.W.2d 509, 514 (1942), Texas law is unclear as to aiding and abetting other torts, such
as tortious interference with business relations.  In the past, the Texas Supreme Court has
discussed but declined to adopt Restatement (Second) Torts § 876(b), which imposes aiding-and-
abetting liability.  The Court stated that even if § 876(b) applied, its purpose is to "deter
antisocial or dangerous behavior," which suggests that it would not apply aiding and abetting to a

claim for tortious interference with business expectancy.  See Juhl v. Airington, 39 Tex. Sup. Ct.

J. 830, 936 S.W.2d 640, 644 (1996).  At least one Texas court of appeals and a federal district

court in Texas have reached a similar conclusion as to the competition-related torts of

misappropriation of trade secrets, civil theft, unfair competition by misappropriation, and tortious

interference with contract.  See N.Y. Pizzeria, Inc. v. Syal, 56 F. Supp. 3d 875, 884 (S.D. Tex.

2014); W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 922 (Tex.

App. 2014) (same as to misappropriation of trade secrets).  But see Clayton v. Richards, 47 S.W.

3d 159, 154 (Tex. App. 2001) (applying aiding and abetting to a claim for invasion of privacy).

The Court is unwilling to conclude that Texas would recognize a claim for aiding and abetting

tortious and anticompetitive conduct, as SourceOne alleges here.  Because the Court concludes

that one jurisdiction would not recognize a claim for aiding and abetting at all, there is an actual

conflict as to the laws of the three potential jurisdictions on that claim.

     As noted above, the Court applies New York law to the tortious-interference and civil-

conspiracy claims, because there is no conflict of laws on those claims.  As for the aiding-and-

abetting claim, for which the laws of the relevant jurisdictions do conflict, New York courts

conduct an "interest analysis" and apply the law of the jurisdiction with the greatest interest in

the litigation.  Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95

(1985) (quoting Miller v. Miller, 22 N.Y.2d 12, 15, 290 N.Y.S.2d 734, 737 (1968)).

     Defendants argue that because the majority of the alleged conduct occurred in or

involved Texas, that state has the greatest interest in the litigation and its law should apply.

SourceOne argues that because SourceOne is incorporated and headquartered in Arizona, it

suffered the damages from defendants' allegedly tortious conduct there, and therefore Arizona's

law should apply.  SourceOne also points out that at least some of the tortious conduct occurred

in Arizona too, when defendants allegedly interfered with SourceOne's relationship with the Arizona Dental Association, and, through it, with potential customers.

Under New York law, "the interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that people use as a guide to governing their primary conduct, or loss-allocating rules that prohibit, assign, or limit liability after the tort occurs." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 49 (2d Cir. 2013) (Licci II) (internal quotation works and citation omitted).

Where, as here, conflicting conduct-regulating laws are at issue, the Second Circuit has concluded that the law of the jurisdiction where the allegedly tortious acts occurred (as opposed to the jurisdiction where the injury was inflicted) should generally apply because "that jurisdiction has the greatest interest in regulating behavior within its borders." Id. at 49. In reaching this conclusion, the Second Circuit, applying the New York Court of Appeals' decision in Schultz, explicitly considered whether the law of the place of injury or the law of the place of wrongful conduct governed; for conduct-regulating rules, it adopted the latter. See id. at 50-51.

The Court agrees with defendants that the majority of the tortious conduct occurred in Texas, which has the greatest interest in this case under New York's choice-of-law rules, as interpreted by Licci II. The Court will therefore apply Texas law to the aiding-and-abetting claim, and, because the Court concludes that Texas would not recognize an aiding-and-abetting claim under these circumstances, grants summary judgment in favor of defendants on that claim.

### B. Tortious Interference with Prospective Economic Advantage

To prevail on a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must show that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the

defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).  Improper or wrongful means generally must amount to a crime or an independent tort, and include an excessive degree of economic pressure, physical violence, or fraud, but exclude mere acts of persuasion.  Smith v. Meridian Techs., Inc., 86 A.D.3d 557, 560, 927 N.Y.S.2d 141, 144 (2011).

As to the first element – a business relationship with a third-party – SourceOne has also demonstrated a reasonable probability of a future contractual relationship.  Defendants argue that SourceOne cannot demonstrate that it was reasonably probable that it would have entered into a business relationship with state dental associations and dentists absent defendants' allegedly tortious interference.  I disagree.  SourceOne has produced evidence that it had a reasonable assurance that at least the Louisiana and Colorado Dental Associations would have endorsed SourceOne but for defendants' interference.  SourceOne has also produced evidence that defendants' allegedly tortious conduct interfered with its future business relations with the Texas and Arizona Dental Associations and their members by pointing to evidence that the TDA eventually dropped its endorsement of SourceOne because of pressure from defendants and related pressure from TDA members.  SourceOne cites testimony by leaders of those organizations that their endorsements of SourceOne caused problems with dentists who were upset about defendants withdrawing from the dental associations' annual conventions.

As to the second element – that defendant knew of the business relationship and intentionally interfered with it – SourceOne has produced considerable evidence, described in the Background and discussed in the Discussion Parts I-III, from which a jury could conclude that defendants intentionally tried to disrupt SourceOne's current and prospective business

relationships with state dental associations, dentists, and manufacturers.  Defendants do not deny (and could not, based on the evidence presented at summary judgment) that they knew of SourceOne's business expectancy with the Texas and Arizona Dental Associations, and knew of SourceOne's plan to seek endorsement by at least the Louisiana Dental Association.

