UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
SOURCEONE DENTAL, INC.,                                  :
                                                         :   **MEMORANDUM**
                                       Plaintiff,        :   **DECISION & ORDER**
                                                         :
                    - against -                          :   15-cv-5440 (BMC)
                                                         :
PATTERSON COMPANIES, INC. and BENCO                      :
DENTAL SUPPLY COMPANY,                                   :
                                                         :
                                       Defendants.       :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff moves this Court *in limine* to exclude certain testimony of defendants' expert, Professor Kenneth G. Elzinga. Defendants move *in limine* to exclude the testimony of plaintiff's experts, Doctor Jeffrey Leitzinger, Professor Marvin Lieberman, and Professor David J. Teece.

For the reasons given below, the Court grants plaintiff's motion, denies defendants' motion as to Dr. Leitzinger's damages model, grants defendants' motion as to some of Dr. Leitzinger's other opinions but denies it as to others, and denies defendants' motion as to the testimony by Profs. Lieberman and Teece.

## DISCUSSION

Federal Rule of Evidence 702 permits testimony by an expert witness "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." "Experts may testify on questions of fact as well as mixed questions of fact and law, including mixed questions that embrace the ultimate issue to be

decided by the factfinder.  Fiataruolo v. United States, 8 F.3d 930, 941 (2d Cir. 1993); see Fed. R. Evid. 704.

The proponent of the expert testimony has the burden of establishing, by a preponderance of the evidence, that the testimony is competent, relevant, and reliable.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93, 592 n.10 (1993).  To determine whether a proposed expert's testimony is admissible under Rule 702, the Court must therefore examine:  (1) the proposed expert's qualifications;[1] (2) whether the proposed testimony is relevant, that is, whether it would be helpful to the factfinder; (3) whether the proposed testimony is based on reliable data and methodologies.  Id.

An expert's testimony is relevant if it fits the issues to be resolved in the case and is directed to matters within the witness's scientific, technical, or specialized knowledge.  Fed. R. Evid. 704.  "[E]xpert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision."  Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005) (second alteration in original) (internal quotation marks and citation omitted); see Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992).

This means that an expert in an antitrust case cannot testify to whether a party's conduct was "anticompetitive" or "unlawful" under the Sherman Act, but can, for example, testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand.  See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, 313 F. Supp. 2d 213, 240-41 (S.D.N.Y. 2004).  An expert

---

[1] Neither motion *in limine* addressed in this order challenges an expert's testimony based on the expert's lack of qualifications.

2

could also hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way. Id.

When evaluating the reliability of an expert's testimony, the Court should consider whether the testimony is "grounded in sufficient facts or data" and is "the product of reliable principles and methods," and whether the witness "has applied the principles and methods reliably to the facts of the case." See Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) (internal quotation marks omitted) (quoting Fed. R. Evid. 702). The Court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002); see Daubert, 509 U.S. at 593-95. A district court has broad discretion in deciding whether an expert's testimony is reliable under Daubert. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

The Second Circuit has endorsed an especially broad standard for the admissibility of expert testimony. See Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996). Under this liberal standard,

> expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, [but] other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.

Id. at 21 (internal quotation marks and citations omitted); see also Amorgianos, 303 F.3d at 267. Expert testimony on "soft sciences" like economics is less likely to be excluded "because these disciplines require the use of professional judgment," and "challenges may ultimately be viewed as matters in which reasonable experts may differ." In re Air Cargo Shipping Servs. Antitrust

3

Litig., No. 06-MD-1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (internal quotation marks omitted).

I.  **Plaintiff's Motion To Exclude Certain Testimony by Patterson's Expert, Professor Kenneth G. Elzinga**

Plaintiff moves for an order precluding defendant Patterson's expert Prof. Elzinga from offering opinions that: (1) Patterson did or did not enter into an agreement with its competitors Benco and Schein to engage in the conduct alleged by SourceOne; and (2) Patterson's conduct was or was not anticompetitive. Plaintiff does not seek to exclude Prof. Elzinga's testimony entirely, only those two opinions. The Court grants plaintiff's motion.

