UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
SOURCEONE DENTAL, INC.,                                      :
                                                             :        **MEMORANDUM**
                                        Plaintiff,           :        **DECISION & ORDER**
                                                             :
                        - against -                          :        15-cv-5440 (BMC)
                                                             :
PATTERSON COMPANIES, INC. and BENCO                          :
DENTAL SUPPLY COMPANY,                                       :
                                                             :
                                        Defendants.          :
------------------------------------------------------------ X

**COGAN**, District Judge.

The parties have cross-moved for summary judgment on defendants' Lanham Act and

state common-law counterclaims.  There are no genuine disputes of material fact precluding

summary judgment; the Court grants summary judgment in favor of plaintiff SourceOne.

## BACKGROUND

The following facts are undisputed, except where specified.  SourceOne operates

websites that sell sale dental supplies and equipment.  Defendants Patterson and Benco distribute

dental products, supplies, and equipment.

SourceOne entered the dental-supplies industry in 2012 by launching its website,

SourceOneDental.com, where it sold manufacturer-direct products directly to dentists.  In 2013,

SourceOne also began seeking endorsements by state dental associations (state-based trade

organizations for dentists).  SourceOne was eventually endorsed by the dental associations in

Texas, Arizona, Nevada, Florida, and Georgia.

While it was seeking the endorsement of the Texas Dental Association in 2013,

SourceOne submitted documents about its business and gave a presentation to the TDA and its

wholly-owned, for-profit subsidiary, TD Financial Services.  In these documents and

presentation, SourceOne made statements about the savings it could offer dentists, including:

- "The average dental practice in Texas spends approx. $54,000 per year on consumable dental supplies. We can save these practices over 40% on this significant part of their annual budget";

- "Average Savings = 35%"; "Savings over Henry Schein: 41%"; "Savings over Patterson: 40%"; "Savings over Darby: 32%"; "Savings over Benco: 42%";

- "Avg. customer that switches to [SourceOne Dental] saves over 30% on supplies";

- "Our average savings amount on the 28,000 products on our site is over 40%."

These statements made to the TDA (and later to the Arizona Dental Association and in

advertisements or other materials disseminated by the TDA and AZDA) were based on price

comparisons SourceOne originally created for current and potential customers.  In these

analyses, SourceOne compared the prices of its products on purchase invoices submitted by

current or potential customers with the prices of the same or similar products offered by

defendants or other distributors.  Although SourceOne used these price comparisons to support

its claims of 35%+ savings (either in general or on average) on the prices of defendants and other

distributors, defendants' expert concluded (based on the price comparisons provided) that the

average savings was actually an average of 19.5% to 22.2%.  SourceOne's expert calculated a

similar average savings of approximately 19%.

In its application for endorsement by the TDA submitted in May 2013, SourceOne also

stated that Dinesh Sakhrani was SourceOne's "VP [of] Product Sourcing and Supplier

Relations."  Although SourceOne claims that its CEO, Ahmed Shams, believed he had an

agreement with Sakhrani to assume that position as of May 2013, Sakhrani never became an

employee or officer of SourceOne.

The TDA endorsed SourceOne in September 2013. In October 2013, SourceOne launched TDA Perks Supplies, an online platform for TDA members to purchase dental supplies. The site was owned and operated by SourceOne but endorsed and promoted by the TDA. The vendors who supplied products for TDA Perks Supplies were required (as a condition of gaining access to the TDA customer base) to discount their prices at least 4.3% below the prices on SourceOne's publicly available website, which SourceOne claims were already at least 10% below defendants' prices for comparable goods. Defendants dispute that all of SourceOne's prices were 10%+ lower than theirs and dispute that SourceOne always offered comparable products.