As to the third element – that defendants used dishonest, unfair, or improper means to interfere – SourceOne has presented sufficient evidence that defendants interfered with its prospective business relationships by means that were unlawful or improper.  Where "unlawful restraint of trade is effected," a competitor can be held liable for interference with prospective contractual relations.  Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632 (1980).  "[E]ven absent a finding of antitrust violations, certain degrees of economic pressure may be sufficiently wrongful to compel a finding of liability based on this cause of action."  Id.; see also Tech. Consortium, Inc. v. Digital Commc'ns Assocs., Inc., 757 F. Supp. 197, 200 (E.D.N.Y. 1991).

Furthermore, the competitor justification, through which an interference intended at least in part to advance the competing interest of the interferer may be justified, simply does not apply here because it is only available where "no unlawful restraint of trade is effected, and the means employed are not wrongful."  Guard-Life Corp., 50 N.Y.2d at 191, 428 N.Y.S.2d at 632.  Because SourceOne has created a genuine dispute of material fact as to whether defendants violated state and federal antitrust law through an illegal boycott, defendants are not entitled to summary judgment on this claim based on the competitor justification.

As to the fourth element – causation and injury – SourceOne must show "that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations," Pacheco v. United Med. Assocs., P.C., 305 A.D.2d 711, 712, 759 N.Y.S.2d 556, 559

(3d Dep't 2003), and that it suffered some actual damages, such as lost opportunities for profits

on business diverted from it.  Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 521 N.Y.S.2d

672 (1st Dep't 1987).  The parties did not address proximate cause in their briefing.

Nevertheless, the Court is satisfied that SourceOne has produced sufficient evidence for the

proximate-cause element to survive summary judgment.

> An injury or damage is proximately caused by an act, or a failure to act, whenever
> it appears from the evidence in the case that the act or omission played a
> substantial part in bringing about or actually causing the injury or damage, and
> that the injury or damage was either a direct result or a reasonably probable
> consequence of the act or omission.

Jund v. Town of Hempstead, 941 F.2d 1271, 1286 (2d Cir. 1991); see also Walley v. Bivins, 81

A.D.3d 1286, 1287, 917 N.Y.S.2d 461, 463 (4th Dep't 2011).

Defendants argue that there is no evidence that state dental associations or dentists

refused to do business with SourceOne because of their actions.  SourceOne, however, has

produced significant evidence – in the form of testimony from leadership in the TDA and AZDA

and communications from two prospective dental associations, Louisiana and Colorado – that

those organizations' concerns that defendants would boycott their annual meetings was a

substantial factor in their decision to not to endorse SourceOne or to cease endorsing SourceOne.

SourceOne has also produced intra-company and inter-company emails in which defendants'

employees discuss not attending dental association meetings to discourage the TDA, the AZDA,

or other dental associations from endorsing SourceOne.  From this evidence, a reasonable jury

could conclude that defendants' actions were both a cause-in-fact of SourceOne's lost business

(and therefore profits), and that the lost business was a foreseeable consequence of defendants'

actions.

And, as described in Part III of the Discussion, SourceOne has created a genuine dispute of material fact as to damages in the form of lost profits from a continuing business relationship with the Texas Dental Association and other dental associations (at least the Louisiana and Colorado Dental Associations, for whom plaintiff has demonstrated a reasonable assurance of future business).

Because SourceOne has demonstrated a genuine dispute of material fact as to each contested element of its tortious-interference claim, defendants are not entitled to summary judgment on that claim.

### C. Civil-Conspiracy Claims

As mentioned above, New York only recognizes a civil-conspiracy claim if it is connected to a separate underlying tort.  ACR Sys., 232 F. Supp. 3d at 479.  Once that showing has been made, a plaintiff must establish:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in furtherance of the agreement; and (4) resulting damage or injury.  Id.

Defendants argue that SourceOne cannot show an underlying tort, such as that they violated antitrust law by agreeing to exclude SourceOne from the market.  As explained above, the Court concludes that SourceOne can survive summary judgment as to both the antitrust claims and its tortious-interference claim, so SourceOne has clearly satisfied the underlying tort requirement.  See Alexander & Alexander, 68 N.Y.2d at 969, 510 N.Y.S.2d at 547.  As for the four elements, they essentially replicate the elements of federal and state antitrust law.  SourceOne's civil-conspiracy claim therefore survives summary judgment for the same reasons given in Parts I-III of the Discussion.

34

*D.  Claims for Aiding and Abetting Tortious and Anticompetitive Conduct*

Because, as described above, the Court concludes that Texas would not recognize a claim for aiding and abetting tortious and anticompetitive conduct, defendants are entitled to summary judgment on their aiding-and-abetting claims.

## CONCLUSION

Defendants' motions for summary judgment [158], [161] are therefore GRANTED IN PART AND DENIED IN PART.  Defendants' motions for summary judgment on the Sherman Act claim, state statutory antitrust claims, damages claim are denied.  Applying New York law to the common-law tortious-interference and civil-conspiracy claims, defendants' motions for summary judgment as to those claims are denied.  Applying Texas law to the common-law claim for aiding and abetting, defendants' motions for summary judgment as to that claim are granted.

**SO ORDERED.**

_____
U.S.D.J.

Dated:  Brooklyn, New York
        April 10, 2018