Much of Prof. Elzinga's 69-page report is admissible expert testimony about the dental-supplies industry and what results an economist might expect from the parties' actions. A few times in his report, Prof. Elzinga veers into legal conclusions about whether defendants' behavior was anticompetitive. For example, he concludes that: "[t]he reaction of Patterson's local branches to the TDA's partnership with SourceOne was to cease attending and supporting the TDA because the association 'basically amounts to a direct competitor.' Patterson's response to this alliance between the TDA and SourceOne is not anticompetitive (and also not surprising)"; "The decision Patterson's regional managers made to pull back from TDA and AZDA marketing is not anticompetitive. Just the opposite: it is a sign of Patterson putting its promotional resources where it could compete most effectively"; "In Appendix E, I discuss other manufacturers that SourceOne claims were pressured into stopping sales through SourceOne. As demonstrated in that appendix, SourceOne has failed to provide evidence that these manufacturers were pressured."

Similarly, Prof. Elzinga's conclusion that the emails Patterson's Clint Edens sent to manufacturers upon first learning about SourceOne were "not anticompetitive," but instead are

4

"explained by unilateral self-interest" because they "illustrate that a distributor has an incentive to alert a manufacturer that its products may be going through unauthorized channels," is also a legal conclusion. Although Prof. Elzinga wraps these conclusions in economic verbiage, fundamentally, they address Patterson's motivation in taking certain exclusionary actions. Such statements are inadmissible because a witness cannot testify to legal principles, conclusions, or states of mind. See Hygh, 961 F.2d at 363.

There are also a few conclusions in Prof. Elzinga's report that do not depend on any economic principles or analysis. For example, in Part V.C. of his report, Prof. Elzinga concludes that Patterson's decision not to attend the TDA convention was not conditioned on the same decision by Schein or Benco, based on the timing of those decisions. Prof. Elzinga does not cite any economic principles for his conclusion about timing; he simply asserts a logical inference from one event occurring after another. Because this proposed testimony concerns matters that the average juror is capable of understanding on his or her own, it is not admissible as expert testimony. See, e.g., United States v. Mejia, 545 F.3d 179, 194-95 (2d Cir. 2008).

The Court therefore grants plaintiff's motion. Prof. Elzinga cannot offer opinions – except those based on his economic expertise – about whether Patterson entered into an agreement with its competitors to engage in the conduct alleged by SourceOne. And, although it should go without saying, Prof. Elzinga cannot offer legal conclusions about whether Patterson violated the Sherman Act. Prof. Elzinga can, however, offer non-legal economic testimony on topics that the average juror is not capable of understanding on his or her own.

**II.   Defendants' Motion to Exclude Certain Testimony by SourceOne's Experts, Doctor Jeffrey Leitzinger and Professors Marvin Lieberman and David J. Teece**

Defendants move to exclude entirely the testimony of three of plaintiff's experts. Defendants challenge the reliability of Dr. Leitzinger's principles and methods, the sufficiency of

5

the data he relies on, and the applicability of his testimony to this case. For the other two experts, defendants object primarily to the underlying facts Prof. Lieberman and Prof. Teece use in applying their economic theories. The Court denies defendants' motion to exclude Dr. Leitzinger's damages model, grants in part their motion to exclude his other conclusions, and denies their motion to exclude the testimony of Profs. Lieberman and Teece.

## A. Dr. Jeffrey Leitzinger

Defendants move to exclude Dr. Leitzinger's damages model, as well as his opinions that: (1) defendants offered "premium pricing"; (2) defendants prevented SourceOne from achieving an operational scale; and (3) many dentists paid "substantially higher prices" because of defendants' conduct. Defendants argue that Dr. Leitzinger's damages model is unreliable because his inputs are not tethered to the facts of this case and therefore will not assist the jury.

Defendants identify a number of weaknesses in Dr. Leitzinger's analysis. First, defendants argue that Dr. Leitzinger's initial cut of how many dentists belong to dental associations that would have endorsed SourceOne but for defendants' conduct is unreliable because it assumes that all state dental associations would have been equally likely to endorse SourceOne. Defendants point to affidavits by representatives of 11 state dental associations who said that their organizations were not interested in collaborating with SourceOne. Defendants also argue that there is little concrete evidence that the California Dental Association planned to endorse SourceOne in the past and that any future endorsement is unlikely because the California Dental Association formed its own group-purchasing entity in June 2015.[2]

---

[2] In addition to the arguments described above, defendants cite to two documents to support their argument that the California Dental Association was not interested in partnering with SourceOne. The key document, a declaration by Robert Spinelli, Chief Operating Officer of the California Dental Association's group-purchasing organization during the relevant time, was executed on October 6, 2017, several months after the close of expert discovery (in June 2017). Because defendants failed to produce these two documents within the discovery period, the Court will not consider them.