After the TDA endorsed SourceOne, the TDA, with SourceOne's input or approval, sent e-mails and promotional materials about TDA Perks Supplies to TDA members. Those materials included the following statements:

- "On October 1, 2013, TDA Perks launched a new program that leverages the group buying power of more than 7,400 TDA members, who collectively have an annual dental supplies spend of more than $370 million";

- "TDAPerksSupplies.com enables members to save an average of more than 35 percent on dental supplies";

- "SAVE more than 35% on DENTAL SUPPLIES . . . TDAPerksSupplies.com leverages the group buying power of more than 7,400 members . . . . Perks Supplies is projected to save TDA members an average of more than 35% on dental supplies";

- "You've probably heard of TDA Perks Supplies by now, and that it's projected to save TDA members more than 35% on dental supplies";

- "By leveraging the group buying power of more than 7,400 TDA members, a new TDA Perks program is projected to save TDA members an average of more than 35% on dental supplies."

SourceOne provided the figures in these statements. Around this time, the "About Us" section of the TDA Perks Supplies website (available only to TDA members) stated: "Save an average of 31.8% on your monthly supply bill by using TDA Perks Supplies."

SourceOne then pursued and obtained an endorsement by the Arizona Dental Association. As part of its proposal to the AZDA board, SourceOne made the following statements:

- "Avg. Customer that switches to [SourceOne Dental] saves over 30% on supplies";

- "Average Savings: 35% . . . Savings over Patterson: 39% . . . Savings over Benco: 42%."

After the AZDA endorsed SourceOne, it created a website for its members similar to the TDA Perks Supplies website. Like the TDA Perks Supplies website, this site was owned and operated by SourceOne but endorsed and promoted by the AZDA. After the AZDA endorsed SourceOne, it sent, with SourceOne's input or approval, e-mails and other promotional materials to its members that included statements similar to those in the TDA's materials. Those statements included:

- "Leverage the buying power of over 2,300 AzDA members and save over 32% on dental supplies";

- "What has AzDA done for you lately? How about 33% off dental supplies?"

SourceOne also pursued an endorsement from the Washington State Dental Association. In July 2014, Terry Xelowski, manager of business development of the AZDA, sent Anthony Trotter, Assistant Executive Director of the Washington State Dental Association, a SourceOne PowerPoint presentation which contained:

- The statement that the "Avg. Customer that switches to [SourceOne Dental] saves over 30% on supplies";

- A slide titled "AZDA Member Benefit," stating "Over 35% ($20,000 annual) Savings on Dental Supplies";

- A slide reproducing the TDA advertisement, stating "TDAPerksSupplies.com is projected to save TDA members an average of more than 35% on dental supplies";

- A slide titled "SourceOne Challenge," stating "Average Savings: 35%," "Savings over Patterson: 39%," and "Savings over Benco: 42%."

Donovan Osio, general manager of TDA-subsidiary TD Financial Services, also contacted state dental associations on SourceOne's behalf. In the fall of 2013, he contacted Elise Rupinski, Director of Marketing and Programs for the Virginia Dental Association, to tell her about the TDA's partnership with SourceOne.[1] In November 2013, Osio sent Rupinski a copy of SourceOne's May 2013 application for endorsement by the TDA, which included the statement about Sakhrani being "VP [of] Product Sourcing and Supplier Relations." Osio also gave Rupinski access to the TDA Perks Supplies password-protected site. Rupinski later reported to the Virginia Dental Association board (discussing SourceOne) that "[o]n average, their customers save 30%."

SourceOne also pursued, and eventually received, an endorsement from the Florida Dental Association. As part of its efforts, SourceOne emailed Scott Ruthstrom, the Chief Operating Officer of FDA Services, Inc., the Florida Dental Association's independent insurance agency, in February 2015 and attached a promotional PowerPoint. That PowerPoint included the following:

- The statement that the "Avg. customer that switches to [SourceOne Dental] saves over 30% on supplies";

- A slide labeled "Member Benefit," which included the statement that "Over 33% ($16,000 annual) Savings on Dental Supplies."

_____

[1] Defendants' brief states that Osio contacted Rupinski in the fall of 2014, but the underlying documents they cite state that it was the fall of 2013.