6

As plaintiff points out, representatives of those 11 state dental associations swore the affidavits after defendants engaged in allegedly anticompetitive conduct, so the affidavits are not relevant to establish the "but for" universe without defendants' conduct. Plaintiff has also produced affidavits of its own suggesting that for at least some of those 11 state dental associations, their stated lack of interest in SourceOne was the result of defendants' allegedly illegal pressure on the Texas and Arizona Dental Associations. Dr. Leitzinger's assumption that all state dental associations nationwide would be equally interested in endorsing SourceOne in a but-for world is a contested point, but it is hardly "so unrealistic and contradictory as to suggest bad faith." See Boucher, 73 F.3d at 21. It is therefore properly the subject of cross-examination, not a ground to exclude Dr. Leitzinger's model.

Second, defendants object to the benchmarks Dr. Leitzinger used to determine the number of dentists whose state dental associations would have endorsed SourceOne and at what rate, but for the alleged anticompetitive activity. Dr. Leitzinger examined the rates at which four companies were endorsed by state dental associations and then used the rates for the two companies he determined were most analogous to SourceOne. The first, DemandFlow, sells marketing software to dental and medical practices, as well as non-medical offices like salons, spas, and automotive shops. According to Dr. Leitzinger's report, DemandFlow achieved a 50% endorsement rate within 7 years (that is, DemandFlow was endorsed by state dental associations representing 50% of the total population of dentists who are dental-association members).

The other benchmark company, Association Gloves, a non-profit organization owned by the Michigan Dental Association, sells only certain dental supplies, with a focus on examination gloves. Defendants allegedly engaged in some anticompetitive behavior when Association Gloves first launched, but to a much smaller degree than with SourceOne. Association Gloves

achieved a 40% endorsement rate within 10 years. Dr. Leitzinger averaged the endorsement rate of those two companies to estimate the rate SourceOne would have achieved absent defendants' alleged interference.

Defendants do not dispute the validity of a benchmark or "yardstick" methodology – unsurprisingly, because it is a generally accepted method for measuring antitrust damages. See In re Elec. Books Antitrust Litig., No. 11 MD 2293, 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) (collecting cases). They argue instead that the benchmarks Dr. Leitzinger selected are too different from SourceOne to provide a reliable model of the but-for world. Defendants point out that both companies offer different products than SourceOne: Association Gloves sells dental supplies, but has a much narrower product line than SourceOne, and DemandFlow does not sell dental supplies at all. Defendants also point out that states that endorsed Association Gloves have not actually endorsed SourceOne, suggesting that any theoretical correlation is not probative of what would have actually happened. Defendants emphasize that Dr. Leitzinger did not explain why the simple average of the endorsement rates of these two companies is appropriate, as opposed to some kind of weighted average.

Defendants have identified some important differences between Dr. Leitzinger's selected benchmark companies and SourceOne. But these differences alone do not make Dr. Leitzinger's testimony unreliable – he responded to them in his expert and rebuttal reports, explaining how he accounted for those differences in his model. Dr. Leitzinger concluded that the commonalities between Association Gloves and SourceOne – an online platform, a business model based on endorsement by state dental associations, and a customer base of cost-sensitive solo practitioners and small dentistry practices – made the former's experience relevant despite the companies' differences. Dr. Leitzinger reached a similar conclusion about DemandForce, whose business

model in the dental industry was also based on receiving endorsements from state dental associations.

The benchmarks Dr. Leitzinger selected are sufficiently comparable to permit a degree of reliable comparison, and therefore do not render his damages calculation inadmissible.[3]  See, e.g., Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) ("Generally, issues such as the choice of a [benchmark] reasonable time-frame in which to examine data are issues of the expert's credibility that ought to be decided by the jury."). Defendants will have an opportunity to cross-examine Dr. Leitzinger on both his selection of benchmark companies and his decision to take the simple average of their endorsement rates. See Allen v. Dairy Mktg. Servs., LLC, No. 5:09-CV-230, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013).  The weaknesses defendants identify are not the kind of deep-seated methodological flaws that can preclude an expert's testimony.  If defendants believe that Dr. Leitzinger has insufficiently discounted his conclusion because of dissimilarities between his benchmarks and plaintiff, they or their experts can make that point at trial.