In their email exchange about SourceOne pursuing an endorsement by the Florida Dental Association, Ruthstrom asked Shams, "[w]hat can you provide me about you[r] company? Employees, financials, etc." Shams replied (among other things): "Support: 14 Full time" and "10 Part time." When asked at a deposition why he posed this question to Shams, Ruthstrom replied that he wanted "[t]o make sure that they had the infrastructure in place to be able to take orders [and] deliver products as promised" because he "didn't want [the Florida Dental Association] members to suffer from a customer service standpoint." Ruthstrom reiterated that he "wanted to make sure that [Shams] was actually in business and had employees and could deliver on a customer service standard that we would expect for our members."

SourceOne had six employees as of October 2013, three employees as of the spring of 2014 and added two more employees by February of 2017.

## DISCUSSION

A court will grant summary judgment where "there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." 10 Ellicott Square Court Corp. v. Mtn. Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (internal quotation mark and citation omitted). Accordingly, after the moving party has shown that there is no genuine issue as to any material fact, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

### I.     Lanham Act Claims

Defendants' federal counterclaims are based on the Lanham Act, 15 U.S.C. § 1125(a), which creates a cause of action for false descriptions of goods or services. To prevail on their

Lanham Act claims, defendants must show that the challenged statements were (1) false, (2) made in connection with commercial advertising or promotion, (3) material (that is, likely to influence purchasing decisions), (4) placed in interstate commerce;[2] and (5) that they were injured by the false statement. <u>S.C. Johnson & Son, Inc. v. Clorox Co.</u>, 241 F.3d 232, 238 (2d Cir. 2001). As the parties bringing the Lanham Act claims, defendants have the burden of proving each of these elements at trial. <u>See</u> <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997).

To establish falsity, defendants may demonstrate either "that the challenged advertisement is literally false, *i.e.*, false on its face," or that the advertisement, "while not literally false, is nevertheless likely to mislead or confuse consumers." <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 (2d Cir. 2007). Defendants' Lanham Act claims are all based on the former, literal falsity.

A statement is literally false where the "statement, on its face, conflicts with reality," <u>id.</u> at 153, or where "the words or images, considered in context, necessarily imply a false message," <u>id.</u> at 158. An ambiguous statement – one "susceptible to more than one reasonable interpretation" – cannot be literally false. <u>Id.</u> Unlike a claim that an advertisement is likely to mislead or confuse customers, the party bringing a claim based on literal falsity need not demonstrate that the advertisement actually affected customers. <u>Id.</u> at 153.

The touchstone of the second element, commercial advertising or promotion, is "that the contested representations are part of an organized campaign to penetrate the relevant market." <u>See</u> <u>Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.</u>, 314 F.3d 48, 57 (2d Cir. 2002). To qualify as advertising or promotion, a statement must be (1) commercial speech; (2) made for the

---

[2] The parties do not dispute that these statements were made in interstate commerce.

purpose of influencing consumers to buy the party's goods or services; which is (3) disseminated sufficiently to the relevant purchasing public.  Id. at 56-58.  "[R]epresentations less formal than those made as part of a classic advertising campaign may suffice," but "isolated disparaging statements do not."  Id.

In addition to falsity and commercial advertising or promotion, defendants must show that the false representation "involved an inherent or material quality of the product" – that is, a claimant must show that the false statement was material.  Time Warner, 497 F.3d at 153 n.3. The Second Circuit has defined materiality as "likely to influence purchasing decisions."  Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 63 (2d Cir. 2016) (quoting Nat'l Basketball Ass'n, 105 F.3d at 855).  The relevant "consumers" are the people or groups of people to whom the advertisement was addressed.  See Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir. 1992).

As to the fifth element, damages, a false-advertising claimant who seeks a permanent injunction need not show actual damages (such as diverted sales) but can instead show likelihood of irreparable harm from the false statements.  See Time Warner, 497 F.3d at 161; Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 461 (S.D.N.Y. 2012).  That requires "a reasonable basis for believing that the false advertising will likely cause it injury," which means a "logical causal connection between the alleged false advertising and its own sales position."  Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980).  If the parties are competitors and the false advertising is comparative in nature, the court can presume this injury.  See Time Warner, 497 F.3d at 161 (reaching this conclusion in the context of a motion for a preliminary injunction).