Third, defendants argue that the information Dr. Leitzinger used to estimate how many dentist-members of state dental associations that endorsed SourceOne would actually purchase supplies from SourceOne is also unreliable.  Dr. Leitzinger concluded that one-third of such dentists would use SourceOne, based on information from a customer-segmentation analysis by Patterson and on the results of a survey conducted by SourceOne.  According to the Patterson analysis (presented on an internally distributed powerpoint presentation), approximately 35% of

---

[3] Indeed, defendants have not identified a better benchmark Dr. Leitzinger overlooked.  Whether Dr. Leitzinger's benchmarks (and his model more generally) establish damages by a preponderance of the evidence is a question for the jury.

9

Patterson's dental-supplies customers are price sensitive and place a low value on the services provided by its sales representatives.

Defendants object to Dr. Leitzinger's use of this Patterson powerpoint, noting that Patterson's President subsequently disavowed it as "developed by advertising people" who had "no experience to any degree in the dental industry." A jury could reasonably reject this characterization of the customer-segmentation analysis, given that Patterson's President forwarded the powerpoint to the company's senior management. Defendants may cross-examine Dr. Leitzinger on the applicability of the Patterson document, but his use of it does not render his damages calculation inherently unreliable.

On the other hand, the Court shares defendants' concerns about the reliability and usefulness of the 2011 SourceOne survey. The survey asked respondents to evaluate whether they would use an earlier version of SourceOne's model, which involved serving as a platform for direct manufacturer sales (without any dental association endorsements). The survey's results were based on only 187 responses, or less than 1% of the 20,000 surveys sent out by SourceOne. SourceOne refers to "undisputed evidence . . . that the survey reports statistically significant results," but cites only testimony by SourceOne's CEO and founder that he did the statistical significance determination himself, based on a "mathematical formula that I learned in statistics classes," which he could not remember at the time of deposition. Furthermore, as defendants point out, Dr. Leitzinger did not assess the survey's methodology (such as the design of the questions and whether the responders were a representative sample of the relevant population) to determine whether its results were reliable and relevant to his damages analysis.

But these concerns about the survey's reliability are not fatal, because it is not clear that Dr. Leitzinger really relied on the survey's conclusions for his analysis. Contrary to defendants'

contention, Dr. Leitzinger's report did not use the survey's results to conclude that one-third of dentists would make 100% of their purchases online through such a website. (Apparently survey responders said they would shift 36% of their total dental supply purchases to a website that consolidated the products of direct-selling manufacturers.). Dr. Leitzinger undisputedly cited the survey in his report, but his conclusion that "one third of the solo practitioner and small-practice dentists in endorsing state [dental associations] would have ended up utilizing SourceOne as their primary source for dental supplies" could just as easily be drawn exclusively from the Patterson powerpoint, which stated that 35% of Patterson customers were price-sensitive. Since the next step of Dr. Leitzinger's analysis attempts to estimate what proportion of supplies customers would purchase from SourceOne, it is unclear why the survey results were relevant to determining what percentage of dentists would purchase from SourceOne at all.

Finally, defendants argue that Dr. Leitzinger's model is not helpful to the jury because Dr. Leitzinger did not provide any way to disaggregate damages in the event that the jury finds only one defendant liable, or finds some of the alleged conduct to be lawful. Dr. Leitzinger's analysis assumed three types of underlying conduct by both defendants: (1) pressuring state dental associations, manufacturers, and individual dentists not to deal with SourceOne; (2) disparaging SourceOne to manufacturers; and (3) preventing other distributors from supplying to SourceOne.

Dr. Leitzinger's model does not attempt to disaggregate damages for each of those three types of conduct, but he was not required to for his model to be admissible. In re High Pressure Laminates Antitrust Litig., No. 00 MDL 1368, 2006 WL 931692, at *2 (S.D.N.Y. Apr. 7, 2006) (expert's failure to disaggregate damages as to each alleged act of collusion goes to weight of expert's testimony, not its admissibility). Defendants' objections on this final point are

11

premature; if the evidence submitted at trial is inadequate to support the jury's damages verdict, the Court will set it aside. See Fed. R. Civ. P. 50.