Defendants' counterclaims are based on three sets of statements made by SourceOne or its agents: (1) statements made to state dental associations or dentists about how much money their members could save through SourceOne; (2) statements made to dentists about how SourceOne's model leverages the buying power of state dental association members; and (3) statements made to state dental associations about SourceOne's personnel. The first category – statements about how much money customers could save – further breaks down into statements about savings of or exceeding a certain percentage (*e.g.*, "Save more than 35% on dental supplies") and statements about average savings (*e.g.*, "Save an average of 31.8% on your monthly supply bill").

Defendants argue that all of these statements are literally false, commercial advertising or promotion, and material, and that, because SourceOne's advertisements targeted defendants specifically, defendants are entitled to the presumption of injury.

Because there are no genuine disputes of material fact and the Court concludes that some of the claims are ambiguous and the others are literally false but not material (and, in the case of one of the personnel claims, are neither material nor "commercial advertising or promotion"), the Court grants summary judgment to SourceOne on all of the defendants' Lanham Act claims.

### A. Statements about Savings

The first set of statements defendants allege are literally false are SourceOne's statements to dentists and to state dental associations about saving a certain percentage or saving more than a certain percentage. Some examples include: "Over 33% ($16,000 annual) Savings on Dental Supplies"; "Save more than 35% on dental supplies"; "Savings over Patterson: 40% . . . Savings over Benco: 42%." Defendants argue that these claims are literally false because they either explicitly state or necessarily imply that customers will save the stated amount (or over the stated

amount), while the analysis of both parties' experts shows that relatively few customers achieved that level of savings. More precisely, based on the price comparisons, SourceOne's member customers saved an average of approximately 19%, and, according to SourceOne's expert, only 10% of customers saved 35% or more (defendants' expert concluded that fewer than 6% of customers saved that amount).

Whether these statements are literally false is a close call. Defendants' interpretation of these claims – that customers *would* save a certain percentage on dental supplies – is a reasonable interpretation. SourceOne argues that the statements could also mean dentists "*could* save more than 35% on dental supplies." SourceOne's interpretation certainly describes what happened – a hypothetical customer *could* save 35% or more – but 90 to 94 out of 100 customers did not. A reasonable purchaser reading the statement "save more than 35% on dental supplies" would not read it to mean that the purchaser may, but is highly unlikely to, save 35% or more. The Court therefore concludes that these statements are literally false.

Defendants also challenge certain statements by SourceOne advertising an "average" savings of a certain percentage or more and statements about customers' projected savings. These claims are also literally false. The statements such as "[the] Avg. Customer that switches to [SourceOne Dental] saves over 30% on supplies" and "Perks Supplies is projected to save TDA members an average of more than 35% on dental supplies" unambiguously imply that although some customers may save more than or less than 30-35%, the average customer will save that amount.

Defendants' expert has demonstrated – and plaintiffs' expert has confirmed – that this is false. Defendants' expert Dr. Kenyon calculated an average savings of approximately 19%; plaintiff's expert Dr. Leitzinger calculated the same. The fact that *some* customers saved an

average of 30-35% does not support SourceOne's statements that the *average* customer would save that much. Contrary to SourceOne's arguments, its belief that its customers would save that amount in the future does not render the statement literally true or ambiguous. It is irrelevant that the advertisements do not reveal how SourceOne calculated these "averages"– the advertisement claimed an average amount without specifying whether particular products were included or excluded, and a reasonable consumer would have no basis to infer that the stated "average" referred only to certain products.

The same reasoning applies to the statements SourceOne made (directly or through its agents) to TDA members through direct mailing and in the TDA Journal that the "new TDA Perks program is projected to save TDA members an average of more than 35% on dental supplies." Both parties' experts concluded that the data underlying those projections showed an average savings of closer to 19% than 35%. The projections SourceOne cites do not support its statements.