An antitrust plaintiff is required to make a "reasonable estimate" of damages, not a perfect calculation. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 124 (1969); see also Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013). A plaintiff's obligation to provide this estimate of damages is lightened (to an extent) in antitrust cases, where there is often little market information unaffected by defendants' collusion. New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 88 (2d Cir. 2000). Here, defendants' objections to Dr. Leitzinger's damages model focus almost entirely on his factual inputs and assumptions rather than his methodology. These objections go to the probative value of Dr. Leitzinger's testimony, not its admissibility, and the jury will decide how probative it is. See In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1135 (2d Cir. 1995). Cross-examination and impeachment at trial, and the contrary opinions of defendants' experts are sufficient to expose any weaknesses in Dr. Leitzinger's model. See Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001).

Defendants also seek to exclude Dr. Leitzinger's testimony about defendants' "premium pricing." Defendants argue that Dr. Leitzinger's testimony is unreliable because it is based only on the price-comparison documents prepared by SourceOne and the testimony of SourceOne's principle. Defendants argue that those price-comparison documents are unreliable and literally false, and therefore could not support Dr. Leitzinger's conclusions.

Dr. Leitzinger's testimony on defendants' "premium pricing" is admissible. First, defendants' expert Joseph D. Kenyon will apparently testify to the same (approximately) 20% price differential as Dr. Leitzinger, so it is hard to see why Dr. Leitzinger's conclusion is

objectionable. Second, Dr. Leitzinger's analysis accounted for the weaknesses in the data that defendants describe. Defendants note that some price-comparison worksheets did not include sales tax for one of the products, but, as Dr. Leitzinger described at his deposition, he removed sales tax before comparing prices in those instances. In his reply report, Dr. Leitzinger also independently compared SourceOne's prices to defendants' prices across a group of 30 top-selling products, and concluded that, across all 30 products, SourceOne's prices for solo practitioners and small-practice dentists were lower on average by 18 percent compared to Schein's and 22 percent compared to Patterson's. Dr. Leitzinger's testimony on this point is admissible.

Defendants also move to exclude Dr. Leitzinger's conclusions that defendants prevented plaintiff from achieving operational scale and that, because of defendants' conduct, many dentists paid substantially higher prices for dental supplies than they would have otherwise. Dr. Leitzinger's conclusion that "[a]s an economic matter, the conduct challenged in this case would be properly characterized as exclusionary and anticompetitive, both in its purpose and in its likely effect" is a pure legal statement; it is inadmissible. Prefacing it with the clause "as an economic matter" does not make it less so. Dr. Leitzinger may testify to, for example, the dynamics of the dental-supplies market before SourceOne's entry, how SourceOne's model was different from other distributors', or how economists might expect a firm offering lower prices to affect other firms in the same market, and similar economic concepts. But neither he nor any other expert may testify to legal conclusions, including defendants' motivations for taking certain actions or whether those actions were "[f]rom an antitrust perspective, . . . a legitimate cause of concern."

13

Although plaintiff cannot offer evidence of damages that is speculative, that rule has to be applied in a situation where exclusion from a market requires economic estimation of hypothetical presence. If plaintiff succeeds in persuading the jury as to liability, there has to be some model it can use to determine damages. Defendants have not suggested any alternative to Dr. Leitzinger's approach, and the Court does not readily see one either. In this situation, Dr. Leitzinger's model appears to be the least speculative one that plaintiff could use.

Defendants' motion to preclude Dr. Leitzinger's testimony is therefore denied as to his damages model and his opinion on premium pricing, but granted as to any legal opinion, including his opinions that defendants' conduct was anticompetitive in its purpose and effect.

### B. Professor Marvin Lieberman

Prof. Lieberman's expert report discusses the concept of "disruptive entry" and the related theories of "first mover" advantages. In his report, Prof. Lieberman concludes that SourceOne's entry into the dental-supplies market fits the model of disruptive entry, and that its entry could potentially have caused incumbent dental-supply distributors to lose substantial market share and have resulted in SourceOne receiving "first mover" advantages, such as "durably high market share."

Defendants move to exclude Prof. Lieberman's testimony, arguing that it will not help the jury understand the evidence. Defendants' primary objection is that Professor Lieberman did not independently review the record, but rather reached his conclusions by applying his expertise to 13 factual assumptions provided to him by plaintiff's counsel. Defendants do not cite any cases that support their theory that such assumptions are categorically unacceptable.

Expert testimony is not admissible if it merely serves as a conduit to construct a factual narrative, Highland Capital Management, L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y.