SourceOne's related statement that TDA Perks is "projected to save TDA members more than 35% on dental supplies" (similar to the one previously discussed, but without the reference to average savings) is a closer call, but the Court ultimately concludes that it too is literally false for the same reason that SourceOne's other claims about saving a certain amount or more than a certain amount are literally false. Although the word "projected" here could mean "estimated," the full statement "projected to save TDA members more than 35%" also implies that, based on the estimate, some or the average or most TDA members will save 35%. The statement does not explicitly say so, but it necessarily implies that more than a negligible number of members will save 35% or more (which both sides' experts confirmed is not the case). The claim that TDA

Perks is "projected to save TDA members more than 35% on dental supplies" is therefore literally false by necessary implication.

However, falsity is only the first element of a Lanham Act claim. Defendants must also show, among other things, that these literally false statements were material – that is, "likely to influence purchasing decisions." Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 70 n.11 (2d Cir. 2016).

Here, defendants have not demonstrated that these claims were material for either dentists or state dental associations. Although defendants need not produce evidence that any consumers – either individual dentists who were consumers of SourceOne's products or state dental associations who entered into contracts with SourceOne – were actually influenced by SourceOne's literally false statements, they must still produce some evidence that customers' purchasing decisions were *likely* influenced by those statements.[3]

As to individual dentists, defendants have produced no evidence that a SourceOne customer's average savings of 19-20% as compared to SourceOne's advertised savings of 35% would be likely to influence dentist consumers' purchasing decisions. Defendants instead rely on the "mere fact that dentists purchased dental supplies from the TDA Perks Supplies and AZDA Perks Supplies websites shortly after their launches" to demonstrate materiality. The Second Circuit has specifically rejected this kind of generalized evidence that a company's sales increased as evidence of materiality. See Apotex, 823 F.3d at 68.

---

[3] At one point in their opposition brief, defendants appear to conflate falsity with materiality. "Once literal falsity is proved, there is no requirement of extrinsic evidence showing consumer deception. But [defendants are] not thereby relieved of the burden of showing materiality, which requires that the allegedly false or misleading representation involved an inherent or material quality of the product [] – *i.e.*, that the representation was likely to influence purchasing decisions." Apotex, 823 F.3d at 68 (internal quotation marks and citation omitted).

Defendants also argue – somewhat confusingly – that their employees' testimony that a discount of 5% to 10% could induce dentists to switch suppliers supports their argument that SourceOne's false statements were material. This argument does not make sense. The point is to assess whether consumers would have made different purchasing decisions but for the false advertisement. If defendants agree that a consumer would be induced to switch to a supplier which offered goods for 10% less, then SourceOne's customers' average savings of 9% more than that (in lieu of the promised 20%+ more) is just gravy. Defendants have failed to produce evidence that these statements of average savings as made to individual dentists were material.

Nor can defendants show that the statements about savings that SourceOne made to state dental associations were material. Defendants point to the depositions of state dental association officials in which they said that SourceOne's claims about saving their members money on dental supplies were important to their association's decision whether to endorse SourceOne. In the cited portions of those nine depositions, the dental association officials generally said that discounted pricing was part of what attracted them to SourceOne or that lower prices for dental supplies would provide a benefit for their members. See, e.g., Deposition of Donavan Osio of the Texas Dental Association ("[a]ny kind of benefit to a member that would reduce that [dental supplies] expense would be good for not only the member, it would be very good for the patient" and "it would be better for our members to get lower pricing."); Deposition of Ward Blackwell of the Louisiana Dental Association ("The benefit to members in terms of the discounted pricing" was a consideration discussed by the LDA board); Deposition of Elise Rupinski of the Virginia Dental Association (agreeing that TDA members experiencing savings was a benefit to them and agree that "it could be [a benefit]" if she could have delivered the same savings in Virginia").

Although these statements by dental association officials support the general (and unsurprising) proposition that lower prices were attractive or important to dental associations, none of them show that SourceOne's specific percentage-savings claims (rather than significant, if lesser savings) were material to those dental associations' decisions to endorse SourceOne. Defendants have produced no evidence that an average savings of 19% as compared to the advertised savings of 35% would be likely to influence purchasing decisions by either dentist consumers or prospective dental association partners.