2005), or if it simply parrots a witness's statements without supporting a larger point, Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 46-48 (S.D.N.Y. 2016), because such testimony would not aid the fact-finder.

But Prof. Lieberman's report does not fall into either of these categories. His report describes the concept of disruptive market entry and different iterations of it, explains why disruptive market entrants have certain advantages over market incumbents, and then explains why – based on the factual assumptions he was provided – SourceOne was a potentially disruptive market entrant. Prof. Lieberman listed the factual assumptions he relied on in reaching his conclusions, providing defendants the opportunity to cross-examine him on how each supports his conclusion. See R.F.M.A.S., Inc. v. Mimi So, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010). Furthermore, defendants do not point to any flaws in Prof. Lieberman's methodology.

Of course, Prof. Lieberman cannot testify to the validity of the 13 assumptions counsel provided to him, but he can testify about theories of disruptive market entry and about the conclusions he drew by applying the provided assumptions to those theories. Defendants' motion to exclude Prof. Lieberman's testimony is denied.

### C. *Professor David J. Teece*

Defendants move the Court to exclude Prof. Teece's testimony, arguing that his opinion about the "general importance of innovation" and about disruptive business models is not tailored to the dental-supplies industry. Defendants also argue that Prof. Teece's testimony should be excluded because he did not conduct a pricing study to support his conclusion that SourceOne's customers received better prices. Defendants' objections to Prof. Teece's testimony are similar to their objections to Prof. Lieberman's opinions, and their motion is

denied as to Prof. Teece for similar reasons.  Their challenges are to his conclusions, rather than to his methodology or principles, and therefore go to his testimony's weight rather than to its admissibility.

First, defendants contend that Prof. Teece did not independently analyze the record evidence.  Prof. Teece's report states that he reviewed 15 deposition transcripts and 60 normal-course-of-business documents and interviewed SourceOne's founder and CEO.  An expert may properly consider deposition testimony to marshal facts to which the expert then applies his expertise.  See, e.g., U.S. Info. Sys., 313 F. Supp. 2d at 236-37.

Second, defendants argue that Prof. Teece's report is simply a regurgitation of the facts.  But the report describes – for more than 50 pages – the dental-supplies market, economic theories of innovation and competition, e-commerce business-to-business company models, and the concept of first-mover advantages.  Prof. Teece then applies his review of the record to those theories, and concludes, among other things, that

> [p]rior to SourceOne's entry into the dental supplies marketplace, the U.S. dental supplies distribution market was dominated by three large dental supplies distributors that relied on a traditional distribution model.  This industry exhibited price discrimination, lacked price transparency, and relied on a more labor intensive sales representative based business model . . . . Prior to the defendants' contested actions, SourceOne was well positioned to benefit from positive network effects, switching costs generated by customer and supplier adoption of its platform, and pre-emptively securing valuable marketing and co-branding partners.  These factors could have been expected to provide an early market entrant like SourceOne with a first mover advantage over other potential new entrants.

As plaintiff points out, these conclusions by Prof. Teece respond to the theory of defendants' expert, Prof. Elzinga, who posited that defendants acted to prevent SourceOne from free riding on their investments.  Prof. Teece's conclusions also provide a theoretical basis for why SourceOne was a competitive threat to defendants.

Finally, defendants argue that Prof. Teece's conclusions that SourceOne had a "disruptive business model" and was a "first mover" are not supported by the facts of the case. Defendants argue that Prof. Teece overlooked facts and information that contradict or do not support his opinions in reaching those conclusions. Defendants' objections are exactly the type that can be effectively addressed through cross-examination. See, e.g., U.S. Info. Sys., 313 F. Supp. 2d at 235 ("While an expert should address evidence that contradicts his conclusions, [i]t is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." (alterations in original) (internal quotation marks and citation omitted)).

Defendants have failed to convince the Court that any flaws in Prof. Teece's analysis cannot be adequately explored through cross-examination. See In re Vitamin C Antitrust Litig., No. 05-CV-0453, 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. Prof. Teece's testimony is admissible under Rule 702.

## CONCLUSION

The Court grants in part [154] plaintiff's motion to exclude certain expert testimony by Prof. Elzinga and grants in part and denies in part [156] defendants' motion to exclude the expert testimony of Dr. Leitzinger and Profs. Lieberman and Teece.

**SO ORDERED.**

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       May 10, 2018