In sum, it is not sufficient for defendants to presume materiality simply on the basis that purchasers generally like to spend less instead of more. This is because price sensitivity turns on the marginal price difference and the nature of the product at issue. Purchasers who see a product that they have purchased advertised for 33% less, but who have received excellent customer service from their current seller, might be well inclined to take an "if it ain't broke, don't fix it," approach. On the other hand, the same or other customers might also decide that it would be worth switching to a new distributor for even a 10-15% savings.

Perhaps there is some level where materiality can be found as a matter of law – *e.g.*, where customers were promised 90% savings over a competing product. But in the absence of that kind of obvious disparity, defendants were required to introduce some form of evidence – usually, although not necessarily, survey evidence or expert testimony based on it – to raise a factual question as to whether the differential between advertised and actual prices was material in this market. Defendants did not, and I cannot let a jury speculate on materiality based on nothing more than the size of the differential here. Plaintiff's motion for summary judgment is granted and defendants' motion is denied as to the statements about savings.

### B. *Claims about Leveraging the Buying Power of State Dental Associations*

Defendants argue that SourceOne's "leveraging" statements made to prospective dentist customers are literally false. These claims said that customers could "[l]everage the buying power of over 2,300 AzDA members and save over 32% on dental supplies" and that "[b]y leveraging the group buying power of more than 7,400 members, a new TDA Perks program is projected to save TDA members an average of more than 35% on dental supplies."

Defendants contend that the leveraging statements are false because SourceOne did not have contractually specified "volume-based pricing agreements" with its suppliers and because there is no evidence that SourceOne dropped prices as sales volume increased. They also argue that the leveraging claims are false because each statement in context states or necessarily implies that the 35% savings was derived purely from leveraging the buying power of the association, when in fact state dental association members only saved 5% more than members of the general public using SourceOne's website.

The leveraging claims are ambiguous. There is no dispute that SourceOne's prices on its websites branded for state dental associations are lower (approximately 5% lower) than the prices it charges for the same products on its publicly available website. SourceOne argues that its suppliers agreed to provide this additional discount for members of state dental associations (the Texas Dental Association in particular) based on the suppliers' expectation that their sales would increase through SourceOne's affiliation with state dental associations. To support this, SourceOne cites emails with SourceOne suppliers Arnold Dental and IQ Dental in which SourceOne asked supplier to commit to an additional 5% discount of the prices on SourceOne's website and touted potential increased volume from sales to members of state dental associations.

Even assuming defendants are correct about the lack of volume-based supply agreements (a fact SourceOne disputes), reasonable customers could interpret SourceOne's statement to mean that the prices available to members of dental associations that had endorsed SourceOne were lower than the prices than they would otherwise have paid. The prices for members of state dental associations were therefore "leveraged" based on the predicted increased sales volume of association members.

Furthermore, although defendants' cause-and-effect interpretation of the entire statement is one reasonable interpretation, it is not the only one. Reasonable customers could interpret these two statements to be asserting separate facts: first, that the prices available to members of dental associations that had endorsed SourceOne were lower than the prices than they would otherwise have paid, and second, that those association members would save an average of 35%.

Because SourceOne's leveraging statements are ambiguous, they cannot be literally false. Time Warner, 497 F.3d at 153.[4] Plaintiff's motion for summary judgment is granted as to this claim and defendants' motion is denied.

### C. Personnel Claims

Defendants have also brought Lanham Act claims based on two statements SourceOne made to state dental associations about their personnel: (1) that Dinesh Sakhrani is "VP [of] Product Sourcing and Supplier Relations" of SourceOne; and (2) that SourceOne has 14 full-time support personnel and 10 part-time support personnel. SourceOne made the former statement to

---

[4] Defendants have brought claims alleging that SourceOne's statements were literally false, not that they were "likely to mislead or confuse consumers," the latter of which requires extrinsic evidence of customer deception or confusion, usually demonstrated by consumer surveys. Statements which are ambiguous, and therefore not materially false, may still have a "tendency to mislead, confuse, or deceive" consumers, but defendants did not bring claims that these statements were misleading, only that they are literally false.

the Louisiana and Virginia Dental Associations and the latter to Scott Ruthstrom, CEO of FDA Services (the Florida Dental Association's subsidiary).

The first statement – that Dinesh Sakhrani is Vice President of Product Sourcing and Supplier Relations of SourceOne – is literally false. SourceOne admits that although SourceOne's founder and CEO thought that Sakhrani was going to be a Vice President of SourceOne as of May 2013, Sakhrani never assumed that title. The statement in SourceOne's endorsement application was therefore literally false when made to the TDA in May 2013 and when the TDA shared it with the Florida and Virginia Dental Associations in November 2013. However, defendants have not produced any evidence or even argued that this statement about Sakhrani was material, either in their own motion or in opposition to SourceOne's motion (in which SourceOne raised this point), so their Lanham Act claim fails as to this statement.

As to the second statement, SourceOne does not respond to defendants' allegation about 10 part-time employees and therefore does not contest that the statement is literally false. However, SourceOne has established a genuine dispute of material fact as to the statement about the number of full-time personnel. SourceOne CEO Sham's email to Ruthstrom lists the following in response to Ruthstrom's request for information about SourceOne and its employees: "Support: 14 Full time, 10 Part Time." SourceOne points to Sham's deposition testimony, in which he testified that he had contractor sales representatives who were not SourceOne employees but who worked full-time for him.

Even though there is a genuine dispute of material fact as to the literal falsity of the claims about 14 full-time personnel, defendants' claim as to both portions of this personnel statement fail because the statements are not "commercial advertising or promotion" within the

meaning of the Lanham Act and because defendants have not produced evidence that supports a finding that the statements were material.

Although the email statement about SourceOne was commercial speech made for the purpose of influencing a customer to buy SourceOne's service, the statement was not disseminated sufficiently to the purchasing public to qualify as advertising or promotion. These statements about personnel were made in an email to a single representative (Ruthstrom) of a single state dental association (the Florida Dental Association). State dental associations are one set of SourceOne's customers, but making a statement to one of fifty potential customers does not qualify as widespread dissemination. See Fashion Boutique, 314 F.3d at 58 (citing cases finding insufficient evidence of commercial advertising or promotion where statements made to 2 out of 150 potential customers or 27 out of thousands of customers, but sufficient where statements made to 11 out of 74 potential customers).

In stating the standard for commercial advertising and promotion in Fashion Boutique, the Second Circuit noted that "businesses harmed by isolated disparaging statements do not have redress under the Lanham Act." The Second Circuit cited Garland Co. v. Ecology Roof Systems Corp., 895 F. Supp. 274, 279 (D. Kan. 1995), in which that district court rejected a Lanham Act claim based on a single letter sent from the defendant construction company's president to one potential contractor customer comparing the quality of materials used by defendant and plaintiff, a competing construction company. This case presents an analogous situation – SourceOne made a single, isolated statement to Ruthstrom about the number of SourceOne's employees.

Furthermore, even if the statement were "commercial advertising or promotion" within the meaning of the Lanham Act, defendants have not shown that it was material. Defendants point to Ruthstrom's testimony that he asked about how many employees SourceOne had

because he wanted "[t]o make sure that they had the infrastructure in place to be able to take orders [and] deliver products as promised" because he "didn't want [Florida Dental Association] members to suffer from a customer service standpoint." Ruthstrom later reiterated that he asked about SourceOne's employees because he "wanted to make sure that [Shams] was actually in business and had employees and could deliver on a customer service standard that we would expect for our members."

As SourceOne points out, none of the materials Ruthstrom provided to the FDA Services Board for its consideration in deciding whether to endorse SourceOne mentioned the number of SourceOne's employees (although they did mention other things, such as the royalty rate the Florida Dental Association would receive on gross receipts from the platform, SourceOne's projected savings for dentists, and which other dental associations had endorsed SourceOne). SourceOne's statement about the number of its employees was therefore not likely to influence the Florida Dental Association's decision in endorsing SourceOne.

To sum up: the Court concludes that SourceOne's statements about savings are literally false but not material, that its leveraging claims are ambiguous and therefore not actionable, and that its personnel claims are either literally false and not material or literally false and neither material nor "commercial advertising or promotion" under the Lanham Act. The Court therefore grants summary judgment in favor of SourceOne on defendants' Lanham Act counterclaims.

## II.    State Common-Law Claims

A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which the court sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In determining which state's law to apply, New York courts first determine whether there is a conflict between the laws of the jurisdictions involved. In re Allstate Ins. Co. (Stolarz),

81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993). There is a conflict if "'the applicable law from each jurisdiction provides different substantive rules' and those differences are 'relevant to the issue at hand[ ] and . . . have a significant *possible* effect on the outcome of the trial.'" First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd., 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014) (alteration in original) (quoting Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 331 (2d Cir. 2005)). If there is no actual conflict, federal courts in New York apply New York law. See Wall v. CSX Transp., Inc., 471 F.3d 410, 422 (2d Cir. 2006).

### A. Common-Law Unfair Competition Claim

Defendants asserted a counterclaim for unfair competition based on false advertising. None of the parties' briefs analyze potential conflicts of laws. The parties agree that Texas, Arizona, and Florida state law all prohibit the same type of unfair competition as the Lanham Act and that those states' laws have materially similar elements. See eMove Inc. v. SMD Software Inc., No. CV-10-02052-PHX-JRG, 2012 WL 1379063, at *7 (D. Ariz. Apr. 20, 2012); Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007); Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd., 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000). This Court has not found any cases to the contrary. A claim for unfair competition under New York common law includes the same elements as the Lanham Act, but also includes an additional element of bad faith. See Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 383 (2d Cir. 2000).

The Court has already concluded that the challenged statements are either ambiguous or not material, so the additional element under New York law is not material to these claims. Therefore, there is no difference in the elements of common-law unfair competition under the laws of these four states, New York law applies, and SourceOne is entitled to summary judgment

on the common-law unfair competition claim for the same reasons it is entitled to summary judgment on the federal claims.

### B.  Common-Law Claim for Tortious Interference with Prospective Economic Advantage[5]

To prevail on such a claim under New York law, a plaintiff must show that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).  Improper or wrongful means includes an excessive degree of economic pressure, physical violence, or fraud, but does not include mere acts of persuasion.  Smith v. Meridian Techs., Inc., 86 A.D.3d 557, 560, 927 N.Y.S.2d 141, 144 (2d Dep't 2011).  For a tortious inference claim in which the defendant's interference is intended, at least in part, to advance its own competing interest, New York law requires the party seeking relief to prove that the tortfeasor interfered with the prospective relationship using criminal or fraudulent means.  See S.O. Textiles Co. v. A & E Prod. Grp., 18 F. Supp. 2d 232, 240 (E.D.N.Y. 1998).

The only state whose law the parties propose to apply to this claim Texas, and its comparable cause of action, tortious interference with prospective business relations, has materially similar elements to the common-law claim under New York law.  See Coinmach Corp. v. Aspenwood Apartment Corp., 56 Tex. Sup. Ct. J. 77, 417 S.W.3d 909, 923 (2013).

---

[5] Defendants' counterclaims allege that SourceOne tortiously interfered with their prospective contracts with future customers.  They refer to this claim as one for "tortious interference with prospective business relationships" (Patterson) and "tortious interference with business relationships" (Benco), but those terms are interchangeable with and raise the same claim as one for "tortious interference with prospective economic advantage" under New York law.  See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015).

The Court need not examine all of the elements of the respective claims because defendants' allegation of an independent tort – false advertising – fails for the same reasons that their Lanham Act and unfair competition claims fail.

## CONCLUSION

Defendants' motion for summary judgment on their counterclaims [160] is DENIED. Plaintiff's motion for summary judgment on those counterclaims [163] is GRANTED.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      June 18, 2018